MH
530

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name  Mauzey         Ronald        K.            FEB    7 2008
          (Last)         (First)       (Initial)

3                                                   RICHARD W. WIEKING
4  Prisoner Number ____ C-61868                     CLERK, U.S. DISTRICT COURT
                                                    NORTHERN DISTRICT OF CALIFORNIA
   Institutional Address  P. O. Box 705, FD-16L
5

6  ════════════════════════════════════════════════

7             **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA** E-filing

8  Ronald Keith Mauzey                    )
   (Enter the full name of plaintiff in this action.)   )  CV  08    0847
9                                         )
                   vs.                    )  Case No. _____
10                                        )  (To be provided by the clerk of court)
   Ben Curry, Warden                      )
11 _____  )  **PETITION FOR A WRIT**   MHP
                                          )  **OF HABEAS CORPUS**
12 _____  )
                                          )                          (PR)
13 _____  )
                                          )
14 (Enter the full name of respondent(s) or jailor in this action)   )
                                          )
15                                        )

16  ════════════════════════════════════════════════
                Read Comments Carefully Before Filling In

17  Underlined: When and Where to File

18         You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23         If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1    <u>Who to Name as Respondent</u>

2         You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14           Superior Court of California, Riverside, California

15                Court                   Location

16           (b)    Case number, if known 4 CRIM 14860 (Sup. Ct. No. 18817NF)

17           (c)    Date and terms of sentence 02-08-93. 25 years-to-life

18           (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                parole or probation, etc.)       Yes X     No _____

20                Where?

21                Name of Institution: Correctional Training Facility

22                Address: P. O. Box 705, Soledad, CA.

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   Conspiracy to commiet first degree murder

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS    - 2 -

3. Did you have any of the following?

    Arraignment:                           Yes __X__    No _____

    Preliminary Hearing:               Yes __X__    No _____

    Motion to Suppress:               Yes _____    No __X__

4. How did you plead?

    Guilty _____    Not Guilty __X__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?             Yes _____    No __X__

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment              Yes __X__    No _____

    (b)    Preliminary hearing      Yes __X__    No _____

    (c)    Time of plea             Yes __X__    No _____

    (d)    Trial                    Yes __x__    No _____

    (e)    Sentencing               Yes __X__    No _____

    (f)    Appeal                 Yes __X__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No __X__

8. Did you appeal your conviction?         Yes __X__    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal           Yes __X__    No _____

            Year: _1983_    Result: Denial

            Supreme Court of California    Yes _____  No __X__

            Year: _____    Result:_____

            Any other court          Yes _____  No __X__

            Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1          petition?                                    Yes _____    No _X___

2     (c)   Was there an opinion?                 Yes _____    No _X___

3     (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                                        Yes _____    No _X___

5          If you did, give the name of the court and the result:

6          _____

7          _____

8  9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9  this conviction in any court, state or federal?          Yes _____    No _X___

10          [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition.  You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15  U.S.C. §§ 2244(b).]

16     (a)   If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding.  Attach extra paper if you need more space.

18     I.    Name of Court: _____

19          Type of Proceeding: _____

20          Grounds raised (Be brief but specific):

21          a._____

22          b._____

23          c._____

24          d._____

25          Result: _____Date of Result:_____

26     II.   Name of Court: _____

27          Type of Proceeding: _____

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1            a._____

2            b._____

3            c._____

4            d._____

5            Result: _____Date of Result:_____

6      III.    Name of Court: _____

7            Type of Proceeding: _____

8            Grounds raised (Be brief but specific):

9            a._____

10           b._____

11           c._____

12           d._____

13           Result: _____Date of Result:_____

14     IV.    Name of Court: _____

15           Type of Proceeding: _____

16           Grounds raised (Be brief but specific):

17           a._____

18           b._____

19           c._____

20           d._____

21           Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                          Yes \_\_\_\_\_    No\_\_\_\_\_

24        Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26        State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    need more space.  Answer the same questions for each claim.

2        [Note·  You must present ALL your claims in your first federal habeas petition.  Subsequent

3    petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: See page 11 of this petition _____

6    _____

7        Supporting Facts:_____

8    _____

9    _____

10   _____

11       Claim Two: See page 12 of this petition _____

12   _____

13       Supporting Facts:_____

14   _____

15   _____

16   _____

17       Claim Three:_____

18   _____

19       Supporting Facts:_____

20   _____

21   _____

22   _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  _____

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes_____    No _X____

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _January 28, 2008_             R.K. Manya

14              Date                        Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

## MEMORANDUM OF LAW

"When a liberty interest arises out of state law, the substantive and procedural protections to be accorded that question is a question of federal law." (Bearing v. Georga, 461 U.S. 660, 665 n7 (1988); Vitec v. Jones, 455 U.S. 480, 488-489 (1980)), or when a state administrative agency's actions are contrary to statutory law or regulations the action is reviewable under the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution (Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Wasko v. Vasquez, 820 F.2d 1090, 1091 (9th Cir. 1987)). If a statute or regulation establishes a rule governing conduct of an agency with respect to an aspect of agency action, the court may determine whether the agency has complied with the rule (City of Santa Clara, California v. Andus, 572 F.2d 660, 668 (9th Cir, 1978).

California Penal Code section 3041 vests all California prisoners whose sentences provided for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. (Sass v. Cal. Board of Prison Terms, 461 F.3d 1123, 1128; Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002); see also Bd. of Pardons v. Allen, 482 U.S. 369, 377-378 (1987) quoting Greenholtz v. Inmates of Neb. Penal & Correc. Complex, 442 U.S. 1, 12 (1979).) The United States Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," Sass, 461 F.3d at 1128-1129 (citing McQuillion,

306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 at 457 n2. When assessing whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. See Biggs, 334 F.3d at 915.

Under California law, prisoners serving an indeterminate sentence for first degree murder "may serve up to life in prison, but [] become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078. Although the board must "normally set a parole release date" before the minimum term has been served, Id., an inmate "shall be found unsuitable for parole and denied parole if, in the judgment of the board, the prisoner will pose an unreasonable risk of danger to society if released from prison." Id. at 1080 (quoting Cal. Code Regs., tit. 15, § 2402 (a)).

The board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending to show suitability" set forth in Cal. Code Regs., tit. 15, § 2402 (c)-(d). A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the board can "point to factors beyond the minimum elements of the crime for which the inmate will, at the time of the suitability hearing, present a danger to society if released. Dannenberg, 34 Cal.4th at 1071.

9

This petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA) and this court cannot grant the relief petitioner seeks unless the State decisions that are challenged are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. " 28 U.S.C. § 2254 (d)(1). AEDPA limits the source of clearly established federal law to Supreme Court precedent, including the legal principles that flow from that precedent. Here the controlling United States Supreme Court law is clearly established: A board's decision, like a disciplinary board's decision, deprives a prisoner of due process if it is not supported by "some evidence" or is "otherwise arbitrary," (Superintendent v. Hill, 472 U.S. at 457; see McQuillion 306 F.3d 895 at 905.) "If a state court's decision that a parole board's determination is both supported by "some evidence" and not "otherwise arbitrary" constitutes an unreasonable application of Hill, the court decision must be reversed under AEDPA and the writ must be granted. (Sass, 461 F.3d at 1123.)

Petitioner has exhausted his state court remedies. Petitioner received a silent denial from the Superior Court of California, County of Riverside. (Attachment One.) Petitioner also received silent denials from the Court of Appeal of the State of California, Fourth Appellate District, and the California State Supreme Court. (Attachments Two and Three, respectively.)

Petitioner argues that there was not sufficient evidence to find him unsuitable for parole, that the board failed to follow the required regulations and law, and the board illegally relied

10

on unchanging factors.

I

**PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE THE BOARD'S DECISION WAS WITHOUT SUPPORTING EVIDENCE THAT THE COMMITMENT OFFENSE WAS PARTICULARLY EGREGIOUS AND THAT PETITIONER CURRENTLY POSED AN UNREASONABLE RISK OR THREAT TO PUBLIC SAFETY**

The California Supreme Court has held that a board's parole decision violates due process and must be reversed if there is not "some evidence" in the record to support it.  Also, although parole may in some cases be denied on the basis of the crime, there must be evidence to support a finding that the crime was particularly egregious.  (In re Rosenkrantz (2002) 29 Cal.4th 616, 683.)

In petitioner's case, as in all board decisions, the commitment offense is the evidence relied on by the board to support a finding that the crime was particularly egregious. However, the test is not whether some evidence supports the reasons the board cites for denying parole, but whether some evidence indicates a parolee's release unreasonable endangers public safety.  (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison.]; see e.g. In re Scott (2005) 133 Cal.App.4th 573, 595 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonalbe public safety risk if released from prison.].) Therefore, it is axiomatic that if the board does not cite or demonstate that some evidence exist in the record that parole applicants, at the time of the parole consideration hearing, pose an unreasonable public safety risk, then parole is

11

mandatory.

A cursory review of the record in this case demonstrates that the state court's decision was unreasonable under the applicable "some evidence" rule and was "otherwise arbitrary." The record simply does not contain any evidence that petitioner's act of conspiracy to commit first degree murder was, in contrast to the large majority of such offenses, particularly egregious. Nor does the record contain any evidence that petitioner is curently a threat to society.  Given that both findings are required by California law there is zero evidence in the record to support the board's decision.

## II

**PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE BOARD RELIED ON UNCHANGING FACTORS AFTER PETITIONER HAD SERVED HIS MINIMUM TERM**

The circumstances of petitioner's crime do not amount to "some evidence" supporting the conclusion that petitioner poses an unreasonable risk of danger or a threat to society if released.

"In the parole context, the requirements of due process are met if "some evidence supports the decision." Biggs, 334 F.3d at 915. "Some evidence," however, does not mean literally "any" evidence.  If it did, the protection afforded by due process would be meaningless.  In addition, the evidence underlying the decision must possess some indicia of reliability. Biggs, 334 F.3d at 916; Casswell, 363 F.3d at 839; see Hill, 472 U.S. at 455-456.  Evidence that lacks any real probative value cannot constitue "some evidence."  Otherwise, the requirements of "some evidence" could be satisfied by baseless speculation, superstition, or stereotyping.  That, too, would reduce the requirement of "some evidence" to a sham or mockery.

Even the most perfunctory review of the board's determination, and the rationale offered to justify it, reveals that the decision was not supported by "some evidence" and that it is "otherwise arbitrary."  What in the record  makes petitioner's conviction such as to warrant the conclusion that regardless of the extent of his rehabilitation  he remains, indefinitely, unsuitable for parole, or what in the record justifies singling out petitioner's case from the vast majority in which individuals who have been convicted of conspiracy to commit first degree murder became eligible for a parole date in the absence of prison conduct that demonstrates a lack of suitability.

The Ninth Circuit Court of Appeal has held, "[I]n all cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in Biggs, Sass, and here [Irons], the petitioner had not served the minimum number of years which they had been sentenced at the time of the challenged parole denial by the board.  Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1123, 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."  Irons v. Carey, 479 F.3d 658, 665.  However, the court did not allow for the legal reduction of the minimum term provided by California law.  For the purposes of parole, the "fixed minimum" is not necessarily the determinate term specified in the statutes in effect at the time the court

13

sentenced the defendant.  That minimum can be decreased by credits for time served, work, and good conduct in prison.

Inmates who were sentenced between November 8, 1978 and May 26, 1987, receive up to six months reduction of their minimum term for every year of confinement, program participation, and good behavior.  After May 27, 1987, indeterminate sentenced inmates receive four months reduction of their minimum term for every year of confinement.

Petitioner was convicted in 1982 and sentenced in 1983, for a crime committed in 1981, to a term of 25 years-to-life. Petitioner's term started with his arrest on December 11, 1981. Petitioner's minimum parole date was set at December 10, 2006. The state reduced the minimum parole date to September 9, 1998 based on the application of credits earned.  The state further reduced petitioner's minimum to November 27, 1996 to comply with a court order concerning good time credits.

Petitioner has no base term under the board's regulations as do prisoners convicted of first or second degree murder. (Cal. Code Regs., tit. 15, § 2403 (c) [maximum base term for second degree murder is 21 years and the minimum base term for first degree murder, where one or more victims were actually murdered, is 25 years].)  The "fixed minimum" term for prisoners convicted of concpiracy to commit murder is somewhere between a 21 year minimum and a 25 year maximum.

Petitioner had served over 24 years of incarceration at the time of the parole hearing.  Therefore, according to the precedent articulated in Irons, adjusting for the reduction of sentence allowed by law, petitioner has served over the minimum number of years to which he had been sentenced at the time the board denied

14

the grant of parole, resulting in a violation of the due process clause of the constitution.  And the state court's denials resulted in an unreasonable application of controlling United States Supreme Court precedent.

## CONCLUSION

Regardless of whether the board ever was entitled to rely upon the commitment offense to find that petitioner posed  an unreasonable risk of danger and was unsuitable for parole, in the exceptional circumstances presented by this case, the board's reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" possessing "some indicia of reliability" that petitioner poses a danger to the community.  See Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; and Irons, 358 F.Supp.2d at 947.

Because there is no reliable evidence to support the board's conclusion that petitioner is unsuitable for parole, that determination violates due process.  See Hill, 472 at 455. The state court's determination to the contrary was based upon an unreasonable determination of the facts in light of the evidence presented during the parole hearing and that determination amounted to an unreasonable application of clearly established Supreme Court precedent.

The record before the board provided no evidence upon which to find petitioner unsuitable for release on parole on the grounds relied upon by the board or on any other grounds identified by applicable law and regulations.

Considering that the board's decision denying petitioner a parole release date was not made in accordance  with applicable

15

legal principles and was not supported by "some evidence," that denial resulted in a violation of the due process clause of the constitution.  Petitioner is therefore entitled to have the board's denial reversed, a new parole hearing scheduled and the board ordered to follow both the letter and spirit of the applicable laws, regulations, and court precedents.

DATED: January 28, 2008                    Respectfully submitted,

                                           R. K. Mauzey
                                           R. K. Mauzey
                                           In Pro Per

## VERIFICATION

I, R. K. Mauzey, hereby declare under penalty of perjury and the laws of the United States, that the foregoing facts are true and correct, and I would testify to the same in a court of law if called upon to do so.  Executed this 28th day of January, 2008, at Soledad, California.

                                           R. K. Mauzey
                                           R. K. Mauzey

16

**A T T A C H M E N T**

**O N E**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF RIVERSIDE

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAR 13 2007

IN THE MATTER OF THE APPLICATION OF:    } CASE NO.    RIC466177

R.K. MAUZEY    }

    } ORDER RE: PETITION FOR WRIT OF

FOR A WRIT OF HABEAS CORPUS.    } HABEAS CORPUS PURSUANT

Pursuant to California Rule of Court 4.551, the petition is denied due to the failure of the petition

to state a prima facie case supporting petitioner's release.  The record before the Board of Prison

Terms contained some evidence in support of the Board's findings

Date:  *03·13·07*

Michele D. Levine,
Judge of the Superior Court

IMAGED

MC-275

Name    R. K. Mauzey

Address    P. O. Box 705, WA-326U

Soledad, CA 93960-0705

CDC or ID Number    C-61868

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF RIVERSIDE
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

R. K. Mauzey
Petitioner

vs.

No. _____
*(To be supplied by the Clerk of the Court)*

Board of Parole Hearings, et al.
Respondent

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

| | | |
|---|---|---|
| [ ] A conviction | [XX] Parole | |
| [ ] A sentence | [ ] Credits | |
| [ ] Jail or prison conditions | [ ] Prison discipline | |
| [ ] Other *(specify):* _____ | | |

1. Your name:  R. K. Mauzey

2. Where are you incarcerated?  Correctional Training Facility

3. Why are you in custody?  [X] Criminal Conviction  [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Conspiracy to Commit First Degree Murder

   b. Penal or other code sections:  § 182

   c. Name and location of sentencing or committing court:  Superior Court of the State of California, County of Riverside

   d. Case number:  4 CRIM 14860 (Sup. Ct. NO.: 18817NF)

   e. Date convicted or committed:  December 1, 1982

   f. Date sentenced:  February 8, 1983

   g. Length of sentence:  25 Years to Life

   h. When do you expect to be released?  Unknown

   i. Were you represented by counsel in the trial court?  [X] Yes.  [ ] No. If yes, state the attorney's name and address:

   Samuel A. Kahn, retired, address unknown

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**PETITION FOR WRIT OF HABEAS CORPUS**

7. Ground 2 or Ground _____ *(if applicable):*

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
      N/A

   b. Result _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☐ No.  If yes, give the following information:

   a. Result   N/A _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A _____

    _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
       N/A _____

       _____

       _____

       _____

       _____

       _____

       _____

       _____

    b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   N/A

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   N/A

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:   February 11, 2007                   ▶ R. K. Mary

                                            (SIGNATURE OF PETITIONER)

1  R. K. Mauzey
   P. O. Box 705, WA-326U
2  Soledad, CA 93960-0705

3  Petitioner, In Pro Per

4

5

6

7

8

9

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                      **COUNTY OF RIVERSIDE**

12

13

14  _____
                                    )
15  R. K. Mauzey,                   )
                                    )      Case No.
16              Petitioner,         )
                    v.              )      **PETITION FOR WRIT OF**
17                                  )      **HABEAS CORPUS**
    Board of Parole Hearings, et al., )
18                                  )
                Respondent.         )
19  _____)

20

21          **TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF**
            **CALIFORNIA, IN AND FOR THE COUNTY OF RIVERSIDE**
22

23      Petitioner hereby petition for a Writ of Habeas Corpus and

24  by this verified petition states as follows:

25                               **I**

26                          **INTRODUCTION**

27      1.  The Board of Parole Hearings [hereinafter Board] failed

28  to make its suitability determination in a manner consistent

                                1

1  with its obligation under the California Penal Code, California
2  Code of Regulations and settled California law.  The Board's
3  decision failed to follow or apply controlling legal principles
4  and its own regulations in finding petitioner unsuitable for
5  parole, the decision was devoid of the "some evidence" required
6  by law, and was arbitrary and capricious resulting in a due
7  process violation of Article 1, § 7 of the California
8  Constitution and the Fifth and Fourteenth Amendments to the
9  United States Constitution.  The Board's continued reliance on
10  unchanging factors to deny parole resulted in a due process
11  violation.  For these reasons the Board's finding that
12  petitioner is unsuitable for parole should be reversed.

13                                II

14      2.  Petitioner R. K. Mauzey is a prisoner of the State of
15  California and is currently incarcerated at the Correctional
16  Training Facility in Soledad, California.

17      3.  Respondent Ben Curry is the Acting Warden of the
18  Correctional Training Facility, Soledad, California.

19      4.  Respondent J. Dovey is the Director of the California
20  Department of Corrections and Rehabilitation.

21      5.  Respondent James Davis is the Chairperson of the Board
22  of Parole Hearings and is responsible for its operations.
23  (Penal Code § 5075.)

24      6.  Respondent Arnold Schwarzenegger is the Governor of the
25  State of California and is responsible for the Board's
26  operations.   (Penal Code §§ 5075, 3041.1 and 3041.2.)

27

28

                                2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III

### STATEMENT OF FACTS

7.   Petitioner was convicted of conspiracy to commit first degree murder on December 1, 1982.

8.   On May 4, 2006, Petitioner's fifth Parole Consideration Hearing was held before the Board.  Petitioner was denied parole for the maximum period of two years.

9.   Petitioner has no other plain or adequate remedy in the ordinary course of the law.  This petition is addressed to this courts original habeas corpus jurisdiction because the issues raised are of constitutional dimension, questioning the legality of petitioner's confinement.  A petition for a Writ of Habeas Corpus based upon factual allegations to be determined by reviewing court is generally first brought in the Superior Court.  (*In re Hillery* (1972) 202 Cal.App.2nd 293.)  Petitioner alleges that the Board violated his due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest.  The Fifth and Fourteenth Amendments of the United States Constitution and the California Constitution, Article I, section 7, subdivision (a), prohibit the government from depriving an inmate of life, liberty, or property without due process of law.  Petitioner has been denied due process of law in violation of not only the United States Constitution but also the Constitution of the State of California, the California Penal Code, the California Code of Regulations, and established law.  This is petitioner's first request for habeas relief, and thus is properly filed in this court.

3

1    10.   The accompanying Memorandum of Points and Authorities
2  and factual allegations contained herein, as well as the
3  exhibits appended to this petition, are incorporated herein by
4  reference.

5    WHEREFORE, petitioner respectfully prays that this Court:

6    A.   Issue a Writ of Habeas Corpus directing the Director of
7  the Department of Corrections and Rehabilitation to inquire into
8  the legality of petitioner's incarceration;

9    B.   Order the immediate release of the petitioner; or

10    C.   Order the Board to schedule and commence a new term-
11  fixing hearing within thirty days, and to render a new
12  determination in strict accordance with both the letter and
13  spirit of the regulations and law;

14    D.   Conduct an evidentiary hearing;

15    E.   Appoint counsel;

16    F.   Declare the rights of the parties; and

17    G.   Grant any and all relief the court deems appropriate.

18

19

20  DATE:   February 11, 2007                Respectfully submitted,

21

22

23                                          R. K. Mauzey
                                            R. K. Mauzey
24                                          Petitioner, In Pro Per

25  ///

26  ///

27  ///

28  ///

                                 4

**VERIFICATION**

I, R. K. Mauzey, state:

I am the petitioner in this action.  I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on February 11, 2007.

R. K. Mauzey
R. K. Mauzey
Petitioner, In Pro Per

1

2

## MEMORANDUM AND POINTS OF AUTHORITY

### INTRODUCTION

3       "The Board of Prison Terms is authorized by statute to

4   determine parole suitability, and to exercise its discretion in

5   deciding whether to grant or deny parole." (*In re Rosenkrantz*

6   (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

7       Penal Code section 3041 sets forth criteria for determining

8   parole and provides in pertinent part: "(a) ... One year prior

9   to the inmate's minimum eligible release date a panel consisting

10  of at least two commissioners on the Board of Prison Terms shall

11  ... meet with the inmate and shall normally set a parole release

12  date.... The release date shall be set in a manner that will

13  provide uniform terms for offenses of similar gravity and

14  magnitude in respect to their threat to the public, and that

15  will comply with the sentencing rules that the Judicial Council

16  may issue and any sentencing information relevant to the setting

17  of parole release dates.  The Board shall establish criteria for

18  setting of parole release dates and in doing so shall consider

19  the number of victims of the crime for which the prisoner was

20  sentenced and other factors in mitigation or aggravation of the

21  crime ...  [¶] (b) The panel or board shall set a release date

22  unless it determines that the gravity of the current convicted

23  offenses, or the timing and gravity of current or past convicted

24  offense, or offenses, is such that consideration of the public

25  safety requires a more lengthy period of incarceration for this

26  individual, and that a parole date, therefore, cannot be fixed

27  at this meeting."

28

6

1    The California Code of Regulations (hereinafter CCR), title
2  15, division 2, chapter 3, article 11, section 2400 et seq. set
3  forth additional criteria for determining parole suitability for
4  persons found guilty of murders committed after November 7,
5  1978.  Subdivision (a) of section 2402 provides: "The panel
6  shall first determine whether the life prisoner is suitable for
7  release on parole.  Regardless of the length of time served, a
8  life prisoner shall be found unsuitable for and denied parole if
9  in the judgment of the panel the prisoner will pose an
10  unreasonable risk of danger to society if released from prison."
11    Subdivision (b) of section 2402 directs the Board to
12  consider "[a]ll relevant, reliable information available to the
13  panel ... in determining suitability for parole.  Such
14  information shall include [(1)] the circumstances of the
15  prisoner's social history; [(2)] past and present mental state;
16  [(3)] past criminal history; including involvement in other
17  criminal misconduct which is reliable documented; [(4)] the base
18  and other commitment offenses, including behavior before, during
19  and after the crime; [(5)] past and present attitude towards the
20  crime; [(6)] any conditions of treatment or control, including
21  the use of special conditions under which the prisoner may
22  safely be released to the community; and [(7)] any other
23  information which bears on the prisoner's suitability for
24  release.  Circumstances which taken alone may not firmly
25  establish unsuitability for parole may contribute to a pattern
26  which results in a finding of unsuitability."
27    Subdivision (c) of section 2402 sets forth the
28  "circumstances tending to show unsuitability" for parole, which

7

1  "include:  [¶] (1) Commitment Offense.  The prisoner committed
2  the offense in an especially heinous, atrocious or cruel manner.
3  The factors to be considered include: [¶] (A) Multiple victims
4  were attacked, injured or killed in the same or separate
5  incidents.  [¶] (B) The offense was carried out in a
6  dispassionate and calculated manner, such as an execution-style
7  murder.  [¶] (C) The victim was abused, defiled or mutilated
8  during or after the offense.  [¶] (D) The offense was carried
9  out in a manner which demonstrates an exceptionally callous
10 disregard for human suffering.  [¶] (E) The motive for the crime
11 is inexplicable or very trivial in relation to the offense.  [¶]
12 (2) Previous Record of Violence.  The prisoner on previous
13 occasions inflicted or attempted to inflict serious injury on a
14 victim, particularly if the prisoner demonstrated serious
15 assaultive behavior at an early age.  [¶] (3) Unstable Social
16 History.  The prisoner has a history of unstable or tumultuous
17 relationships with others.  [¶] (4) Sadistic Sexual Offenses.
18 The prisoner has previously sexually assaulted another in a
19 manner calculated to inflict unusual pain or fear upon the
20 victim.  [¶] (5) Psychological Factors.  The prisoner has a
21 lengthy history of severe mental problems related to the
22 offense.  [¶] (6) Institutional Behavior.  The prisoner has
23 engaged in serious misconduct in prison or jail."

24      Subdivision (d) of section 2402 sets forth the
25 "circumstances tending to show suitability" for parole, which
26 "include: [¶] (1) No Juvenile Record.  The prisoner does not
27 have a record of assaulting others as a juvenile or committing
28 crimes with a potential of personal harm to victims.  [¶] (2)

                                8

1  Stable Social History.  The prisoner has experienced reasonably
2  stable relationships with others.  [¶] (3) Signs of Remorse.
3  The prisoner performed acts which tend to indicate the presence
4  of remorse, such as attempting to repair the damage, seeking
5  help for or relieving suffering of the victim, or indicating
6  that he understands the nature and magnitude of the offense.
7  [¶] (4) Motivation for Crime.  The prisoner committed his crime
8  as the result of significant stress in his life, especially if
9  the stress has built over a long period of time. ... [¶] (6)
10 Lack of Criminal History.  The prisoner lacks any significant
11 history of violent crime.  [¶] (7) Age.  The prisoner's present
12 age reduces the probability of recidivism.  [¶] (8)
13 Understanding and Plans for Future.  The prisoner has made
14 realistic plans for release or has developed marketable skills
15 that can be put to use upon release.  [¶] (9) Institutional
16 Behavior.  Institutional activities indicate an enhanced ability
17 to function within the law upon release."

18     In *Rosenkrantz*, our Supreme Court held "that the judicial
19 branch is authorized to review the factual basis of a decision
20 of the Board denying parole in order to ensure that the decision
21 comports with the requirements of due process of law, but that
22 in conducting such a review, the court may inquire only whether
23 *some evidence* in the record before the Board supports the
24 decision to deny parole, based upon *the factors specified by*
25 *statute and regulation.*  If the decision's consideration of the
26 specified factors is not supported by some evidence in the
27 record and thus is devoid of a factual basis, the court should
28 grant the prisoner's petition for writ of habeas corpus and

1  should order the Board to vacate its decision denying parole and
2  therefore to proceed in accordance with due process of law."
3  (*In re Rosenkrantz*, 29 Cal.4th 616, 658, emphasis added.)

4      In *Dannenberg* the Supreme Court held "In that regard, we
5  noted that 'the nature of the prisoner's offense, alone, can
6  constitute a sufficient basis for denying parole. [Citations.]'
7  (*Rosenkrantz, supra,* 29 Cal.4th 616, 682.) While neither the
8  board nor the Governor may adopt a blanket no-parole policy for
9  particular offenses, we said, 'the [parole] authority properly
10 may weigh heavily the degree of violence used and the amount of
11 viciousness shown by a defendant.' (*Id.,* at p. 683.) [¶]
12 However, we cautioned, sole reliance on the commitment offense
13 might, in particular cases, violate section 3041, subdivision
14 (a)'s provision that a parole date 'shall normally be set' under
15 'uniform term' principles, and might thus also contravene the
16 inmate's constitutionally protected expectation of parole. We
17 explained that such a violation could occur, 'for example[,]
18 where no circumstances of the offense reasonable could be
19 considered more aggravated or violent than the minimum necessary
20 to sustain a conviction for that offense.' (*Rosenkrantz, supra,*
21 29 Cal.4th 616, 683.) Quoting *Ramirez, supra,* 94 Cal.App.4th
22 549, 570, we suggested that, in order to prevent the parole
23 authority's case-by-case suitability determinations from
24 swallowing the rule that parole should 'normally' be granted, an
25 offense must be '*particularly egregious*' to justify the denial
26 of parole. (*Rosenkrantz, supra,* at 683.)" (*In re Dannenberg,*
27 (2005) 34 Cal.4th 1061, 1094-1095.)

28

10

1    The Supreme Court then held "As we have explained, however,
2  the Board must apply detailed standards when evaluating whether
3  an individual inmate is unsuitable for parole on public safety
4  grounds.  (See § 3041, subd. (b); CCR § 2402.)  When the Board
5  bases unsuitability on the circumstances of the commitment
6  offense, it must cite 'some evidence' of aggravating facts
7  *beyond the minimum elements of that offense.  (Rosenkrantz,*
8  *supra,* 29 Cal.4th 616, 658, 683.)"  (*In re Dannenberg, supra,* 34
9  Cal.4th 1061, 1095.)

10    Therefore, the Board must follow and apply the standards
11  set forth above in determining that the circumstances of the
12  commitment offense were "particularly egregious" and support
13  that determination with "some evidence" in the record.  As will
14  be shown below, the Board failed to meet this requirement, as
15  well as controlling legal principles, which resulted in a
16  violation of petitioner's due process rights and other state and
17  federal constitutional rights.

I

19    *Claim:*  The Board failed to follow or apply the controlling
20  legal principles, the decision was devoid of the "some evidence"
21  required by law, and was arbitrary and capricious resulting in a
22  due process violation of Article I, § 7 of the California
23  Constitution and the Fifth and Fourteenth Amendment to the
24  United States Constitution.

25    Argument:  In finding petitioner unsuitable for parole the
26  Board relied on CCR, § 2402, subdivisions  (c)(1)(E),  (c)(2),
27  (c)(5),  (c)(6), and (d)(8) as "some evidence" that petitioner is

28

11

1  unsuitable for parole and *currently* poses a threat to public

2  safety.  Petitioner addresses each of these findings below.

3  A.   The Board's decision lacked the "some evidence"
        demonstrating that petitioner's offense was "particularly
4       egregious" as required by law.

5   First, a cursory review of the record in this case

6  demonstrates that the Board's decision was unreasonable under

7  the applicable "some evidence" rule.  The record simply does not

8  contain *any* evidence that petitioner's act of conspiracy to

9  commit first degree murder was *particularly* egregious.  Nor does

10  it contain *any* evidence that petitioner is currently a threat to

11  society.  Given that both findings are required by California

12  law, there is *zero* evidence in the record to support the Board's

13  decision.

14  The nature of the offense may justify a denial of parole if

15  the crime was committed in an "especially heinous, atrocious or

16  cruel manner."  An offense that was "no more aggravated or

17  violent than the minimum necessary to sustain a conviction" for

18  conspiracy to commit first degree murder does not justify a

19  finding of unsuitability for parole.  (*Rosenkrantz* at p. 683.)

20  To guide this determination, CCR, § 2402, subd. (c)(1)(A)-

21  (E) establishes the specified criteria the Board must rely on to

22  demonstrate that a prisoner committed his offense in an

23  "especially heinous, atrocious or cruel manner."  It is

24  axiomatic that absent the required "some evidence" supporting

25  any of the specified factors the decision would be arbitrary and

26  capricious and result in a due process violation.

27  The Board's finding that petitioner committed his offense

28  "in an especially heinous, atrocious or cruel manner," relied

12

1  solely on § 2402, subd. (c)(1)(E), "The motive for the crime,
2  very trivial in relation to the offense...." (See Exhibit 1,
3  Subsequent Parole Consideration Hearing Transcript, May 4, 2006
4  [hereinafter HT1], p. 84, L 20:21.)  The record contains no
5  evidence supporting this determination, however.

6      "The epistemological and ethical problems in the
7  ascertainment and evaluation of motive are among the reasons the
8  law has sought to avoid the subject.  As one authority has
9  stated, '[h]ardly any part of penal law is more definitely
10  settled than that motive is irrelevant.'  (Hall, General
11  Principles of Criminal Law (2d ed. 1960) at p. 88; see also
12  Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
13  Justice Ethics 3.) ... The offense committed by most prisoners
14  serving life terms is, of course, murder.  Given the high value
15  our society places upon life, there is no motive for unlawfully
16  taking the life of another human being that could not reasonably
17  be deemed 'trivial.'  The Legislature has foreclosed that
18  approach, however, by declaring that murderers with life
19  sentences must 'normally' be given release dates when they
20  approach their minimum eligible parole date.  (Pen. Code, §
21  3041, subd. (a).)  The governing statute also states the Board
22  shall set a release date 'unless it determines that the gravity
23  of current convicted offense or offenses, or the timing and
24  gravity of the current or past convicted offense or offenses, is
25  such that consideration of the public safety requires a more
26  lengthy period of incarceration for this individual, and that a
27  parole date, therefore cannot be fixed at this meeting.'  (Pen.
28  Code, § 3041, subd. (b).)  This language means a 'more lengthy

13

1   period of incarceration' is called for where the gravity of the

2   offence or offenses of the prisoner in question is more

3   indicative of a danger to the public if the prisoner is released

4   than would ordinarily be the case.  The reference in Board

5   regulations to motives that are 'very trivial in relationship to

6   the offense' therefore requires comparisons; to fit the

7   regulatory description, the motive must be materially less

8   significant (or more 'trivial') than those which conventionally

9   drive people to commit the offense in question, and therefore

10  more indicative of a risk of danger to society if the prisoner

11  is released than is ordinarily presented."  (*In re Scott* (2004)

12  119 Cal.App.4th 871, 893.)

13       The "evidence" articulated by the Board in support of their

14  finding that the "motive" was "very trivial" was that petitioner

15  had been convicted of the crime.  (Exhibit 1, HT1, p. 84, L

16  21:26.)  Although this "fact" is reliably documented, it fails

17  to make the required comparison of how the "motive" was "very

18  trivial" in relation to other conspiracies to commit murder or

19  how it was indicative of a risk of danger to society.

20       Second, the circumstance of petitioner's crime do not

21  amount to some evidence supporting the conclusion that

22  petitioner poses an unreasonable risk of danger if release.

23  "[I]n the parole context, the requirements of due process are

24  met if some evidence supports the decision." (*Biggs v. Terhune,*

25  334 F.3d 910, 915 (9th Cir. 2003.)  "Some evidence," however

26  does not mean literally "any" evidence.  If it did, the

27  protection afforded by due process would be meaningless.  In

28  addition, the evidence underlying the decision must possess some

14

1   indicia of reliability." (Biggs at 914 [internal quotations
2   omitted]; Caswell, 363 F.3d at 839; see Hill at 455-456.)
3   Evidence that lacks any real probative value cannot constitute
4   "some evidence." (See Cato, 924 F.2d at 705.) Otherwise, the
5   requirement of "some evidence" could be satisfied by baseless
6   speculation, superstition, or stereotyping. That, too, would
7   reduce the requirement of "some evidence" to a sham or a
8   mockery.

9       The California rules governing parole in murder cases, for
10  which parole eligibility is provided by statute, [CCR, supra, §
11  2402] are as follows: "[P]arole eligibility is the rule, rather
12  than the exception." (In re Scott, supra, 119 Cal.App.4th at p.
13  891.) "[P]arole is 'normally' to be granted." [Id. (quoting
14  Cal. Pen. Code § 3041 (a)).] The murder giving rise to the
15  prisoner's incarceration must be "particularly egregious" for
16  parole to be denied. (In re Rosenkrantz, supra, 29 Cal.4th at
17  p. 683.) Indeed, a murder must be "heinous, atrocious or cruel"
18  if, as here, the offense is to serve as the basis for parole
19  denial. In addition, in such cases, the prisoner must presently
20  present a danger to society. (Cal. Pen. Code § 3401 (b).) In
21  short, in petitioner's case, the circumstances surrounding the
22  crime or the manner in which it was committed must show not only
23  that the conspiracy to commit first degree murder at issue was
24  more cruel or vicious than the ordinary conspiracy to commit
25  murder, but also that petitioner would likely pose a current
26  risk to public safety if released. The record in this case
27  contains absolutely no evidence that would meet either of the
28  two requirements. Thus, there can be little doubt that the

15

1  Board violated the applicable rules when it denied petitioner

2  parole on the basis of his commitment offense.

3  B.    The Board's finding that petitioner had a previous record
       of violence is not supported by the facts.

4

5     CCR, § 2402 (c)(2), states, "Previous Record of Violence.

6  The prisoner on previous occasions inflicted or attempted to

7  inflict serious injuries on a victim, particularly if the

8  prisoner demonstrated serious assaultive behavior at an early

9  age."

10    In support of this finding the Board stated, "Your record

11 of violent behavior is evidenced by the statement of fact,

12 wherein on July 1981, you went to the victim's home, kicked the

13 door down and you shot him twice with a rifle.  And also the

14 behavior continued in 1995, when you received a 115 for force

15 and violence with another inmate."  (Exhibit 1, HT1, p. 85, L

16 13:19.)

17    The finding of fact by the Board is incorrect for the

18 following reasons.  First, petitioner went to the victim's home

19 in June 1981, not July 1981.  Second, the victim was not shot

20 twice as the Board stated, but once.  (Exhibit 2, Probation

21 Officer's Report, p. 4. L 10:13.)  Third, petitioner was found

22 guilty and the sentence was stayed for the attempted murder.

23 (Exhibit 3, Abstract of Judgment.)  Fourth, there is no evidence

24 in the record of any serious assaultive behavior at an early

25 age.

26    The Board's decision failed to rise to the level of the

27 some evidence standard.  Therefore, the decision is arbitrary

28 and capricious.

1  C.   The Board's finding that due to psychological factors
         petitioner was unsuitable for parole and a threat to
2        society if released is not supported by the evidence or
         regulations.

3

4       CCR, § 2402 (c)(5) states, "Psychological Factors.  The

5  prisoner has a lengthy history of severe mental problems related

6  to the offense."

7       The Board stated, "[T]he psychological report that was

8  written by Doctor Zika indicated that due to your history of

9  violence and history of involvement with alcohol and drugs, your

10 potential is somewhat higher than that of the average citizen in

11 the community."  (Exhibit 1, HT1, p. 86, L 5:11.)  "The

12 psychological report dated 9/26/03, authored by Dr. Shafer, was

13 not totally supportive of release.  He [sic] indicated at the

14 present time, his remorse is more of an intellectual than

15 emotional experience.  If released to the community, his

16 violence potential is somewhat higher than that of the average

17 citizen in the community, due to his history of violence and the

18 history of involvement with alcohol and drugs."  (Exhibit 1,

19 HT1, p. 86, L 15:24.)

20      This statement of reason by the Board is both incorrect and

21 inaccurate.  First, Dr. Zika never authored the psychological

22 report attributed to him.  Dr. Zika, at the time the

23 psychological evaluation was prepared, was the Senior

24 Supervising Psychologist and signed off on the report that was

25 prepared by Dr. Shafer.  (Exhibit 4, p. 4.)  Second, the

26 psychological evaluation prepared by Dr. Shafer stated that

27 petitioner does not have a mental disorder which would

28 necessitate treatment.  (Exhibit 4, p. 3, section XV, ¶ B.)  (It

17

1  should be noted that all of the previous psychological

2  evaluations also state that petitioner does not have a history

3  of mental problems.)  (Exhibits 5, 6 and 7.)  Third, for this

4  unsuitability factor to apply to petitioner the Board is

5  required to demonstrate that there is or was a "lengthy history

6  of severe mental problems related to the offense."  (CCR, § 2402

7  (c)(5).)

8      The Board has failed to meet this regulatory requirement.

9  Absent some, or any, evidence to support this finding, the

10 Board's decision is arbitrary and capricious and cannot stand.

11 D.   The Board's finding that petitioner engaged in serious
        misconduct is a misapplication of this factor and is not
12      some evidence of current dangerousness

13     CCR, § 2402 (c)(6), states "Institutional Behavior.  The

14 prisoner has engaged in serious misconduct in prison or jail."

15     The Board states, "But when you to up to 2402 (d)(6), your

16 engagement in serious misconduct in prison was also taken into

17 account.  You have six 115's since your last Board appearance."

18 (Exhibit 1, HT1, p. 85, L 25:26 to p. 86, L 1:3.)

19     The "serious" misconduct the Board relies on is six Rules

20 Violation Reports (CDC-115's), five classified as serious

21 violations for refusing a direct order to interview and one

22 classified as an administrative violation for failure to

23 perform.  The Board cites no evidence of any serious assaultive

24 behavior during petitioner's 25 years of incarceration, with the

25 exception of the 1995 violation for being involved in a physical

26 altercation.  Petitioner has no record of physically assaulting

27 or stabbing either other inmates or prison staff.  The Board

28 uses the fact that five of the CDC-115's referred to were

18

1 classified as serious "Division F" offenses.  The California
2 Department of Corrections and Rehabilitations has a grading
3 system for serious rule violations.  The most serious
4 classification is a "Division A" offense and the least serious
5 classification is a "Division F" offense, the only other
6 classification being the "Administrative" classification.  (See
7 California Code of Regulations, title 15, division 3, article 5,
8 sections 3310 to 3323.)

9     The Board is well aware that once a parole release date is
10 established petitioner will be assessed the loss of credit for
11 each of the serious rules violations.  Thus, petitioner will be
12 punished twice for each of the rules violation.  Once when the
13 Board uses them as a "factor" in finding him unsuitable for
14 parole and again after a parole release date has been set.  This
15 is double jeopardy.

16     The Board's decision to use the rule violations as a
17 contributing factor in support of an unsuitability determination
18 is a misapplication of the regulations.

19 E.   The Board's finding that petitioner had unrealistic parole
         plans are unsupported by the regulations and statutes.
20

21     CCR, § 2402 (d)(8) states, "Understanding and Plans for
22 Future.  The prisoner has made realistic plans for release or
23 has developed marketable skills that can be put to use upon
24 release."

25     The Board states, "Your parole plans considered by this
26 Panel are marginal, where you do have residential plans that
27 your mom said that you -- she would give you a place to stay and
28 that you plan to start a -- your business back up and in -- your

19

1  corporation back up again.  But the Panel was not given any
2  documents to show that you had either made an attempt to do this
3  or to even apply and take the necessary steps so that we can
4  assure that you would, in fact, be able to do that.  You do have
5  a marketable skill."  (Exhibit 1, HT1, p. 86, L 24:26 to p. 87,
6  L 1:9.)

7       The California Business and Professions Code, Licenses,
8  Div. 1.5, § 480, states, "The board may deny a license pursuant
9  to this subdivision only if the crime or act is substantially
10  related to the qualifications, functions or duties of the
11  business or professions for which application is made."
12  Therefore, petitioner, by law, can form a corporation and obtain
13  a contracting license.  It would be costly and unproductive for
14  petitioner to incorporate and procure his contracting license at
15  this time and the Board's requirement for him to do so in order
16  to be found suitable for parole is unrealistic.

17       The regulation states that applicants for parole must
18  either have realistic plans for the future or marketable skills.
19  Petitioner has both.  Petitioner has provided the Board with
20  verifiable parole plans, proof of a place to reside upon parole,
21  and that he will have financial support from his family.
22  (Exhibit 13, Letter of Support.)  The Board even acknowledges
23  that petitioner has marketable skills.  Therefore, this factor
24  should apply to him as indicating suitability for parole.

25       The Board's characterization of a factor indicating
26  suitability to demonstrate unsuitability is demonstrative that
27  petitioner's parole hearing was a sham.  The Board's decision is

28

                                   20

1 | arbitrary and capricious because it is inconsistent with the law
2 | and its own regulations.

3 | F.   The Board's use of factors not listed or included in its
     regulations is a violation of petitioner's due process
4 |      rights.

5 | The Board relied on four other "factors" in determining
6 | that petitioner posed an unreasonable risk of danger to society
7 | if released at this time.  However, none of these "factors" are
8 | mentioned in the Board's regulations.

9 | The factors set forth in CCR, § 2402 (c) used by the Board
10 | to determined whether the prisoner is unsuitable for parole are
11 | objective, i.e. easily verifiable, and subjective, i.e. based on
12 | the opinion of the decision-maker.  As will be discussed below,
13 | because the objective factors used by the Board to find
14 | petitioner unsuitable are easily verifiable, petitioner did not
15 | have reasonable notice that they would apply to him.  The four
16 | factors are:

17 | 1.   "You have done very little programming while you've
18 | been incarcerated."  (Exhibit 1, HT1, p. 85, L 19:21.)  "In
19 | addition, Title XV, paragraph nine, talks about institutional
20 | behavior for suitability.  Act - institutional activities
21 | indicate an enhanced ability to function within the law upon
22 | release."  (Exhibit 1. HT1, p. 85, L 21:25.)

23 | 2.   "And also the fact that the record reflects that you
24 | were arrested and convicted of driving under the influence
25 | August the 12th, 1980, where you received a three-year
26 | probation."  (Exhibit 1, HT1, p. 86, L 11:15.)

27 | 3.   "The District Attorney of Riverside - We noted on the
28 | 3042 response that the District Attorney of Riverside County

21

1  indicated their opposition to a finding of parole suitability."
2  (Exhibit 1, HT1, p. 87, L 9:13.)

3      4.   "In addition, the Panel concluded that your previous
4  attempts on Mr. Paulsen's [sic] life, when taken together with
5  the fact that you were found guilty of conspiracy to commit
6  murder, indicates to us – to us when you put those two together,
7  that's a contributing factors contributing to a pattern which
8  results in unsuitability."   (Exhibit 1, HT1, p. 87, L 13:20.)

9      The four "factors" the Board used to demonstrate that
10 petitioner is currently a threat to public safety if released on
11 parole are arbitrary and capricious.   Nowhere in the Board's
12 regulations are any of the above cited "factors" published.
13 Therefore, the Board cannot rely on any of these factors to
14 prove that petitioner is currently a threat to society.

15     "A statute (or regulation) is void for vagueness 'if it
16 fails to give adequate notice to people of ordinary intelligence
17 concerning the conduct it proscribes, or if it invites arbitrary
18 and discriminatory enforcement.'"   (United States v. Doremus,
19 888 F.2d 630, 634 (9th Cir. 1989).)   "[T]he court need only
20 examine the vagueness challenge under the facts of a particular
21 case and decide whether, under a reasonable construction of the
22 statute or regulation, the conduct in question is prohibited."
23 (United States v. Hogue, 752 F.2d 1503, 1504 (9th Cir. 1985).)

24     Based on the regulations cited above [CCR, supra, § 2402
25 (c)], it is clear that this court should find that petitioner
26 did not have adequate notice that these factors would apply to
27 him.   Accordingly, the Board's decision denying parole should be
28 reversed.

1

**II**

2      *Claim:*  The Board's continued reliance on unchanging
3    factors resulted in a due process violation.

4      *Argument:*  In finding petitioner unsuitable at his sixth
5    parole suitability hearing, the panel relied exclusively on an
6    unchanging factor: the commitment offense.  In Biggs, the Ninth
7    Circuit stated that the Board was *"initially* justified" in
8    finding Mr. Biggs unsuitable based on the circumstances of the
9    offense and his conduct prior to imprisonment.  The Ninth
10   Circuit added that "[a] continued reliance in the future on an
11   unchanging factor, the circumstance of the offense and conduct
12   prior to imprisonment, runs contrary to the rehabilitative goals
13   espoused by the prison system and could result in a due process
14   violation."  (*Biggs, supra,* 334 F.3d at 917.)

15     One district court has explained the rationale underlying
16   this aspect of Biggs as follow:

17       "Whether the facts of the crime of conviction, or other
          unchanging criteria, affect the parole eligibility decision
18       can only be predicated on the "predictive value" of the
          unchanged circumstance.  Otherwise, if the unchanged
19       circumstance per se can be used to deny parole eligibility,
          sentencing is taken out of the hands of the judge and
20       totally reposited in the hands of the BPT.  That is, parole
          eligibility could be indefinitely and forever delayed based
21       on the nature of the crime even though the sentence given
          set forth the possibility of parole − a sentence given with
22       the facts of the crime fresh in the mind of the judge.
          While it would not be a constitutional violation to forego
23       parole altogether for certain crimes, what the state cannot
          constitutionally do is have a sham system where the judge
24       promises the possibility of parole, but because of the
          nature of the crime, the BPT effectively deletes such from
25       the system.  Nor can a parole system, where parole is
          mandated to be determined on someone's future potential to
26       harm the community, constitutionally exist where despite 20
          or more years of prison life which indicates the absence of
27       danger to the community in the future, the BPT
          commissioners revulsion towards the crime itself, or some
28       other unchanged circumstance, constitutes the alpha and

23

1    omega of the decision.  Nobody elected the BPT
     commissioners as sentencing judges.  Rather, in some
2    realistic way, the facts of the unchanging circumstance
     must indicate a present danger to the community if
3    released, and this can only be assessed not in a vacuum,
     after four or five eligibility hearings, but counterpoised
4    against the backdrop of prison events."

5
     (*Bair v. Folsom State Prison*, 2005 WL 2219220 (E.D.Cal. 2005),
6
     report and recommendation adopted by 2005 WL 3081634 (E.D.Cal.
7
     2005)
8
          Another district court explained:
9
          "More important ... in assessing any due process violation
10   is the fact that continued reliance on unchanging
     circumstances transforms an offense for which California
11   law provides eligibility for parole into a de facto life
     imprisonment without the possibility of parole.  The court
12   asks rhetorically – what is it about the circumstances of
     petitioner's crime or motivation which are going to change?
13   The answer is nothing.  The circumstances of the crime will
     always be what they were, and petitioner's motive for
14   committing them will always be trivial.  Petitioner has no
     hope for ever obtaining parole except perhaps that a panel
15   in the future will arbitrary hold that the circumstances
     were not that serious or the motive was more than trivial.
16   Given that *no one* seriously contends lack of seriousness or
     lack of triviality at the present time, the potential for
17   parole in this case is remote to the point on non-
     existence.  Petitioner's liberty interest should not be
18   determined by such an arbitrary, remote possibility." n2

19   n2 "To a point, it is true, the circumstances of the crime
     and motivation for it may indicate a petitioner's
20   instability, cruelty, impulsiveness, violent tendencies and
     the like.  However, after fifteen or so years in the
21   caldron of prison life, not exactly an ideal therapeutic
     environment to say the least, and after repeated
22   demonstrations that despite the recognized hardships of
     prison, this petitioner does not possess those attributes,
23   the predictive ability of the circumstances of the crime in
     near zero."
24
25   (*Irons v. Warden of California State Prison – Solano,* 358
26   F.Supp.2d 936, 949.)

27        In the circumstances of this case, the Board's continued
28   reliance upon the nature of petitioner's crime to deny him

                              24

1  parole in 2006 violates due process. Continued reliance upon
2  the unchanging facts of petitioner's crime makes a sham of
3  California's parole system and amounts to an arbitrary denial of
4  petitioner's liberty interest. Petitioner has been denied
5  parole on five occasions prior to the determination he now
6  challenges. (See Exhibits 8, 9, 10, 11, and 12.) Continued
7  reliance upon the unchanging characterization of petitioner's
8  offense amounts to converting petitioner's sentence of 25 years
9  to life to a term of life without the possibility of parole.

10     The Board's continued reliance on the commitment offense
11  violates due process because it resulted in an arbitrary
12  decision and because the facts surrounding the offense do not
13  now constitute "some evidence" possessing "some indicia of
14  reliability" that petitioner pose a danger to the community.
15  (See *Hill*, 472, U.S. at 455; *Biggs*, 344 F.3d at 917; *Irons*,
16  358 F.Supp.2d at 947; *Masoner v. State*, 2004 WL 1080177 at *1-2
17  (C.D.Cal. 2004) ["Although the gravity of the commitment offense
18  and other pre-conviction factors alone may be sufficient to
19  justify the denial of a parole date at a prisoner's initial
20  hearing, subsequent BPT decisions to deny a parole date must be
21  supported by some post-conviction evidence that the release of
22  an inmate is against the interest of public safety].)

23     Beside not being especially atrocious, heinous or callous,
24  petitioner's crimes have little, if any, predictive value for
25  future criminality. Simply from the passing of time,
26  petitioner's crimes 25 years ago have lost much of their
27  usefulness in foreseeing the likelihood of future offenses than
28  if he had committed them five or ten years ago. (*In re Scott*,

25

1  133 Cal.App.4th at 573 [past crime's value for predicting future
2  crime diminishes over time].)

3      Because there is no reliable evidence supporting the
4  Board's conclusions that petitioner is unsuitable for parole,
5  that determination violates due process.  (*Hill*, 472, U.S. a5
6  455.)

7                          **CONCLUSION**

8      The Board's statement of decision is cryptic at best.  It
9  merely recites the commitment offense as the primary basis upon
10 which it denied parole.  It does not explain what it is about
11 the commitment offense that makes petitioner "an unreasonable
12 risk of danger to society if released," or how the commitment
13 offense was "particularly egregious."  A determination of
14 unsuitability is simply shorthand for a finding that a prisoner
15 currently would pose an unreasonable risk of danger if released
16 at this time.  Absent any evidence in support, the Board's
17 decision finding petitioner unsuitable for parole is arbitrary
18 and capricious and resulted in a due process violation.

19

20     WHEREFORE, petitioner prays the Court will grant this
21 petition.

22

23 DATE:  February 11, 2007                Respectfully Submitted

24

25

26                                         R. K. Mauzey
27                                         Petitioner, In Pro Per

28

26

TABLE OF EXHIBITS

EXHIBIT 1
     Subsequent Parole Consideration Hearing Transcript
     May 4, 2006

EXHIBIT 2
     Probation Officer's Report
     December 28, 1982

EXHIBIT 3
     Abstract of Judgment
     February 8, 1983

EXHIBIT 4
     Psychological Evaluation
     September 25, 2003

EXHIBIT 5
     Psychological Evaluation
     November 15, 1995

EXHIBIT 6
     Psychological Evaluation
     November 7, 1997

EXHIBIT 7
     Psychological Evaluation
     December 10, 1999

EXHIBIT 8
     Initial Parole Consideration Hearing Transcript
     February 20, 1996

EXHIBIT 9
     Subsequent Parole Consideration Hearing Transcript
     February 25, 1998

EXHIBIT 10
     Subsequent Parole Consideration Hearing Transcript
     October 31, 2000

EXHIBIT 11
     Subsequent Parole Consideration Hearing Transcript
     September 24, 2002

EXHIBIT 12
     Subsequent Parole Consideration Hearing Transcript
     January 9, 2004

EXHIBIT 13
     Letter of Support
     November 28, 2003

E X H I B I T

1

Subsequent Parole Consideration Hearing Transcript
May 4, 2006

E X H I B I T

2

Probation Officer's Report
December 28, 1982

A-135109

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE

PROBATION OFFICER'S REPORT

PEOPLE vs RONALD KEITH MAUZEY                    CR-18817 MF (CR-19283)

LEGAL STATUS:

On July 26, 1982, a third Amended Information was filed charging the defendant with attempt violation of Section 187 of the Penal Code (Attempt Murder), in Count I, with violation of Section 653f(b) of the Penal Code (Solicitation for Murder), in Counts II and III, and with violation of Section 182 of the Penal Code (Conspiracy to Commit Murder), in Count IV, all felonies. Further, the Information alleged that at the time of the commission of the offense, as to Count I, the defendant personally used a firearm, to wit, a rifle, within the meaning of Penal Code Section 12022.5 and the defendant inflicted great bodily injury within the meaning of Penal Code Section 12022.7 and, as to Count IV, the Information alleged four overt acts. On that same date, the defendant entered pleas of not guilty and denied the special allegations and overt acts. On July 27, 1982, jury trial was set for Septemeber 7, 1982 and duly trailed, continued and reset to November 2, 1982. On that date, a jury trial commenced and on December 1, 1982, as to Count I, the jury returned a verdict finding the defendant guilty of attempt violation of Section 187 of the Penal Code

1  (Attempt: Murder of the First Degree), as charged in the third amended

2  Information. Further, as to Count I, the jury found the special allegations

3  within the meaning of Penal Code Sections 12022.5 and 12022.7 true. As to

4  Counts II and III, the jury returned verdicts finding the defendant guilty

5  of violation of Section 653f(b) of the Penal Code (Solicitation for Murder),

6  as charged in the third amended Information. As to Count IV, the jury

7  returned a verdict finding the defendant guilty of violation of Section

8  182 of the Penal Code (Conspiracy to Commit First Degree Murder), as

9  charged in the third amended Information. Further, as to Count IV, the

10 jury found the overt acts true. The matter was thereupon referred to

11 the Probation Officer for a pre-sentence investigation and report,

12 returnable January 10, 1983, at 8:30 a.m., in Department 5.

13     The defendant is presently in custody and is represented by Mr.

14 Samuel Kahn, Attorney-at-Law.

15 PERSONAL DATA: (As provided by the defendant)

16     Address: Riverside County Jail, Riverside, California.

17     The defendant is a 36 year old divorced Caucasian male born October 13,

18 1946, in Sapula, Oklahoma. He was the oldest of three children born to the

19 union of Wayne K. Mauzey and Ruth Mauzey. The defendant indicated that he

20 married Elke Steffanowski, age 31, on October 22, 1967, but that they were

21 divorced on November 13, 1981. Two children, now ages 14 and 10 years old,

22 were born as a result of their union. He indicated that his oldest son

23 resides with his parents in Riverside, California and that his youngest son

24 resides with his ex-wife, who is now married to the victim in this matter,

25 John Paullin.

26     With regard to his formal education, the defendant stated that he

27 graduated from Ponca Military Academy in Oklahoma in 1964. He attended

28 Cypress College from 1968 to 1971 and then Cal State Fullerton to 1972.

1   In 1974 he attended the University of Tulsa. He stated that his major was

2   Business Administration but that he did not obtain any degrees. He was

3   last self-employed as a general contractor and business owner. He related

4   that he owned Ronco Framing Incorporated, Lumber Commodities Incorporated

5   and W.H. Wash Trucking Incorporated, but lost those businesses due to his

6   incarceration in the instant matter. He stated that his corporations had

7   a net business profit of between $250,000.00 to $300,000.00 per year and

8   that he had a personal income of $90,000.00 to $100,000.00 per year. He

9   listed previous employment experience as an accountant. He indicated that

10  he has been a member of the Carpenter's Union since 1968. He served in

11  the United States Army from 1965 to 1968 and was honorably discharged.

12  The defendant indicated that he currently has no income nor any assets.

13  He stated that due to his arrest in the instant matter he has lost

14  assets of approximately $400,000.00. He listed no major liabilities.

15      The defendant describes his health as good and listed no handicaps

16  or ailments. With regard to the use of alcohol, the defendant stated

17  that he only drank occasionally, except during the period of the instant

18  offenses. With regard to the use of controlled substances, the defendant

19  stated that he used cocaine, only during the period of the instant offenses.

20      He claims affiliation with the First Baptist Church of Sunnymead and

21  that he has attended services sporadically. His goal is to "get out, start

22  my businesses again and regain custody of my sons. He plans to "return

23  my environment back to the same before it got bad".

24  ARREST RECORD: (CII A02734183; FBI: 969597W1; SSN: 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)

25      A communication received from the California Bureau of Identification

26  reveals no arrests or convictions other than the instant offenses.

27      Local records reveal that in RMC-005405, on 8-12-80, the defendant

28  was convicted of violation of Section 23102(a) of the Vehicle Code,

1 | granted three (3) years Court probation and fined $365.00.

2 | Further, in RMC-107889, on 10-1-81, the defendant was convicted of

3 | violation of Section 23103 of the Vehicle Code, granted two (2) years

4 | Court probation and fined $350.00.

5 | SUMMARY OF OFFENSE:

6 | The following information is summarized from reports of the Riverside

7 | Police Department. (This information is not necessarily the same information

8 | elicited at the trial in this matter).

9 | COUNT I:

10 | On June 30, 1981, at approximately 11:50 p.m., officers responded to

11 | the 4200 Block of Lido, Riverside, California, following a radio call of

12 | a shooting incident. Victim, John Howard Paullin, was located and had

13 | a gunshot wound to his side. He was in severe pain, made no statement

14 | and was transported to Parkview Hospital where it was later determined

15 | the bullet was lodged in the victim's abdomen or liver. The victim's

16 | neighbors advised the victim came to their residences stating someone

17 | was after him and that he had been shot by the defendant. Officers were

18 | then contacted by Elke Mauzey, the defendant's estranged wife who had

19 | been living with the victim. She advised that as they were awake in

20 | the bedroom, the victim went to answer the front door and she then heard

21 | the victim and the defendant, who she identified by his voice, fighting.

22 | Witnesses observed the defendant leave the area at a high rate of speed

23 | in his pickup truck which was later recovered at his parent's residence

24 | where he had borrowed another vehicle.

25 | On July 1, 1981, Elke Mauzey was again interviewed and stated that

26 | on April 23, 1981, she had left the defendant's residence after advising

27 | him that divorce proceedings were in progress and subsequently began

28 | living with the victim. She advised that on approximately June 19, 1981,

1  while attempting to pursuade her to leave her boyfriend the defendant ad-

2  vised her he knew his identity, had driven around his residence and that

3  he was going to "hire some Mexicans to get him". She advised the defendant

4  had been violent towards her in the past, has a bad temper when drinking

5  and can be violent. Detectives subsequently siezed as evidence a .22

6  caliber rifle and ammunition from the defendant's Sunnymead residence.

7      On July 2, 1981, the victim, who had undergone surgery to repair his

8  liver, pancreas, colon and stomach was interviewed at the hospital and ad-

9  vised the door was suddenly "kicked open" and he observed the defendant,

10  who he recognized from a photograph, pointing a rifle at him and that the

11  defendant fired the rifle. He related they struggled, he did not recall

12  the weapon discharge again and was not immediately aware of being shot.

13  In a search of the victim's residence detectives noted a shoe print on

14  the front door, located a spent .22 caliber shell casing and removed a

15  lead slug from a 2X4 outside the south bathroom.

16      On July 9, 1981, the defendant was booked for attempted murder and

17  released on $10,000.00 cash bail.

18      During follow-up investigation on July 16, 1981, detectives learned

19  the victim had undergone additional surgery wherein a colostomey was per-

20  formed and that further surgery was anticipated.

21  COUNTS II, III and IV:

22      On approximately November 20, 1981, detectives received information

23  that an informant, Arthur Carranza, had information concerning a possible

24  solicitation for murder wherein the defendant had approached Carranza to

25  kill a subject named John Paullin. Detectives were aware the defendant

26  had previously been arrested for the attempt murder of Mr. Paullin, that

27  Mr. Paullin had testified against the defendant and that the defendant

28  was held to answer in Superior Court.

-5-

1   Subsequently, on November 30, 1981, and December 7, 1981, detectives

2 contacted Carranza who indicated that sometime after August, 1981, the

3 defendant had taken a liking to him, invited him to live in his home and

4 did on several occasions solicit him to kill Mr. Paullin as he was the

5 only person who could identify him regarding the attempted murder.  The

6 defendant offered to buy Carranza a house, give him a job in his con-

7 struction company and pay him $4,000.00 a month, not only for killing

8 Mr. Paullin but also for assisting in illicit sales of cocaine.  A slip

9 of paper the defendant had given Carranza with John Paullin's name, make

10 of car and home and business addresses was seized as evidence.  Carranza

11 advised the detectives the defendant drove him by Paullin's residence

12 and business, showed him the probable route of travel between Paullin's

13 home and business and suggested "sniping" Paullin while enroute to his

14 office.  Carranza advised detectives he did not want to commit the murder

15 himself but may find someone who would and that he did on one occasion

16 contact another subject.  It was later determined through the defendant's

17 telephone records that in October, 1981, Carranza telephoned a Felix Salsedo

18 for the purposes of soliciting the murder for the defendant.  For the purpose

19 of the investigation it was determined the informant would make contact

20 with the defendant and should the defendant still be inclined to solicit

21 Mr. Paullin's murder, Detective Brian McAuley would be introduced as "Wolf",

22 a paid killer.

23  On December 8, 1981, the informant met the defendant at his residence

24 and during taped conversation the defendant made several comments regarding

25 wanting Mr. Paullin killed.  Appropriate payment for the killing was dis-

26 cussed and reference was made to "one grand", "a kilo", or "some coke".

27  On December 9, 1981, Detective McAuley telephoned the defendant as

28 "Wolf" concerning the solicitation for murder.  In the recorded conversation

1   the defendant provided the detective with information concerning Mr. Paullin
2   and indicated he still wanted Paullin killed.

3   On December 10, 1981, the informant again contacted the defendant re-
4   garding subject "Wolf" killing Paullin on Friday, December 11, 1981. The
5   defendant indicated in reference to the killing of Mr. Paullin that it was
6   too soon and that he wanted to postpone the killing until he was able to
7   pay half down and the other half upon completion of the job.

8   On December 11, 1981, an arrest warrant was obtained and the defendant
9   was arrested without incident at his residence at 25502 Jaclyn Street,
10  Sunnymead, California.

11  DEFENDANT'S STATEMENT:

12  In an interview conducted at the Riverside County Jail, the defendant
13  essentially maintained his innocence in the instant matter feeling that the
14  most he should have been convicted of was "simple assault or assault with
15  a deadly weapon".

16  In discussing the attempt murder, the defendant stated the whole thing
17  was "over the children and his ex-wife was the moving force". He explained
18  that during their separation for two and a half months prior to the shooting
19  incident she was "constantly telling me the victim was a better man and
20  would be a better father for our children". He indicated that he only went
21  to the victim's residence that night to "tell my ex-wife and the victim
22  to leave me and the kids alone" and that he had taken the rifle along to
23  "scare the victim and make my point". He stated that when the victim
24  opened the door he grabbed the rifle, they struggled and that he does not
25  even know when the rifle went off. He related it would not have happened
26  had he been himself and that he wasn't rational due to his personal
27  problems, that he had been on a three day binge and had used cocaine.
28  He indicated that he was disappointed as the jury "didn't buy the diminished

1    capacity". He denied that he sought out the victim or that he had made
2    prior threats towards him stating it was his wife who told him all about
3    Paullin and it was she who "got it into her mind that I would do something
4    violent". He did admit that he had driven by the victim's house once prior
5    to the incident "just to see his house".

6        In discussing the other charges, the defendant claimed it was the
7    informant who suggested getting rid of the witness and offered to kill
8    Paullin as they had become friends and the informant felt gratitude for
9    what he was doing for him. He related that he never took the informant
10   seriously, as he knew it wouldn't help his case but that it got to the
11   point that "I just played along with Art". He feels the informant made
12   up the story about "this terrible criminal in Sunnymead" and that the
13   informant testified against him as he had his own problems with the
14   police and for revenge, as he had kicked the informant out of his house.
15   He denied doing anything other than possibly "pointing out the victim's
16   business once when we were partying".

17       When questioned regarding his feeling towards the offenses, the defen-
18   dant stated "if I had wanted Paullin dead I would have done it myself and
19   use something other than a .22 caliber rifle". He feels the attempt
20   murder conviction is "garbage" and that had the informant told the truth
21   he would not have been convicted. He admitted the taped conversations
22   were damaging but stated he didn't mean what was said and when he realized
23   "Art had something there I tried to put it off and say no in a round about
24   way". He related that he is not a violent or dangerous person and that
25   only on one occasion did he "slap my wife on the arm, but the District
26   Attorney made it out like I beat her regularly". When questioned about
27   the victim, the defendant stated "what I've heard since about Paullin,
28   I still don't like him". He explained that his youngest son is now living

1  with his ex-wife and Paullin, and they tell him "better forget his dad, you're better off with us". He indicated that he is still pursuing child custody in court as he does not want his children separated.

4  In discussing sentencing, the defendant realizes he will be sentenced to State Prison. He feels "it was a mistake going over there with the rifle, but it was the tapes that convinced the jury I was guilty of everything". He feels the court should have tried the offenses separately and that he has good grounds for appeal and must now leave it in the hands of the Appeallate Court.

10 ADDITIONAL INFORMATION:

11 Both the District Attorney and the defendant's defense counsel were contacted and their views considered.

13 Detective Rowe, the investigating officer in this matter, advised that he feels the defendant had full intent to murder the victim and then intended to have the victim killed for the added motive of eliminating the witness to the attempted murder. He felt that in addition to the "family reasons" the defendant was motivated to murder Paullin to protect his assets in his construction company due to his pending divorce. He described the defendant as intelligent, but calculating and callous.

20 Wayne K. Mauzey, the defendant's father, was contacted and stated he does not feel the defendant was guilty of everything and "is not capable of doing all that". He feels the defendant's ex-wife drove him out of his mind and that the defendant became involved in a "triangle thing with the victim". He has not known the defendant to be a violent person.

25 Lewis McElfresh, the defendant's minister at the First Baptist Church in Sunnymead, contacted the writer and advised that he has visited the defendant every week in jail to try to keep him encouraged. He feels the defendant realizes he made mistakes and that he has a good attitude in

1   jail, trying to make the best out of a bad situation.

2   .Deputy Persinger, at the Riverside County Jail, contacted the writer

3   and advised the defendant has been a trusty for one (1) year and has been

4   trustworthy, honest and non-violent in the custody setting. He related

5   the defendant has assisted in keeping order in the jail and his behavior

6   while in custody has been indicative of a non-violent person.

7       The writer attempted to make personal contact with Elke Paullin,

8   but was unable to do so. She provided a statement, in conjunction with

9   John Paullin, which is attached to the report for the court's consideration.

10  VICTIM INFORMATION:

11      John Paullin, the victim, provided the Probation Officer with a written

12  statement which he requested be attached to the report for the court's con-

13  sideration. In discussion, the victim indicated that his medical expenses

14  were in excess of $40,000.00 and that his insurance company paid all but

15  the deductible, $1,000.00. He describes his financial losses as a result

16  of the shooting to be in the excess of $150,000.00. In discussing his

17  medical condition, the defendant stated that he has a fourth surgery planned

18  to repair a hernia problem as a result of the shooting incident. He stated

19  that he will remain under a doctor's care, be on a controlled diet and have

20  lingering complications from the shooting for the rest of his life. He

21  described the defendant as being dangerous, threatening and vindictive

22  and that he will fear retaliation from the defendant for the rest of his

23  life. He stated that the defendant had previously threatened his wife

24  who had attempted to divorce him and that on this occasion he made a

25  threat and then followed through. He feels the defendant should be sentenced

26  to the maximum term allowable by law.

27  PROBATION OFFICER'S STATEMENT:

28      Appearing before the court for sentencing is a 36 year old male who

1   has been convicted by a jury of attempt murder of the first degree, two

2   counts of solicitation for murder, and conspiracy to commit first degree

3   murder, all felonies. Further, the jury found the Special allegations

4   true, as to Count I, that the defendant personally used a firearm and that

5   the defendant inflicted great bodily injury within the meaning of Penal

6   Code Sections 12022.5 and 12022.7. Further, as to Count IV, the jury

7   found the overt acts true. The court having heard testimony in this

8   matter is aware of the circumstances of the offenses.

9        The defendant, who has been a self-employed businessman and owner of

10  multiple corporations, was cooperative when interviewed and appears to

11  possess above average intelligence. Although he stands convicted in this

12  matter, he essentially maintains his innocence other than possibly committing

13  a "simple assault or assault with a deadly weapon". Despite the evidence

14  and apparent motives for committing the offenses, he accepts little

15  responsibility and projects blame for his convictions onto the witnesses,

16  the court and the jury. His denials leave little apparent capacity for

17  remorse. In the defendant's behalf, in view of his background of pro-

18  ductivity and lack of prior criminal history, other than alcohol related

19  convictions, one could find it difficult to understand the defendant as

20  one capable of such serious offenses. On the other hand, there are indica-

21  tions that prior to the offenses the defendat had had significant marital

22  problems with incidences of aggressive behavior, possibly induced by

23  substance abuse. He is seen as an individual who, when in control of

24  his environment, functions adequately but who was unable to accept the

25  reality of his disrupted personal life and its consequences and turned

26  to assaultive and violent behavior to protect his interests and needs.

27  Circumstances in this matter indicate the offenses are not just the

28  result of transient emotional and aggressive outbursts but suggests



1  the defendant to be a calculating and callous individual who deliberately,
2  somewhat compulsively and purposefully developed malice intent for the
3  victim in disregard of any value for human life. Particular concern for
4  the victim was not detected nor did he appear to have been impressed with
5  these overall proceedings. The writer sees the defendant as being
6  emotionally confused and possibly continuing to harbor a great deal of
7  anger, frustration and resentment. The writer feels that the defendant,
8  when under stress and lacking proper judgement and control, could still
9  be considered a danger to others.

10     Circumstances in aggravation might include that the crimes involved
11  great violence, great bodily harm, threat of great bodily harm, or other
12  acts disclosing a high degree of cruelty, viciousness or callousness,
13  whether or not charged or chargeable as an enhancement under Section
14  12022.7; that the defendant was armed with or used a weapon at the time
15  of the commission of the crime, whether or not charged or chargeable as
16  an enhancement under Section 12022 or 12022.5; that the defendant induced
17  others to participate in the commission of the crime or occupied a position
18  of leadership or dominance of other participants in its commission; that
19  the defendant attempted to illegally interfere with the judicial process;
20  the planning sophistication or professionalism with which the crime was
21  carried out, or other facts, indicate premeditation; and that the defendant
22  has engaged in a pattern of violent conduct which indicates a serious
23  danger to society. Circumstances in mitigation might include that the
24  defendant has no prior record or an insignificant record of criminal
25  conduct considering the recency and frequency of prior crimes.

26     In summary, the defendant is ineligible for probation conderation
27  pursuant to Penal Code Sections 1203.06 and 1203.075 and a State Prison
28  commitment is being recommended. Even if the defendant were felt to be

1   eligible for probation, considering the nature, seriousness and circumstances
2   of the offenses, wherein it is no credit to the defendant that the victim
3   was not killed, and the defendant's apparent insensitivity to the value of
4   human life, he is seen as unsuitable and undeserving of probation con-
5   sideration. It is felt that a commitment to State Prison is necessary
6   to protect the public and to serve as an appropriate penalty for such
7   serious offenses. Further, it is felt the defendant is in need of
8   correctional, psychological or psychiatric treatment which can most
9   effectively be provided if he is confined in the Department of Corrections.
10   In view of the degree of harm to the victim, that the defendant poses
11   an unreasonable threat and the nature of these multiple offenses, which
12   involve felony offenses committed by the defendant while released custody
13   pending criminal charges on an earlier felony, the writer feels consecutive
14   sentencing could be considered.

15   CREDIT, TIME SERVED:

16   ·   Total days credit 595; local time, 397 days; PC 4019 time, 198 days;
17   State Institution time, 0 days.

18              Arrest Date:              Release Date:

19              July 9, 1981              July 9, 1981

20              December 11, 1981         Not applicable

-13-

RECOMMENDATION:

In the matter of Ronald Keith Mauzey, CR-18817 MF (CR-19283), it is respectfully recommended that probation be denied and that the defendant be committed to State Prison for the term prescribed by law as to Count IV. Further, that as to Counts I, II and III, the defendant be committed to State Prison.

DATED this 28th day of December, 1982.

Respectfully submitted,

LAWRENCE F. SMITH
Probation Officer

BY:  GARY CARNES
Senior Probation Officer

I hereby certify that I have read and considered the Probation Officer's Report.

_____
Judge of the Superior Court

E X H I B I T

3

**Abstract of Judgment**
**February 8, 1983**

In the Sup~ ...r Court of the State c~ .lifornia

in and for the County of __RIVERSIDE__

F I L E D
RIVERSIDE COUNTY

# Abstract of Judgment

FEB - 8 1983

### Commitment to State Prison

WILLIAM E. CONERLY, Clerk
By _____ Deput
Present.

Dept. No. ___5___ Case No. CR-18817 MF
The People of the State of California (CR-19283)

vs.

RONALD KEITH MAUZEY,
                                    Defendant.

Hon. J. WILLIAM MORTLAND
Judge of the Superior Court
District Attorney by:
Randall Tagami, Deputy
Prosecuting Attorney

Samuel Kahn
Counsel for Defendant

This certifies that on the __8th__ day of __February__, 19 _83_, judgment of conviction of the above-named defendant was entered as follows:

(1) In Case No. CR-18817 Count No. _____ he was convicted by __Jury__; on his plea of _____
(court or jury)

__Not Guilty__
(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of __Conspiracy to Commit First Degree Murder__

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of __182 P.C./187 (first degree)P.C.(Overt Acts 1,2,3 and 4)__
(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
| none | --- | --- | --- |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Defendant has been held in jail custody for _____843_____ days as a result of the same criminal act or acts for which he has been convicted. ( * 843  total, local 579 days, PC4019 time 264 days, State Inst.
Defendant ___**___ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap- -0-
(was or was not)

on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.

Defendant ___**___ armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
(was or was not)
tions 969c and 12022 of the Penal Code.

Defendant ___**___ a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of
(used or did not use)
the Penal Code.       ** no finding

(Repeat foregoing with respect to each count of which defendant was convicted.)

ABSTRACT OF JUDGMENT

(2) Defendant _____ _____ adjud_ .bitual criminal within the meaning of S __ )n ____ of Section 644 of the Penal
    (was or was not)                                     (a or b)

Code; and the defendant _____ a habitual criminal in accordance with Subdivision (c) of that Section.  No finding
                     (is or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of ___Riverside_____ and by him delivered to the Director of Corrections of the State of California at ........

Chino, California

It is ordered that~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~):

Sentenced to State Prison and stayed as to the following Counts:
Count I 187(1°) Attempted Murder Middle term – 2 years, plus 2 years re:
12022.5 P.C. use of Firearm, plus 3 years re: 12022.7 PC infliction G.B.I.,
Count II 653(f) sub b – middle term of 4 years, Count III 653(f) middle
term of 4 years, all ordered stayed and stay to become permanent upon
completiton of time served in Count IV.
and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences
from other jurisdictions):

NONE

(4) To the Sheriff of the County of ___Riverside_____ and to the Director of Corrections at the _____

California Institution For Men at Chino, Califorr

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at ___the California Institution For Men Chino,___

California, at your earliest convenience.

Witness my hand and seal of said court

this ___8 th___ day of ___February___, 1983

William E. Conerly, _____ Clerk,

by ___D. Wight___ D. Wight _____ Deputy

State of California,
County of ___Riverside___ } ss.

    I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court this ___8___ day of ___February___,
19__83__.

William E. Conerly, by: ___D. Wight___ D. Wight Depu

County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of ....
Riverside

The Honorable ___J. WILLIAM MORTLAND_____,

Judge of the Superior Court of the State of California, in and for the County of ........

RIVERSIDE

NOTE: If probation was granted in any senter   of which abstract of judgment is certified, attach
a minute order reciting the fact and imposing   ence or ordering a suspended sentence into effect.

E X H I B I T

4

Psychological Evaluation
September 25, 2003

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**SEPTEMBER 2003 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**SEPTEMBER 25, 2003**

This is a psychological evaluation for the Board of Prison Terms for inmate Ronald Mauzey, CDC# C-61868. This report is based upon a clinical interview of the inmate, conducted on 09/25/03, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

Inmate Mauzey's last Board of Prison Terms' psychological evaluation was done by M. Carswell, Ph.D., and was dated 12/10/99. Please refer to that report for the inmate's identifying information, developmental history, educational history, psychosexual development and sexual orientation, military history, and plans if granted release, as there have been no changes.

## PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

There have been no changes in this section since his last report.

II.  **DEVELOPMENTAL HISTORY:**

There have been no changes in this section since his last report.

III. **EDUCATIONAL HISTORY:**

There have been no changes in this section since his last report.

IV.  **FAMILY HISTORY:**

With regard to his family history, one of his brothers has passed away. He died from a heart attack. For additional information, refer to the psychological evaluation of 12/10/99.

V.   **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

There have been no changes in this section since his last report.

**MAUZEY          C-61868          CTF-NORTH          09/26/03          gmj**

MAUZEY, RONALD
CDC NUMBER: C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO


VI.    **MARITAL HISTORY:**

Inmate Mauzey's sons are now 31 and 34 years old. He has two grandchildren, ages 8 and 12. He reports a second marriage while he was in prison, from 1986 to 1989 or 1990. He reports that his marriage ended due to infidelity on his wife's part. For additional information, refer to the psychological evaluation of 12/10/99.

VII.    **MILITARY HISTORY:**

There have been no changes in this section since his last report.

VIII.    **EMPLOYMENT/INCOME HISTORY:**

Inmate Mauzey furnished additional information regarding his employment and income history. He indicated that at the present time he does not choose to have a prison job. He says he spends his time helping others with legal paperwork, playing his guitar, teaching music, and studying German.

IX.    **SUBSTANCE ABUSE HISTORY:**

In addition to the information reported in his 12/10/99 evaluation, inmate Mauzey reported that he was using cocaine during the same two to three month period when he abused alcohol. He strongly feels he is not an alcoholic or addict, and does not wish substance abuse treatment of any kind.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Mauzey indicates that he has a heart condition, for which he takes Niacin. He also reported that he takes Timolol for glaucoma in his right eye.

XI.    **PLANS IF GRANTED RELEASE:**

There have been no changes in this section since his last report.


## CLINICAL ASSESSMENT


XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Mauzey's current mental status is within normal limits.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

There have been no changes in this section since his last report.


MAUZEY          C-61868          CTF-NORTH          09/26/03          gmj

MAUZEY, RONALD
CDC NUMBER: C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## XIII.  REVIEW OF LIFE CRIME:

When asked to review his committing offense, inmate Mauzey denied that he conspired to kill the victim. He acknowledged that he did shoot the victim, but said it was an accident. He took responsibility for exercising extremely poor judgment in going to the victim's residence with a rifle. He stated that he believed he had diminished capacity at that time, but could give no reason for this belief other than the fact that he took his rifle to the scene of the crime because he believed the victim had a gun. He expressed remorse for the pain he had caused his victim and his children and grandchildren. At the present time, his remorse is more of an intellectual than emotional experience.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  Inmate Mauzey has no prior criminal history. He has only one disciplinary report for violence while in CDC. This occurred in 1995, and involved a shoving match with another inmate. It is notable that inmate Mauzey did not take responsibility for his actions at that time, presenting them as justifiable self-defense. He now acknowledges that he was involved in a fight, but points out that it was many years ago. Another concerning rules violation occurred in 1997, when inmate Mauzey was found to have a note in his pocket which contained instructions for the manufacture of methamphetamine. He did not take responsibility for this infraction. Other rule violations in his file are for occasional uncooperativeness and contentiousness. He has functioned well within CDC. He appears to be at lower than average risk for violence compared to a Level II inmate population.

B.  If released to the community, his violence potential is somewhat higher than that of the average citizen in the community due to his history of violence and history of involvement with alcohol and drugs.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate has been able to function well within the institution.

B.  He does not have a mental disorder which would necessitate treatment, either during his incarceration period or following parole.

C.  Although he denies having an alcohol or drug problem, and is resistant to attending Alcoholics Anonymous, it would be reasonable to monitor his drug and alcohol consumption through urine testing on a random basis if he were granted parole. It would also be advisable that he have parole conditions prohibiting the use of alcohol and drugs, and access to weapons.

MAUZEY          C-61868          CTF-NORTH          09/26/03          gmj

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


*[signature]* , Ph.D. for

**DEE SHAFER, Ph.D.**
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


*[signature]* , Ph.D.

**B. ZIKA, Ph.D.**
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

DS/gmj

D:  09/25/03
T:  09/26/03

E X H I B I T

5

Psychological Evaluation
November 15, 1995

## PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

### Richard J. Donovan Correctional Facility

### January 1995 Calendar
### November 15, 1995

This is the fourth report to the Board on this inmate. This writer has had a forty-five minute interview with this inmate and has reviewed his C-File and Medical Record.

Mr. Mauzey works as a clerk in the Program Office in Yard One. He is the Facility Captain's clerk. He does typing, filing, and compilation of figures used for reports. He has been doing this since June of 1992. He receives good work reports and requests for Placement Override for this inmate have been approved and signed by the Warden. In these requests, he is praised for his excellent work and his ability to function without much supervision. Quoting from one of these override requests, "Inmate Mauzey is the PA Clerk-he has demonstrated exceptional skills in fulfilling his duties. His vast clinical experience in other institutions has been used to fine tune the clerical procedures implemented in Facility One. His efficiency has contributed to the smooth operation in the Program Office inspite of numerous supervisory changes." In his free time he enjoys playing the guitar which he does for several hours at night and he also studies calculus. He has two sons who both live out of town. He also has a grandson and granddaughter. He has not participated in NA or AA and states that he has not had a drug or alcohol problem in the past or at present. He appears to be a high functioning individual who is easily able to perform the duties of his job.

He is presently serving a twenty-five year to life sentence for conspiracy to commit first degree murder. He states that the victim was shot and seriously wounded but he is unsure whether he shot him by pulling the trigger or if the rifle discharged during a struggle. The victim, after he was shot, went to a neighbor's home and told them that the defendant had shot him. The defendant was arrested and booked for attempted murder. The victim underwent operations for his abdominal wound and subsequently healed. When I asked the inmate how he felt about what happened, he states, "the guy shouldn't have been shot at all." He felt it was wrong for him to have gone to the victim's house and to have gone there with a gun. This man does not have a long criminal record.

**MAUZEY, RONALD**      C61868      (1)      **RJDCF-SD**      (rmp)

He does not have the attributes necessary to make the diagnosis of Antisocial Personality Disorder. He has functioned on a high level most of his life. Prior to coming to prison, he was married and was divorced in 1981. He graduated from a military academy in 1964 and attended college from 1968 to 1972. He was later self-employed as a general contractor and business owner. He was successful in his business and states that if released, he would go back to the same business he had been in and would be successful. He was in the Army from 1965 to 1968 and received an honorable discharge. Mental Status Examination of this man is entirely normal. He does not have a thought or mood disorder. He does state at the time of the instant offense, he had been drinking and using cocaine and he feels this had probably contributed to committing this offense. However, he denies a drug or alcohol use history and states he used those drugs for a very short period prior to the instant offense. He has had two CDC 115's, one in 1990 and one in 1993. One was for disclosing confidential information and the other was for fighting in which basically no one was seriously injured. He does not show a great deal of remorse and states he has had fourteen years to deal with it. However, he has written a letter to the victim and has apologized to him for what he did. He does state, "I am sorry the guy got shot."

PSYCHIATRIC DIAGNOSIS:

Axis I:        No Diagnosis.

Axis II:       No Diagnosis.

PSYCHIATRIC CONCLUSIONS:

The diagnosed pschopathology has been related to criminal behavior indirectly. During observation in the institution, he has psychiatrically improved greatly. In a less controlled setting, such as return to the community, this inmate is considered likely to continue improvement.

SUGGESTED ACTIONS:

This inmate has had favorable psychiatric reports with similar conclusions favorable for release.

MAUZEY, RONALD        C61868      (2)        RJDCF-SD        (rmp)

PAROLE AND RELEASE:

If this inmate is to be paroled or released, consideration
should be given to the following:

Violence potential outside a controlled setting in the past
is considered to have been average and at present is
decreased.

Conditions of parole should include routine monitoring of
drug or alcohol intake.  This inmate is not on any drug
therapy at the present time.  This individual is highly
functioning and is able to make a living in the community
which he has demonstrated in the past.  At the present time,
he is not a threat or danger to society.  It is very
doubtful that he would be involved in violence of any kind
if he were released to the community.

*Sheldon J. Falkenstein MD*

SHELDON J. FALKENSTEIN, M.D.
Staff Psychiatrist

E X H I B I T

6

Psychological Evaluation
November 7, 1997

RICHARD J. DONOVAN CORRECTIONAL FACILITY

HEALTH CARE SERVICES

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

UPDATE

November 1997 Calendar

*IDENTIFICATION:*

Mr. Mauzey is generally doing well but has received a CDC-115 for Drug Paraphernalia which was a note found in his pocket at visiting. This note gave instructions on how to make methamphetamine. Mr. Mauzey maintains he is not guilty and is taking it to court. This incident happened this year, 1997. He also received a CDC-115 for not showing skin at night in his cell. He states that the officer wakes him up at one o'clock in the morning so that he will show his skin. Presently, he has been working in PIA textile, which he has just started.

Mr. Mauzey was married in June of this year and states that he likes his wife. He met her thorough an ad in the paper circulated in Europe. He likes her openness and honesty.

From a psychiatric point of view he is basically unchanged. He remains stable with no thought disorder or affective disorder. He is a man of above average intelligence and is well organized.

*DIAGNOSTIC IMPRESSION:*
Axis I:   No diagnosis.
Axis II:  Possible Personality Disorder, NOS.

He has not participated in AA/NA and states that he does not have a drug/alcohol problem, although it is to be noted that he was felt to be under the use of drugs at the time of his instant offense. He has not participated in other activities, for example: such as CROP.

In his free time, he enjoys playing the guitar and visiting with his wife. She visits him four days a week.

In summary, Mr. Mauzey is a intelligent, middle aged, Caucasian male,
D: 11/7/97
T: 11/7/97
MAUZEY                  C-61868              RJDCF/SD              SF/lic

12-16-97

*BOARD OF PRISON TERMS*
*PAGE 2*

*who is doing time for attempted murder and who has adjusted well to the*
*prison environment.  In general he programs well but the recent CDC-115*
*received violates prison rules and is a lapse in his ability to program*
*well.  Psychologically, he is a stable man.  When he is released, I am*
*confident that he will do well in the free community.*

*S. FALKENSTEIN, MD.*
*STAFF PSYCHIATRIST*

*D: 11/7/97*
*T: 11/7/97*
*MAUZEY*                    *C-61868*              *RJDCF/SD*              *SF/lic*

# E X H I B I T

## 7

**Psychological Evaluation**
**December 10, 1999**

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
FEBRUARY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 10, 1999

This is the sixth psychological evaluation for the Board of
Prison Terms on inmate Ronald Mauzey. This report is the
product of a personal interview, conducted on 12/10/99, as
well as a review of his Central file and unit health record.
This single contact interview was for the express purpose of
preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Mauzey is a 53-year-old, divorced, Caucasian
      male. He has no religious preference. No unusual
      physical characteristics were noted and he denied the
      use of any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Mauzey is the oldest of three boys. He stated
      there were no prenatal or perinatal concerns or birth
      defects. He had no abnormalities of developmental
      milestones. All speech, language and motor development
      occurred unremarkably. He denied any history of
      cruelty to animals or any history of arson. He stated
      he had no significant childhood medical history and
      denied any childhood history of physical or sexual
      abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Mauzey has completed four years of college and
      was still attending the University of Tulsa when his
      work became too busy and he stopped attending. His
      last TABE score was in 1990 and was 12.9.

IV.   FAMILY HISTORY:

      Inmate Mauzey's mother is 73 and in good health. His
      father died in 1997. He states his brothers are doing
      well. He communicates with his family monthly by
      writing. He states that his relationship with his
      family is normal.

MAUZEY       C-61868        CTF-NORTH        12/21/99        gmj

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

### V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Mauzey states that he is a heterosexual male.
He denied any history of high-risk sexual behavior
either prior to or since incarceration.

### VI.  MARITAL HISTORY:

Inmate Mauzey was married for 13 years.  There are two
children from that marriage, ages 30 and 28.  He
states that he has a very good relationship with his
children and his grandchildren.

### VII. MILITARY HISTORY:

Inmate Mauzey was in the U.S. Army for three years.
He was discharged in 1968 at the rank of E4 and was a
general staff clerk.

### VIII.EMPLOYMENT AND INCOME HISTORY:

Prior to his incarceration, inmate Mauzey was a general
contractor and owned a contracting company, a trucking
company and a lumber wholesale company.  Since
incarceration, he has worked as a clerk, and is now
working on and enjoying the yard crew.  He has not
finished any vocational work, as he is already a
journeyman carpenter.

### IX.  SUBSTANCE ABUSE HISTORY:

Inmate Mauzey denies any history of substance abuse
whatsoever until a three month window in which the
commitment offense occurred.  He also states that he
has not attended Alcoholics Anonymous nor any self-help
groups due to the fact that eight of the steps are
religiously based and that is an issue with him.

### X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Mauzey has no prior diagnoses nor serious
illnesses.  He has had no medical or psychiatric
hospitalizations and has had no serious accidents or
head injuries.  He has no history of suicidal ideation
or suicide attempts.  He has had no seizures or any
other neurological condition.  He has had no history of

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

disabilities or significant impairments.  He is on no
medication at this time.

XI.    PLANS IF GRANTED RELEASE:

Inmate Mauzey states that should he be paroled, he
would live in Riverside County and would start his
construction business again.  He has kept up with the
trade and he believes that he would do well on parole.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

A. Inmate Mauzey is a 53-year-old, Caucasian male.  He
was appropriately dressed and groomed.  He was
cooperative, calm and alert during the interview.  His
speech was clear and readily understandable.  His
affect was normal.  His flow of thought was normal with
no hallucinations nor delusions noted.  He was fully
oriented and his intellectual functioning was estimated
to be in the average range.  His attention and
concentration were adequate for purposes of this
examination.  There was no evidence of a mood or
thought disorder.  His insight and judgment appeared to
be intact.  He showed good insight into his commitment
offense.

B. CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    No Contributory Clinical Disorder.
AXIS II:   Antisocial Personality Disorder, much
           improved.
AXIS III:  No Contributory Physical Disorder.
AXIS IV:   Incarceration.
AXIS V:    GAF = 85.

Should this inmate at this time be given a parole or
release date, it is expected he will be able to
maintain his present gains in the community.

XIII. REVIEW OF LIFE CRIME:

Inmate Mauzey described the circumstances surrounding
his commitment offense.  He states that he did not
conspire to kill the victim.  He states that he had a

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


rifle and the victim was shot when he (the victim)
pulled on the rifle, or he stated that when the victim
pulled him in the rifle discharged.  However, he does
accept that it was his fault due to the fact that he
should not have been there with a gun.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  This inmate has no criminal history and has been
    able to program well.  Therefore, he would be
    assessed at a lower than average risk for violence
    when compared to this Level II inmate population.

B.  If released to the community, his violence
    potential is estimated to be no higher than the
    average citizen in the community.

C.  The most significant risk factor as a precursor to
    violence for this inmate would obviously be should
    he decide to return to the use of alcohol.

XV. CLINICIAN OBSERVATIONS, COMMENTS AND RECOMMENDATIONS:

A.  This inmate is responsible for his behavior.  He
    has the ability to abide by institutional standards
    and has generally done so during his incarceration
    period.

B.  This inmate has no mental health disorder which
    would necessitate treatment either during his
    incarceration period or after parole.

C.  Since this inmate admits having an alcohol and drug
    problem, he would benefit from attending Alcoholics
    Anonymous.


M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


MAUZEY      C-61868      CTF-NORTH      12/21/99      gmj

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MC/gmj

D:  12/10/99
T:  12/21/99

**E X H I B I T**

8

Initial Parole Consideration Hearing Transcript
February 20, 1996

53

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    **PRESIDING COMMISSIONER GUADERRAMA:**    Okay, the

4    time is 11:50 and all those that were present before

5    the hearing are back with the exception Mr. Giaquinto,

6    and he had to live, however, he did participate in the

7    decision.   And I'll tell you what that decision is.

8    The panel reviewed all the information received from

9    the public and relied on the following circumstances

10    in concluding that you're not suitable for parole and

11    that your release would pose an unreasonable risk of

12    danger to society and a threat to public safety if you

13    were to be released from prison.   This offense was

14    carried out in a manner which exhibits a callous

15    disregard for the suffering of another.   The offense

16    was carried out in a dispassionate and calculated

17    manner.   These conclusions are drawn from the

18    Statement of facts where you went to the home of the

19    Victim to confront him concerning his involvement with

20    your wife and you ended up shooting him.   Prior to

21    that, you had conspired on at least two occasions to

22    have this man killed.   Previous record.   You have an

23    escalating pattern of criminal conduct, a consistent

24    pattern of tumultuous relationships, an unstable

25    social history.   You failed previous grants of

26    probation.   You failed to profit from society's

27    **RONALD MAUZEY    C-61868    DECISION PAGE 1    (2/20/96)**

54

1     previous attempts to correct your criminality.  Such

2     attempts include county jail.  There's some question

3     about the probation (inaudible).  An unstable social

4     history and prior criminality which includes

5     convictions for DUI for which you were placed on

6     probation and prior to the end of that probationary

7     period, you were convicted of reckless driving.  You

8     had a problem with alcohol and also using cocaine

9     prior to the Life offense.  Institutional behavior.

10    You've programmed in a limited manner while

11    incarcerated.  You have failed to prove that you have

12    a marketable skill that can be put to use upon

13    release.  You have failed to prove that you have also

14    improved yourself educationally.  And you have not

15    sufficiently participated in beneficial self-help and

16    therapy programs.  You've failed to demonstrate

17    evidence of positive change.  Misconduct while

18    incarcerated includes two CDC-115's.  The last one was

19    on February 3rd of '95 for fighting.  Psychiatric

20    factors.  The psychological report dated 1/31/92

21    authored by Dr. A. M. Charlens, C-h-a-r-l-e-n-s, is

22    unfavorable.  In that report, Dr. Charlens says "there

23    is present within this Inmate unresolved anger.  He

24    denies experiences of abuse or molestation as a child.

25    He further denies having had homosexual experiences.

26    He has not, as yet, (inaudible) his gaze inward with

27    **RONALD MAUZEY    C-61868    DECISION PAGE 2    (2/20/96)**

55

1    depth and intensity in an effort to understand the
2    source of the homicidal rage." And that takes us to
3    the psychological report that was prepared for this
4    hearing, dated 11/15/95, authored by Dr. Falkenstein.
5    And Dr. Falkenstein has failed to cover the problems
6    that were raised in Dr. Charlens report. And it was a
7    pretty superficial report. And that's no fault of
8    yours. The panel makes the following findings. That
9    you need therapy in order to face, discuss, understand
10   and cope with stress in (inaudible) killing. Until
11   progress is made, he continues to be unpredictable and
12   a threat to others. Therapy in a controlled setting
13   is needed, but motivation and amenability are
14   questionable. Your gains are recent and you must
15   demonstrate an ability to maintain gains over an
16   extended period of time. In view of your recent
17   negative behavior and lack of program participation,
18   there is no indication that you'd behave differently
19   if paroled. Nevertheless, you should be commended for
20   being a good worker, in fact, a critical worker, as
21   pointed out by your attorney. However, this positive
22   aspect of your behavior does not outweigh the factors
23   of unsuitability. We did deny you parole for two
24   years, Mr. Mauzey. The hearing finds it's not
25   reasonable to expect that parole would be granted at a
26   hearing during the following two years. The specific
27   **RONALD MAUZEY    C-61868    DECISION PAGE 3    (2/20/96)**

56

1     reasons for this finding are as follows.  One, you

2     committed the offense.  Specifically, you conspired to

3     have your wife's boyfriend killed, later went to the

4     Victim's home and shot him, seriously wounding him.

5     The second reason, a longer period of time is required

6     to evaluate your suitability in view of your history

7     of criminality and misconduct, including convictions

8     for DUI and reckless driving, using alcohol to excess

9     and cocaine.  The third reason is that you recently

10    committed a serious disciplinary violation on 2/3/95

11    and that was for fighting.  The fourth reason is that

12    you've not gone through the necessary programming

13    which is essential to your adjustment and you need

14    additional time to gain such programming.  Whether you

15    believe it or not, you need to really participate in

16    substance abuse programming.  It's important that you

17    get the kind of therapy to deal with your lack of

18    insight.  You need a lot of (inaudible), more than

19    you've demonstrated (inaudible) here today.  The panel

20    recommends that you become disciplinary free, that you

21    upgrade vocationally and educationally, if you can't

22    produce documents that prove that you have the skills

23    that you say you have and also the education level

24    that you claim you have.  And we also recommend that

25    you participate in self-help and therapy programming.

26    That's the official decision.  You know, you're a good

27    **RONALD MAUZEY    C-61868    DECISION PAGE 4    (2/20/96)**

57

1    worker.  You've been a good worker.  And (inaudible)

2    two 115's during that period of time is (inaudible).

3    What concerns us is the recency of the last one for

4    fighting.  That's a serious 115.  And you need to do

5    some programming, AA or NA or whatever kind of

6    substance abuse program is available.  And you

7    (inaudible) need to do.  And seriously.  Because

8    people just don't go out there and get convicted of

9    drunk driving and reckless driving, or reduced to

10   reckless, (inaudible) DUI.  And another you were

11   drinking and you ran your wife off the road.  It shows

12   that you have a problem.  And there's evidence of it.

13   So you need to work on that.  The last thing we had

14   mentioned for you to do is to get some support on the

15   outside and get letters from people who are going to

16   offer you a job or they have a place for you to live

17   or they're going to help you out financially.  Make

18   sure it's documented.  Get them to write letters.  It

19   doesn't take a lot for them to write.  Okay?  You have

20   some work to do.  And hopefully, it's a different

21   story for the next time you come.  One of the things

22   that you're going to have to deal with, you weren't

23   very credible here today.  And it's going to be a

24   problem.  Whether or not you've been consistent all

25   these years means nothing to us if we don't believe

26   you.  It's going to hurt you.  And all I'm going to

27   **RONALD MAUZEY    C-61868    DECISION PAGE 5    (2/20/96)**

58

1   say is if you didn't tell us the truth today, think

2   about it and make sure you tell the truth (inaudible).

3   Go ahead.

4           **INMATE MAUZEY:**    I was just going to say I have

5   (inaudible)

6           **PRESIDING COMMISSIONER GUADERRAMA:**    Okay.

7   That ends the hearing at five minutes to 12:00.   We

8   want to wish you well and we'll see you in two years.

9                             --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION** _____ MAY 1 4 1996

27   **RONALD MAUZEY     C-61868     DECISION PAGE 6     (2/20/96)**

**E X H I B I T**

9

Subsequent Parole Consideration Hearing Transcript
February 25, 1998

45

1        CALIFORNIA BOARD OF PRISON TERMS

2                 D E C I S I O N

3        PRESIDING COMMISSIONER GIAQUINTO:  All right,

4    we're back on Record at 12:55, and we denied you

5    parole.  The Panel reviewed all the information

6    received from the public and relied on the following

7    circumstances, in concluding that the prisoner is not

8    suitable for parole, and would pose an unreasonable

9    risk of danger to society, and a threat to public

10   safety, if released from prison.  The offense was

11   carried out in a cruel manner and a callous manner,

12   with a disregard for the suffering of another, and a

13   dispassionate and calculated manner.  These

14   conclusions are drawn from the Statement of Facts,

15   wherein, the prisoner was angered by the victim,

16   because the victim had been associating with the

17   prisoner's wife.  And as a result of that, the

18   prisoner armed himself with a rifle, and went to the

19   victim's address, and shot the victim.  And

20   ultimately, he also conspired or solicited others to

21   kill the victim.  The prisoner had been previously

22   arrested for driving under the influence and reckless

23   driving.  And he had used cocaine and alcohol.  The

24   prisoner has not sufficiently participated in

25   beneficial self-help and therapy programming.  The

26   most recent psychiatric report indicates that under

27   RONALD MAUZEY    C-61868    DECISION PAGE 1    2/25/98

46

1    Axis II, the prisoner has a possible personality

2    disorder, not otherwise specified.  The Panel makes

3    the following findings:  That therapy and a controlled

4    setting is needed, but motivation and amenability are

5    questionable.  This denial is for two years.  The

6    Panel finds that it's not reasonable to expect that

7    parole would be granted during the following two

8    years, for the following reasons:  Number one is the

9    life offense, which was carried out in a callous

10   manner.  Specifically, the prisoner attempted to kill

11   another human being and he, also, attempted to solicit

12   others to kill that person.  As a result, a longer

13   period of observation and evaluation is required

14   before the Board should set a parole date.  The

15   prisoner has committed several serious disciplinary

16   violations, including refusing to show skin on

17   2/13/97, and on 7/24/97, introducing contraband, in

18   this case, instructions on how to manufacture

19   methamphetamine, into a facility.  The prisoner has

20   not completed necessary programming, which is

21   essential to his adjustment and needs additional time

22   to gain such programming.  Specifically, he has not

23   participated in substance abuse therapy or other

24   therapy that might help him to gather further insight,

25   and delve into the causative factors related to the

26   life offense, and his use of illegal substances, and

27   **RONALD MAUZEY    C-61868    DECISION PAGE 2    2/25/98**

47

1    his misconduct since he's been incarcerated.    The

2    Panel recommends that the prisoner become

3    disciplinary-free, and participate in available self-

4    help and therapy programming.  And I hope the issues

5    are very clear to you on why you were denied today.

6    Okay?  Good luck to you.  That ends this hearing at

7    12:58.  Yeah, just for the Record, we're also going to

8    ask that the BPT conduct an investigation, regarding

9    the transcripts of the tapes of solicitation for the

10   murder from the Riverside District Attorney's Office.

11   Okay, good luck to you.

12                          --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION_____ **APR 1 4 1998**

27   RONALD MAUZEY    C-61868    DECISION PAGE 3    2/25/98

# E X H I B I T

## 10

**Subsequent Parole Consideration Hearing Transcript**
**October 31, 2000**

60

1  **CALIFORNIA BOARD OF PRISON TERMS**

2  **D E C I S I O N**

3  **PRESIDING COMMISSIONER ANGELE:** This is the

4  matter of Ronald Mauzey. Mr. Mauzey, the Panel

5  reviewed all information received from the public

6  and relied on the following circumstances in

7  concluding that the prisoner is not suitable for

8  parole and would pose an unreasonable risk of

9  danger to society or a threat to public safety if

10  released from prison. The offense was carried out

11  in a violent manner. The offense was carried out

12  in a calculated manner. The offense was carried

13  out in a manner which demonstrates a disregard for

14  human life. These conclusions are drawn from the

15  Statement of Fact wherein, in July of 1981, the

16  inmate shot the victim in an attempt to kill him

17  and, between August and December of 1981, he

18  solicited the murder of the same individual. The

19  prisoner had an unstable social history. We're

20  looking at the three failed marriages. Also, has

21  been on probation twice, these are for vehicle

22  related crimes, I did indicate they are vehicle

23  related not penal code related. The prisoner has

24  programmed in a limited manner while incarcerated,

25  has not sufficiently participated in beneficial

26  self-help or therapy programming, and failed to

27  RONALD MAUZEY   C-61868   DECISION PAGE 1   10/31/00

62

1    2000, for his involvement in the Arts and

2    Corrections Music Program, and for his work

3    reports, which have been satisfactory.  However,

4    these positive aspects of his behavior do not

5    outweigh the factors of unsuitability.  The denial

6    is going to be for a period of two years.  In a

7    separate decision, the Hearing Panel finds that it

8    is not reasonable to expect that parole would be

9    granted at a hearing during the following two

10   years.  The specific reasons for the finding are as

11   follows:  The offense was carried out in a

12   calculated manner.  The offense was carried out in

13   a violent manner.  The offense was carried out in a

14   manner which demonstrates a disregard for human

15   life.  These conclusions, once again, are drawn

16   from the Statement of Fact wherein the inmate, in

17   July of 1981, shot the victim and attempted to kill

18   him.  And between the months of August and December

19   of 1981, did solicit the murder of the victim.  The

20   prisoner has a history of unstable relations with

21   others, these are three failed marriages.  The

22   prisoner recently committed a serious disciplinary

23   violation.  Once again, these will include, since

24   his last hearing, which was February of 1998, he

25   had three 128s, all three for grooming which are

26   not the serious violations, but he did have two

27   RONALD MAUZEY   C-61868   DECISION PAGE 3   10/31/00

62

1    2000, for his involvement in the Arts and

2    Corrections Music Program, and for his work

3    reports, which have been satisfactory.  However,

4    these positive aspects of his behavior do not

5    outweigh the factors of unsuitability.  The denial

6    is going to be for a period of two years.  In a

7    separate decision, the Hearing Panel finds that it

8    is not reasonable to expect that parole would be

9    granted at a hearing during the following two

10   years.  The specific reasons for the finding are as

11   follows:  The offense was carried out in a

12   calculated manner.  The offense was carried out in

13   a violent manner.  The offense was carried out in a

14   manner which demonstrates a disregard for human

15   life.  These conclusions, once again, are drawn

16   from the Statement of Fact wherein the inmate, in

17   July of 1981, shot the victim and attempted to kill

18   him.  And between the months of August and December

19   of 1981, did solicit the murder of the victim.  The

20   prisoner has a history of unstable relations with

21   others, these are three failed marriages.  The

22   prisoner recently committed a serious disciplinary

23   violation.  Once again, these will include, since

24   his last hearing, which was February of 1998, he

25   had three 128s, all three for grooming which are

26   not the serious violations, but he did have two

27   RONALD MAUZEY   C-61868  DECISION PAGE 3  10/31/00

63

1    115s since February 1998, one dealing with grooming

2    and the other, on March the 7th, refusing to

3    comply.  Once again, indicating a disregard,

4    disrespect for authority.  The Panel makes the

5    following recommendations, that the prisoner become

6    and remain disciplinary-free, that if available to

7    participate in self-help and therapy programming.

8    And once again, this will be for a period of two

9    years.  Anything you'd like to add, Mr. Harmon?

10         **DEPUTY COMMISSIONER HARMON:**  Nothing, thank

11   you.

12         **PRESIDING COMMISSIONER ANGELE:**  Good luck to

13   you Mr. Mauzey.  I do indicate that we did also

14   take into consideration some confidential material.

15   At this point, once again, it's for a period of two

16   years.  We do wish you luck.  Like I said, that

17   concludes the hearing.  The time is approximately

18   11:15.

19                        --o0o--

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION____NOV 2 2 2000_____

27   RONALD MAUZEY   C-61868   DECISION PAGE 4   10/31/00

**E X H I B I T**

**11**

**Subsequent Parole Consideration Hearing Transcript**
**September 24, 2002**

**E X H I B I T**

**11**

Subsequent Parole Consideration Hearing Transcript
September 24, 2002

47

1       **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3       **PRESIDING COMMISSIONER MUNOZ:**  All right.

4       It's 2:15 p.m. and the parole consideration

5       hearing for inmate Mauzey has resumed with all

6       parties having returned to the hearing room.  And

7       Mr. Mauzey, this Panel has decided on a one-year

8       denial in your case.  We reviewed all information

9       received from the public and relied on the

10      following circumstances in concluding that the

11      prisoner is not suitable for parole and that his

12      release would pose an unreasonable risk of danger

13      to society if he were to be released at this time.

14      And we did not, we decided during our

15      deliberations not to even consult that letter that

16      we referred to during the hearing in the Central

17      File.  We acknowledge it's there, that's about it.

18      **ATTORNEY COTTON:**  Okay.

19      **PRESIDING COMMISSIONER MUNOZ:**  We're not

20      taking that one under consideration.

21      **ATTORNEY COTTON:**  Thank you.

22      **PRESIDING COMMISSIONER MUNOZ:**  The offense

23      involved was carried out in a callous manner that

24      required some planning.  It demonstrated a

25      disregard for human suffering.  The motive for

26      this crime was, in our view, trivial in relation

27      **RONALD MAUZEY   C-61868    DECISION PAGE 1    9/24/02**

48

1    to the offense.  These conclusions are drawn from

2    the Statement of Facts wherein the prisoner

3    entered into a plan to have victim Paullin killed,

4    initially contacting a Mr. Carranza, and then

5    Mr. Carranza facilitating contacting an undercover

6    officer, in an attempt to kill his wife's lover,

7    an individual who the inmate had shot a few months

8    prior.  In regards to the inmate's previous

9    record, he does have a history of unstable

10   relationships with others referring to the

11   marriage to his first wife or -- Well, actually

12   I'm not sure this is his first wife, but to Elke,

13   which according to some of the reports we've read

14   including the probation officer's report, involved

15   some domestic violence.  He has failed to profit

16   from society's previous attempts to correct his

17   criminality.  That's in reference to the probation

18   as a result of two misdemeanor arrests; that's in

19   reference to the driving under the influence and

20   the reckless driving.  Institutional behavior, the

21   inmate has programmed in a limited manner while

22   incarcerated.  He has failed to obtain a new

23   vocation while incarcerated and has not

24   sufficiently participated in beneficial self-help

25   and/or therapy programming.  The psychological

26   evaluation is for the most part a good evaluation.

27   **RONALD MAUZEY  C-61868    DECISION PAGE 2    9/24/02**

49

 1    The inmate's parole plans, although appearing to
 2    be viable, I will note that we have no current
 3    documentation in support of those plans, although
 4    we don't doubt that that support does exist, we
 5    just need to see some documentation.  I hope
 6    you'll have that for your next parole
 7    consideration hearing.  We note that the District
 8    Attorney from the County of Riverside is opposed
 9    to parole suitability.  We make the following
10    findings.  That the prisoner needs to participate
11    in any and all self-help and therapy programming
12    that may become available in order to face,
13    discuss, understand and cope with stress in a non-
14    destructive manner.  Until progress is made, the
15    prisoner continues to be unpredictable and a
16    threat to others.  The inmate should be commended
17    for his participation in some self-help
18    programming, that's a reference to the Destino
19    course, D-E-S-T-I-N-O, the course in Spanish.
20    However this positive aspect of his behavior does
21    not outweigh the factors of unsuitability.  Again,
22    this is a one-year denial, and that was in spite
23    of the 115 that you were cited for since your last
24    hearing.  But we do expect you to come back in a
25    year without any disciplinaries, 115s or 128(a)s
26    in your packet.  We want you, as I indicated, to
27    **RONALD MAUZEY  C-61868    DECISION PAGE 3    9/24/02**

50

1    participate in anything, any self-help and/or
2    therapy programming that may become available.  We
3    realize that sometimes those kind of things are
4    not available.  And we would also want you to
5    consider self-study, it's up to you.  You may
6    consider reading self-help or motivational books
7    in your cell and maintain a list of those books
8    and bring that list to your next parole
9    consideration hearing.  Mr. Lehman, any comments
10   you wish to make?
11        **DEPUTY COMMISSIONER LEHMAN:**  I have nothing
12   further.  Good luck, sir.
13        **PRESIDING COMMISSIONER MUNOZ:**  Yeah, all
14   right.
15        **ATTORNEY COTTON:**  Could I make one request.
16   Since his last psychological exam was 1999, so we
17   don't have a problem in a year, I'm wondering if
18   the Board could request another psychological
19   evaluation.
20        **PRESIDING COMMISSIONER MUNOZ:**  If that's
21   your request, Ma'am, we'll certainly order one.
22        **ATTORNEY COTTON:**  Yes.  I'd appreciate that.
23        **PRESIDING COMMISSIONER MUNOZ:**  Okay.
24        **ATTORNEY COTTON:**  Thank you.
25        **PRESIDING COMMISSIONER MUNOZ:**  All right.
26   Thank you.  Thank you for being here today.  It's
27   **RONALD MAUZEY  C-61868   DECISION PAGE 4   9/24/02**

51

1  20 minutes after two p.m. and that concludes the

2  hearing.

3                    --oOo--

25  **PAROLE DENIED ONE YEAR**

26  **EFFECTIVE DATE OF THIS DECISION** _____OCT 1 8 2002_____

27  **RONALD MAUZEY  C-61868    DECISION PAGE 5    9/24/02**

**E X H I B I T**

12

Subsequent Parole Consideration Hearing Transcript
January 9, 2004

65

1      **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3          **DEPUTY COMMISSIONER COLDREN:**  We're now on

4      record, Sir.

5          **PRESIDING COMMISSIONER RISEN:**  Okay,

6      everyone who was previously involved in the

7      hearing has returned.  The time is 11:05 a.m.  The

8      Panel reviewed all information received from the

9      public and relied on the following circumstances

10     in concluding that the prisoner is not suitable

11     for parole and would pose an unreasonable risk of

12     danger to society or a threat to public safety if

13     released from prison.  The offense was carried out

14     in an especially violent and brutal manner.  The

15     offense was carried out in a manner which

16     demonstrates an exceptionally callous disregard

17     for human suffering and life.  And the motive for

18     the crime is inexplicable and very trivial in

19     relation to the offense.  These conclusions are

20     drawn from the Statement of Facts wherein the

21     prisoner in July of 1981, went to the victim's

22     house, where he kicked the door down.  When the

23     victim arrived at the door he was shot twice with

24     a rifle by the prisoner, causing severe injury and

25     resulting in numerous operations after the

26     shooting by the victim.  While the prisoner was

27     **RONALD MAUZEY    C-61868    DECISION PAGE 1    1/9/04**

1   out on bail for the crime, he solicited and then
2   conspired with others to murder the victim in the
3   previous assault.  The prisoner has programmed in
4   a limited manner while incarcerated.  He has not
5   sufficiently participated in beneficial self-help
6   as previously recommended by this Board, by his
7   counselors and his psychiatrists.  The prisoner
8   has one 115 during this period, it occurred on
9   October the 6th, 2002, that was just after the
10  last Board hearing, it was for refusing to move.
11  And interestingly just prior to the last Board
12  hearing in June of 2002, he received a 115 for
13  refusal to provide a required specimen.  The
14  psychological report dated 9/26/2003, authored by
15  Dee, first name, D-E-E, last name Shafer,
16  S-H-A-F-E-R, Ph.D., Staff Psychologist at CTF, is
17  not totally supportive of release.  She states on
18  page second to last, if released to the community,
19  his violence potential is somewhat higher than the
20  average citizen in the community, due to his
21  history of violence and history of involvement
22  with alcohol and drugs.  She goes on to say,
23  although he denies having an alcohol or drug
24  problem and is resistant to attending Alcoholics
25  Anonymous, it would be reasonable to monitor his
26  drug and alcohol consumption through urine testing
27  **RONALD MAUZEY   C-61868   DECISION PAGE 2   1/9/04**

6 7

1   on a random basis if he were granted parole.

2   Under parole plans, the prisoner lacks realistic

3   parole plans.  He has no written confirmation of a

4   residence or a job offer.  The hearing Panel notes

5   that in response to the 3042 Notices, the District

6   Attorney's Office of Riverside County participated

7   in the hearing by videoconference, and was opposed

8   to a parole of the prisoner.  We also received a

9   letter from the victim in this case who was

10  opposed to parole.  The Panel makes the following

11  findings:  the prisoner needs to participate in

12  self-help, in order to face, discuss, understand

13  and cope with stress in a non-destructive manner.

14  Until progress is made, the prisoner continues to

15  be unpredictable and a threat to others.  The

16  prisoner should be commended for taking a video

17  course in Spanish, and he also took three music

18  courses in the self-study.  However, these

19  positive aspects of his behavior do not outweigh

20  the factors of unsuitability.  In a separate

21  decision, the hearing Panel finds that it is not

22  reasonable to expect that parole would be granted

23  at a hearing during the following two years.  The

24  specific reasons for these findings are as

25  follows:  the prisoner committed the offense in an

26  especially violent manner.  The offense was

27  **RONALD MAUZEY    C-61868    DECISION PAGE 3    1/9/04**

68

1   carried out in a manner which demonstrates an
2   exceptionally callous disregard for human
3   suffering and life.  Specifically, the prisoner,
4   in July of 1981, went to the door of the victim's
5   home, he kicked it down, then became involved in
6   an altercation and subsequently shot the victim
7   twice with a rifle, causing the victim severe
8   injury.  While the prisoner was out on bail, he
9   solicited and then conspired with others to murder
10  the victim that he had previously shot.  Also the
11  prisoner committed a disciplinary violation during
12  this period.  On June 6th, correction, on October
13  the 6th, 2002, he received a 115 for refusing to
14  move.  A recent psychiatric and psychological
15  report dated 9/26 of 2003, authored by Dee Shafer,
16  S-H-A-F-E-R, indicates a need for a longer period
17  of observation and evaluation.  Also, the prisoner
18  has not completed the necessary programming which
19  is essential to his adjustment.  He needs
20  additional time to gain such programming.  He's
21  failed to sufficiently participate in self-help.
22  Therefore, a longer period of observation and
23  evaluation of the prisoner is required before the
24  Board should find that the prisoner is suitable
25  for parole.  The Panel requests that he remain
26  disciplinary-free, and participate in self-help,
27  **RONALD MAUZEY   C-61868   DECISION PAGE 4   1/9/04**

69

1   if available.  That's the conclusion of the

2   reading of the decision.  Any comments?

3       **COMMISSIONER DALY:**  No, I think you should

4   do like I suggested as far as your self-help.  Go

5   ahead and do up a resume of all of the books that

6   you've read and kind of a summary of what you

7   learned from each one of the books, if you're not

8   going to participate in the formal self-help.  And

9   try to have that to present so it, you know, we'll

10  have something to hand the Board as to what you've

11  done.  I just wish you good luck.

12      **INMATE MAUZEY:**  Could you be more specific

13  as to the self-help, it's not available.  You tell

14  me to take self-help, it's not available, it's

15  kind of a Catch-22.

16      **PRESIDING COMMISSIONER RISEN:**  I think she

17  just answered your question a moment ago.

18      **INMATE MAUZEY:**  Well that's not structured

19  self-help.

20      **PRESIDING COMMISSIONER RISEN:**  It's not

21  what?

22      **INMATE MAUZEY:**  Structured self-help.

23      **PRESIDING COMMISSIONER RISEN:**  We say that

24  there's instructor-type self-help.

25      **ATTORNEY TARDIFF:**  No structured.  He's

26  asking for the -- I do believe there are some

27  **RONALD MAUZEY    C-61868    DECISION PAGE 5    1/9/04**

70

1   self-help programs available, I just don't know if
2   he knows about them.

3           **PRESIDING COMMISSIONER RISEN:**   I know other
4   people come in and they have taken them.

5           **ATTORNEY TARDIFF:**   Right.

6           **COMMISSIONER DALY:**   AA is also considered a
7   self-help.

8           **INMATE MAUZEY:**   So it's the Board's position
9   that I need to become a Christian before I can be
10  found suitable for parole.

11          **PRESIDING COMMISSIONER RISEN:**   No, that's
12  not the Board's position and you know that.

13          **INMATE MAUZEY:**   That's AA or NA.

14          **PRESIDING COMMISSIONER RISEN:**   That
15  terminates the hearing.   The time is 11:10.

16          **INMATE MAUZEY:**   Can I ask how long the
17  denial was?

18          **PRESIDING COMMISSIONER RISEN:**   Two years.
19  Do you have a copy of --

20          **ATTORNEY TARDIFF:**   No, I don't have it yet.

21                          --o0o—

22

23

24

25  **PAROLE DENIED TWO YEARS**

26  **FINAL DATE OF DECISION**_____ APR - 8 2004

27  **RONALD MAUZEY   C-61868   DECISION PAGE 6   1/9/04**

E X H I B I T

13

Letter of Support
November 28, 2003

November 28, 2003


Hearing Panel
Board of Prison Terms
State of California


re:  Letter of Support, R. K. Mauzey, C-61868

Gentlemen,

    This letter is to inform you that I will provide parole
assistance for my son, R. K. Mauzey, C-61868.

    I will provide shelter for my son in one of the two residences
I own in Riverside, California, or I will provide the money for
an apartment.

    I will provide the funds for transportation or will provide
a vehicle.

    I will also provide any and all financial assistance necessary
for my son to make a successful transition from inmate to citizen.

    This letter shall remain in force until written notification
of recension is proffered.

    It is cruel of the Board of Prison Terms to raise the
expectation of my son's release by requiring me to write this
same letter every one, two, or three years.

    Your attention to this matter will be appreciated.  If you
have any question, please advise.


Sincerely,

*Ruth I Mauzey*

R. I. Mauzey

## DECLARATION OF SERVICES

I, R. K. Mauzey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-326U, CTF-North Facility, Soledad, CA 93960-0705; I served the attached document entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

On the persons/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdraw form for appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as followed:

**Superior Court of California**
**County of Riverside**
**4050 Main Street**
**Riverside, CA 92501-3703**


**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**


There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above.  I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 11th Day of February, 2007, at the Correctional Training Facility in Soledad, California.

R. K. Mauzey
R. K. Mauzey

MAILING LIST FOR CASE: E043165
In re RONALD KEITH MAUZEY on Habeas Corpus

Superior Court Clerk
Riverside County
P.O. Box 431 - Appeals
Riverside, CA 92502

Ronald Keith Mauzey
CDC #C61868, WA-326U
P.O. Box 705
Soledad, CA 93960-0705

Office of the State Attorney General
P.O. Box 85266
San Diego CA  92186-5266

District Attorney
County of Riverside
4075 Main Street
Riverside, CA  92501

A T A C H M E N T

T W O

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**



JUN 1 4 2007

COURT OF APPEAL FOURTH DISTRICT

In re RONALD KEITH MAUZEY
on Habeas Corpus.

E043165

(Super.Ct.Nos. RIC466177 &
CR18817)

The County of Riverside

THE COURT

The petition for writ of habeas corpus is DENIED.

**HOLLENHORST**

Acting P.J.

cc:    See attached list

MC-275

Name    R. K. Mauzey

Address    P. O. Box 705, WA-326U

Soledad, CA 93960-0705

CDC or ID Number    C-61868

## IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

(Court)

| | |
|---|---|
| Ronald Keith Mauzey | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | |
| vs. | No. _____ |
| Board of Parole Hearings, et al | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | | |
|---|---|---|
| ☐ A conviction | ☒ Parole | |
| ☐ A sentence | ☐ Credits | |
| ☐ Jail or prison conditions | ☐ Prison discipline | |
| ☐ Other *(specify):* _____ | | |

1. Your name: Ronald Keith Mauzey

2. Where are you incarcerated? Correctional Training Facility

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Conspiracy to Commit First Degree Murder

b. Penal or other code sections: 182

c. Name and location of sentencing or committing court: Superior Court of California

County of Riverside

d. Case number: 4 CRIM 14860 (Sup. Ct. No.: 18817NF)

e. Date convicted or committed: December 1, 1982

f. Date sentenced: February 8, 1983

g. Length of sentence: 25 years to life

h. When do you expect to be released? Unknown

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

Samuel A. Kahn, retired, address unknown

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

7. **Ground 2 or Ground** _____ *(if applicable):*

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

**PETITION FOR WRIT OF HABEAS CORPUS**

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
    N/A

b. Result _____  c. Date of decision: _____

d. Case number or citation of opinion, if known: _____

e. Issues raised:  (1) _____

    (2) _____

    (3) _____

f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

_____

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☐ No.  If yes, give the following information:

a. Result  N/A _____  b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised:  (1) _____

    (2) _____

    (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
    N/A

_____
_____
_____
_____
_____
_____
_____
_____
_____

b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)             **PETITION FOR WRIT OF HABEAS CORPUS**             Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

     (2) Nature of proceeding (for example, "habeas corpus petition"): _____

     (3) Issues raised: (a) _____

        (b) _____

     (4) Result *(Attach order or explain why unavailable):* _____

     (5) Date of decision: _____

   b.  (1) Name of court: _____

     (2) Nature of proceeding: _____

     (3) Issues raised: (a) _____

        (b) _____

     (4) Result *(Attach order or explain why unavailable):* _____

     (5) Date of decision: _____

   c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

   N/A

_____

6. Are you presently represented by counsel?    ☐ Yes.    ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   N/A

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: May 13, 2007

▶ R.K.W. Mauer
(SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page six of six

**IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA**
**FOURTH APPELLATE DISTRICT**

| | |
|---|---|
| In re R. K. Mauzey, | Case No. |
| Petitioner, | |
| On Habeas Corpus. | Riverside County Superior Court<br>Case No. RIC 466177 |

---

**PETITION FOR WRIT OF HABEAS CORPUS**

---

Petitioner In Pro Per

R. K. Mauzey, C-61868
P.O. Box 705, WA-326U
Soledad, Ca  93960-0705

**TABLE OF CONTENTS**

Table of Authorities                                        ii

Petition for Writ of Habeas Corpus                          1

Introduction                                                1

Conclusion                                                 21

Verification                                               23

List of Exhibits                                           24

Proof of Service                                    Last Page

## TABLE OF AUTHORITIES

### CASES

#### STATE

In re Dannenberg (2005) 34 Cal.4th 1061          2,3,5

In re Lee (2006) 49 Cal.Rptr.3d 931                17

In re Ramirez (2001) 94 Cal.App.4th 549          2,5

In re Rosenkrantz (2002) 29 Cal.4th 616    2,3,4,5,6,9,21

In re Scott (2004) 119 Cal.App.4th 871          8,9,21

In re Scott (2005) 133 Cal.App.4th 573          17,21

#### FEDERAL

Bair v. Folsom State Prison, 2005
    WL 2219220 (E.D. Cal.2005)                   19

Biggs v. Turhune, 334 F.3d 910 (9th Cir. 2003)   9,18,20

Irons v. Warden of California State Prison-Solano
    358 F. Supp. 2d 936                          19,20

Masoner v. State, 2004 WL 1080177 (C.D. Cal 2004)   20

Superintendent v. Hill, 472 U.S.                 9,20,21

United State v. Doremus, 888 F.2d 630 (9th Cir. 1989)   16

United State v. Hoque, 752 F.2d 1503 (9th Cir. 1985)   17

### STATUTES

Penal Code
    § 3041 (a)                                   8,9
    § 3041 (b)                                 3,4,8,10,21

### CONSTITUTIONS

United States Constitution                        4
California Constitution                           4

**TABLE OF AUTHORITIES**

**CONTINUED**

**MISCELLANEOUS**

California Code of Regulations
    Division 2, Title 15

    § 2402                                           3,4,21

    § 2402 (a)                                        17,21

    § 2402 (c)                                        17,21

1

**IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT**

2

3

4

5

6  In re R. K. Mauzey,              )      Case No.
                                    )
7            Petitioner,            )
                                    )      Riverside County Superior Court
8  On Habeas Corpus                 )      Case No. RIC 466177
   _____)

9

10

11

12                    **PETITION FOR WRIT OF HABEAS CORPUS**

13      Petitioner, R. K. Mauzey, in pro per, petitions for a Writ

14  of Habeas Corpus, and by this verified petition states as

15  follows:

16                                   **I**

17                             **INTRODUCTION**

18      Sixty-year-old state prisoner R. K. Mauzey is petitioning

19  this Court for a writ of habeas corpus seeking to overturn the

20  Board of Parole Hearings' [hereinafter Board] denial of parole

21  on the grounds that his rights secured under the State and

22  Federal Constitutions, and various provisions of the California

23  Penal Code and Division 2, Title 15 of the California Code of

24  Regulations [hereinafter CCR], were violated by agents of the

25  California Board of Parole Hearings.

26      At the May 4, 2006 parole hearing, the Board determined

27  that petitioner, who was sentenced to 25 years to life for

28  conspiracy to commit first degree murder in 1983, should remain

                                    1

1   in prison on five purported grounds: the motive for the crime

2   was trivial, a previous record of violence, psychological

3   factors, institutional behavior, and understanding and plans for

4   the future.

5        Our Supreme Court's decision in *Rosenkrantz* holds that a

6   Board parole decision violates due process and must be reversed

7   if there is not "some evidence" in the record to support it.

8   Also, although parole may in some cases be denied on the basis

9   of the crime, there must be evidence to support a finding that

10  the crime was particularly egregious. (*In re Rosenkrantz* (2002)

11  29 Cal.4th 616, 683.)

12       In *Dannenberg* our Supreme Court held "[S]ole reliance on

13  the commitment offense might, in particular cases, violate

14  section 3041, subdivision (a)'s provision that a parole date

15  'shall normally be set' under 'uniform term' principles, and

16  might thus also contravene the inmate's constitutionally

17  protected expectation of parole.  We explained that such a

18  violation could occur, 'for example[,] where no circumstances of

19  the offense reasonable could be considered more aggravated or

20  violent than the minimum necessary to sustain a conviction for

21  that offense.' (*Rosenkrantz, supra*, 29 Cal,4th 616, 683.)

22  Quoting *Ramirez, supra,* 94 Cal.App.4th 549, 570, we suggested

23  that, in order to prevent the parole authority's case-by-case

24  suitability determination from swallowing the rule that parole

25  should 'normally' be granted, an offense must be '*particularly*

26  *egregious*' to justify the denial of parole. *(Rosenkrantz, supra*,

27  at 683.)" *(In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095,

28  emphasis added.) The Supreme Court then held "As we have

                                    2

1 explained, however, the Board must apply detailed standards when
2 evaluating whether an individual inmate is unsuitable for parole
3 on public safety grounds. (See § 3041, subd. (b); CCR § 2402.)
4 When the Board bases unsuitability on the circumstances of the
5 commitment offense, it must cite 'some evidence' of aggravating
6 facts *beyond the minimum elements of that offense.*
7 (*Rosenkrantz, supra,* 29 Cal.4th 616, 658, 683.)" (*In re*
8 *Dannenberg, supra,* 34 Cal.4th 1061, 1095, emphasis in original.)

9       Therefore, according to the Supreme Court, the Board must
10 follow and apply the factors specified by statute and regulation
11 in determining that the circumstances of the commitment offense
12 was "particularly egregious" and cite aggravating facts that
13 were beyond the minimum elements of that offense and support
14 these determinations with "some evidence" in the record. The
15 Board must also cite "some evidence" that reliably and
16 rationally indicate a prisoner's release would unreasonably
17 endanger public safety. As will be shown below the Board failed
18 to meet these requirements resulting in a violation of
19 petitioner's due process rights and other state and federal
20 constitutional rights.

21                              II

22       This petition is addressed to this court's jurisdiction in
23 the second instance and based on the material herein and the
24 full record that was before the Superior Court of Riverside
25 County, Case No. RIC 466177. (See Attachment One, Petition for
26 Writ of Habeas Corpus)

27                              III

28       Petitioner would incorporate the grounds, claims, facts and

3

1 | legal arguments in the attached petition and memorandum by
2 | reference herein.

3 |                              **IV**

4 |     *Claim*:   The Board failed to follow or apply the controlling
5 | legal principles, the decision was devoid of the "some evidence"
6 | required by law and was arbitrary and capricious, resulting in a
7 | due process violation of Article I, § 7 of the California
8 | Constitution and the Fifth, Sixth and Fourteenth Amendment to
9 | the United States Constitution.

10 |     *Argument*:   Our Supreme Court has held "that the judicial
11 | branch is authorized to review the factual basis of a decision
12 | of the Board denying parole in order to ensure that the decision
13 | comports with the requirements of due process of law, but that
14 | in conducting such review, the court may inquire only whether
15 | *some evidence* in the record before the Board supports the
16 | decision to deny parole, based upon *the factors specified by*
17 | *statute and regulation.*  If the decision's consideration of the
18 | specified factors is not supported by some evidence in the
19 | record and thus is devoid of a factual basis, the court should
20 | grant the prisoner's petition for writ of habeas corpus and
21 | should order the board to vacate its decision denying parole and
22 | therefore to proceed in accordance with due process of law."
23 | (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, emphasis added.)

24 |     The Supreme Court held "As we have explained, however, the
25 | Board must apply detailed standards when evaluating whether an
26 | individual inmate is unsuitable for parole on public safety
27 | grounds.   (See § 3041, subd. (b); CCR § 2402.)  When the Board
28 | bases unsuitability on the circumstances of the commitment

4

1   offense, it must cite 'some evidence' of aggravating facts
2   *beyond the minimum elements of that offense.* (*Rosenkrantz,*
3   *supra,* 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg* (2005), 34
4   Cal.4th 1061, 1095, emphasis in original.)

5       For the Board's, and lower Court's, decision to withstand
6   judicial review it must have cited some evidence, from the
7   record, that petitioner's commitment offense: 1) Was committed
8   in an especially egregious manner; and 2) Contained aggravating
9   facts beyond the minimum elements of that offense. Also, the
10  evidence cited by the Board must rationally indicate that the
11  prisoner currently presents an unreasonable public safety risk
12  if released from prison. ("[A] life term offense or any other
13  offenses underlying an indeterminate sentence must be
14  particularly egregious to justify the denial of parole date."
15  (*In re Ramirez* (2001) 94 Cal.App.4th 549, 570; disapproved on
16  other grounds in *In re Dannenberg, supra,* 34 Cal.4th 1061.)
17  "When the Board bases unsuitability on the circumstances of the
18  commitment offense, it must cite "some evidence" of aggravating
19  facts *beyond the minimum elements of that offense."*
20  (*Rosenkrantz, supra*, at 658, 683; *In re Dannenberg,* supra, 34
21  Cal.4th 1061, 1095, emphasis in original.)

22      The Superior Court of Riverside County denied the petition
23  for writ of habeas corpus on the grounds that there were
24  relevant facts supporting the Board's decision. However, none
25  of the facts cited by the lower Court in support of the denial
26  complied with either the regulations, statutes or California
27  Supreme Court precedence.

28      In finding petitioner unsuitable for parole the Board relied

1    on CCR, § 2402, subdivisions  (c)(1)(E), (c)(2), (c)(5), (c)(6),
2    and (d)(8) as "some evidence" that petitioner is unsuitable for
3    parole and *currently* poses a threat to public safety.
4    Petitioner addresses each of these findings below.

5    A.   The Board's decision lacked the "some evidence"
          demonstrating that petitioner's offense was "particularly
6         egregious" as required by law.

7         First, a cursory review of the record in this case
8    demonstrates that the Board's decision was unreasonable under
9    the applicable "some evidence" rule.  The record simply does not
10   contain *any* evidence that petitioner's act of conspiracy to
11   commit first degree murder was *particularly* egregious.  Nor does
12   it contain *any* evidence that petitioner is currently a threat to
13   society.  Given that both findings are required by California
14   law, there is *zero* evidence in the record to support the Board's
15   decision.

16        The nature of the offense may justify a denial of parole if
17   the crime was committed in an "especially heinous, atrocious or
18   cruel manner."  An offense that was "no more aggravated or
19   violent than the minimum necessary to sustain a conviction" for
20   conspiracy to commit first degree murder does not justify a
21   finding of unsuitability for parole.  (*Rosenkrantz* at p. 683.)

22        To guide this determination, CCR, § 2402, subd. (c)(1)(A)-
23   (E) establishes the specified criteria the Board must rely on to
24   demonstrate that a prisoner committed his offense in an
25   "especially heinous, atrocious or cruel manner."  It is
26   axiomatic that absent the required "some evidence" supporting
27   any of the specified factors the decision would be arbitrary and
28   capricious and result in a due process violation.

6

1    The Board's finding that petitioner committed his offense

2    "in an especially heinous, atrocious or cruel manner," relied

3    solely on § 2402, subd. (c)(1)(E), "The motive for the crime,

4    very trivial in relation to the offense...." (See Exhibit 1,

5    Subsequent Parole Consideration Hearing Transcript, May 4, 2006

6    [hereinafter HT1], p. 84, L 20:21.) The record contains no

7    evidence supporting this determination, however.

8    "The epistemological and ethical problems in the

9    ascertainment and evaluation of motive are among the reasons the

10    law has sought to avoid the subject. As one authority has

11    stated, '[h]ardly any part of penal law is more definitely

12    settled than that motive is irrelevant.' (Hall, General

13    Principles of Criminal Law (2d ed. 1960) at p. 88; see also

14    Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.

15    Justice Ethics 3.) ... The offense committed by most prisoners

16    serving life terms is, of course, murder. Given the high value

17    our society places upon life, there is no motive for unlawfully

18    taking the life of another human being that could not reasonably

19    be deemed 'trivial.' The Legislature has foreclosed that

20    approach, however, by declaring that murderers with life

21    sentences must 'normally' be given release dates when they

22    approach their minimum eligible parole date. (Pen. Code, §

23    3041, subd. (a).) The governing statute also states the Board

24    shall set a release date 'unless it determines that the gravity

25    of current convicted offense or offenses, or the timing and

26    gravity of the current or past convicted offense or offenses, is

27    such that consideration of the public safety requires a more

28    lengthy period of incarceration for this individual, and that a

7

1 | parole date, therefore cannot be fixed at this meeting.' (Pen.
2 | Code, § 3041, subd. (b).) This language means a 'more lengthy
3 | period of incarceration' is called for where the gravity of the
4 | offence or offenses of the prisoner in question is more
5 | indicative of a danger to the public if the prisoner is released
6 | than would ordinarily be the case. The reference in Board
7 | regulations to motives that are 'very trivial in relationship to
8 | the offense' therefore requires comparisons; to fit the
9 | regulatory description, the motive must be materially less
10 | significant (or more 'trivial') than those which conventionally
11 | drive people to commit the offense in question, and therefore
12 | more indicative of a risk of danger to society if the prisoner
13 | is released than is ordinarily presented." (*In re Scott* (2004)
14 | 119 Cal.App.4th 871, 893.)

15 | The "evidence" articulated by the Board in support of their
16 | finding that the "motive" was "very trivial" was that petitioner
17 | had been convicted of the crime. (Exhibit 1, HT1, p. 84, L
18 | 21:26.) Although this "fact" is reliably documented, it fails
19 | to make the required comparison of how the "motive" was "very
20 | trivial" in relation to other conspiracies to commit murder or
21 | how it was indicative of a risk of danger to society.

22 | Second, the circumstance of petitioner's crime do not
23 | amount to some evidence supporting the conclusion that
24 | petitioner poses an unreasonable risk of danger if release.
25 | "[I]n the parole context, the requirements of due process are
26 | met if some evidence supports the decision." (*Biggs v. Terhune,*
27 | 334 F.3d 910, 915 (9th Cir. 2003.) "Some evidence," however
28 | does not mean literally "any" evidence. If it did, the

8

1 protection afforded by due process would be meaningless.  In
2 addition, the evidence underlying the decision must possess some
3 indicia of reliability." (Biggs at 914 [internal quotations
4 omitted]; Caswell, 363 F.3d at 839; see Hill at 455-456.)
5 Evidence that lacks any real probative value cannot constitute
6 "some evidence." (See Cato, 924 F.2d at 705.)  Otherwise, the
7 requirement of "some evidence" could be satisfied by baseless
8 speculation, superstition, or stereotyping. That, too, would
9 reduce the requirement of "some evidence" to a sham or a
10 mockery.

11      The California rules governing parole in murder cases, for
12 which parole eligibility is provided by statute, [*CCR, supra, §*
13 *2402*] are as follows:  "[P]arole eligibility is the rule, rather
14 than the exception." (*In re Scott, supra,* 119 Cal.App.4th at p.
15 891.) "[P]arole is 'normally' to be granted." [*Id.* (quoting
16 Cal. Pen. Code § 3041 (a)).]  The murder giving rise to the
17 prisoner's incarceration must be "particularly egregious" for
18 parole to be denied. (*In re Rosenkrantz, supra,* 29 Cal.4th at
19 p. 683.)  Indeed, a murder must be "heinous, atrocious or cruel"
20 if, as here, the offense is to serve as the basis for parole
21 denial.  In addition, in such cases, the prisoner must *presently*
22 present a danger to society.  (Cal. Pen. Code § 3401 (b).)  In
23 short, in petitioner's case, the circumstances surrounding the
24 crime or the manner in which it was committed must show not only
25 that the conspiracy to commit first degree murder at issue was
26 more cruel or vicious than the ordinary conspiracy to commit
27 murder, but also that petitioner would likely pose a current
28 risk to public safety if released.  The record in this case

9

1  contains absolutely *no* evidence that would meet *either* of the
2  two requirements.  Thus, there can be little doubt that the
3  Board violated the applicable rules when it denied petitioner
4  parole on the basis of his commitment offense.

5  B.    The Board's finding that petitioner had a previous record
          of violence is not supported by the facts.

7      CCR, § 2402 (c)(2), states, "Previous Record of Violence.
8  The prisoner on previous occasions inflicted or attempted to
9  inflict serious injuries on a victim, particularly if the
10 prisoner demonstrated serious assaultive behavior at an early
11 age."

12     In support of this finding the Board stated, "Your record
13 of violent behavior is evidenced by the statement of fact,
14 wherein on July 1981, you went to the victim's home, kicked the
15 door down and you shot him twice with a rifle.  And also the
16 behavior continued in 1995, when you received a 115 for force
17 and violence with another inmate."  (Exhibit 1, HT1, p. 85, L
18 13:19.)

19     The finding of fact by the Board is incorrect for the
20 following reasons.  First, petitioner went to the victim's home
21 in June 1981, not July 1981.  Second, the victim was not shot
22 twice as the Board stated, but once.  (Exhibit 2, Probation
23 Officer's Report, p. 4. L 10:13.)  Third, petitioner was found
24 guilty and the sentence was stayed for the attempted murder.
25 (Exhibit 3, Abstract of Judgment.)  Fourth, there is no evidence
26 in the record of any serious assaultive behavior at an early
27 age.

28     The Board's decision failed to rise to the level of the

                                    10

1   some evidence standard. Therefore, the decision is arbitrary

2   and capricious.

3   C.     The Board's finding that due to psychological factors
           petitioner was unsuitable for parole and a threat to

4        society if released is not supported by the evidence or
           regulations.

5

6       CCR, § 2402 (c)(5) states, "Psychological Factors. The

7   prisoner has a lengthy history of severe mental problems related

8   to the offense."

9       The Board stated, "[T]he psychological report that was

10   written by Doctor Zika indicated that due to your history of

11   violence and history of involvement with alcohol and drugs, your

12   potential is somewhat higher than that of the average citizen in

13   the community." (Exhibit 1, HT1, p. 86, L 5:11.) "The

14   psychological report dated 9/26/03, authored by Dr. Shafer, was

15   not totally supportive of release. He [sic] indicated at the

16   present time, his remorse is more of an intellectual than

17   emotional experience. If released to the community, his

18   violence potential is somewhat higher than that of the average

19   citizen in the community, due to his history of violence and the

20   history of involvement with alcohol and drugs." (Exhibit 1,

21   HT1, p. 86, L 15:24.)

22       This statement of reason by the Board is both incorrect and

23   inaccurate. First, Dr. Zika never authored the psychological

24   report attributed to him. Dr. Zika, at the time the

25   psychological evaluation was prepared, was the Senior

26   Supervising Psychologist and signed off on the report that was

27   prepared by Dr. Shafer. (Exhibit 4, p. 4.) Second, the

28   psychological evaluation prepared by Dr. Shafer stated that

1  petitioner does not have a mental disorder which would
2  necessitate treatment.  (Exhibit 4, p. 3, section XV, ¶ B.)  (It
3  should be noted that all of the previous psychological
4  evaluations also state that petitioner does not have a history
5  of mental problems.)  (Exhibits 5, 6 and 7.)  Third, for this
6  unsuitability factor to apply to petitioner the Board is
7  required to demonstrate that there is or was a "lengthy history
8  of severe mental problems related to the offense."  (CCR, § 2402
9  (c)(5).)

10     The Board has failed to meet this regulatory requirement.
11  Absent some, or any, evidence to support this finding, the
12  Board's decision is arbitrary and capricious and cannot stand.
13  D.   The Board's finding that petitioner engaged in serious
         misconduct is a misapplication of this factor and is not
14       some evidence of current dangerousness

15     CCR, § 2402 (c)(6), states "Institutional Behavior.  The
16  prisoner has engaged in serious misconduct in prison or jail."
17     The Board states, "But when you to up to 2402 (d)(6), your
18  engagement in serious misconduct in prison was also taken into
19  account.  You have six 115's since your last Board appearance."
20  (Exhibit 1, HT1, p. 85, L 25:26 to p. 86, L 1:3.)

21     The "serious" misconduct the Board relies on is six Rules
22  Violation Reports (CDC-115's), five classified as serious
23  violations for refusing a direct order to interview and one
24  classified as an administrative violation for failure to
25  perform.  The Board cites no evidence of any serious assaultive
26  behavior during petitioner's 25 years of incarceration, with the
27  exception of the 1995 violation for being involved in a physical
28  altercation.  Petitioner has no record of physically assaulting

12

1  or stabbing either other inmates or prison staff.  The Board
2  uses the fact that five of the CDC-115's referred to were
3  classified as serious "Division F" offenses.  The California
4  Department of Corrections and Rehabilitations has a grading
5  system for serious rule violations.  The most serious
6  classification is a "Division A" offense and the least serious
7  classification is a "Division F" offense, the only other
8  classification being the "Administrative" classification.  (See
9  California Code of Regulations, title 15, division 3, article 5,
10 sections 3310 to 3323.)

11     The Board is well aware that once a parole release date is
12 established petitioner will be assessed the loss of credit for
13 each of the serious rules violations.  Thus, petitioner will be
14 punished twice for each of the rules violation.  Once when the
15 Board uses them as a "factor" in finding him unsuitable for
16 parole and again after a parole release date has been set.  This
17 is double jeopardy.

18     The Board's decision to use the rule violations as a
19 contributing factor in support of an unsuitability determination
20 is a misapplication of the regulations.

21 E.  The Board's finding that petitioner had unrealistic parole
       plans are unsupported by the regulations and statutes.
22

23     CCR, § 2402 (d)(8) states, "Understanding and Plans for
24 Future.  The prisoner has made realistic plans for release or
25 has developed marketable skills that can be put to use upon
26 release."

27     The Board states, "Your parole plans considered by this
28 Panel are marginal, where you do have residential plans that

                               13

1 | your mom said that you -- she would give you a place to stay and
2 | that you plan to start a -- your business back up and in -- your
3 | corporation back up again.  But the Panel was not given any
4 | documents to show that you had either made an attempt to do this
5 | or to even apply and take the necessary steps so that we can
6 | assure that you would, in fact, be able to do that.  You do have
7 | a marketable skill."  (Exhibit 1, HT1, p. 86, L 24:26 to p. 87,
8 | L 1:9.)

9 | The California Business and Professions Code, Licenses,
10 | Div. 1.5, § 480, states, "The board may deny a license pursuant
11 | to this subdivision only if the crime or act is substantially
12 | related to the qualifications, functions or duties of the
13 | business or professions for which application is made."
14 | Therefore, petitioner, by law, can form a corporation and obtain
15 | a contracting license.  It would be costly and unproductive for
16 | petitioner to incorporate and procure his contracting license at
17 | this time and the Board's requirement for him to do so in order
18 | to be found suitable for parole is unrealistic.

19 | The regulation states that applicants for parole must
20 | either have realistic plans for the future or marketable skills.
21 | Petitioner has both.  Petitioner has provided the Board with
22 | verifiable parole plans, proof of a place to reside upon parole,
23 | and that he will have financial support from his family.
24 | (Exhibit 13, Letter of Support.)  The Board even acknowledges
25 | that petitioner has marketable skills.  Therefore, this factor
26 | should apply to him as indicating suitability for parole.

27 | The Board's characterization of a factor indicating
28 | suitability to demonstrate unsuitability is demonstrative that

14

1 │ petitioner's parole hearing was a sham.  The Board's decision is

2 │ arbitrary and capricious because it is inconsistent with the law

3 │ and its own regulations.

4 │ F.    The Board's use of factors not listed or included in its
      │       regulations is a violation of petitioner's due process
5 │       rights.

6 │      The Board relied on four other "factors" in determining

7 │ that petitioner posed an unreasonable risk of danger to society

8 │ if released at this time.  However, none of these "factors" are

9 │ mentioned in the Board's regulations.

10 │      The factors set forth in CCR, § 2402 (c) used by the Board

11 │ to determined whether the prisoner is unsuitable for parole are

12 │ objective, i.e. easily verifiable, and subjective, i.e. based on

13 │ the opinion of the decision-maker.  As will be discussed below,

14 │ because the objective factors used by the Board to find

15 │ petitioner unsuitable are easily verifiable, petitioner did not

16 │ have reasonable notice that they would apply to him.  The four

17 │ factors are:

18 │      1.    "You have done very little programming while you've

19 │ been incarcerated."  (Exhibit 1, HT1, p. 85, L 19:21.)  "In

20 │ addition, Title XV, paragraph nine, talks about institutional

21 │ behavior for suitability.  Act – institutional activities

22 │ indicate an enhanced ability to function within the law upon

23 │ release."  (Exhibit 1. HT1, p. 85, L 21:25.)

24 │      2.    "And also the fact that the record reflects that you

25 │ were arrested and convicted of driving under the influence

26 │ August the 12th, 1980, where you received a three-year

27 │ probation."  (Exhibit 1, HT1, p. 86, L 11:15.)

28 │      3.    "The District Attorney of Riverside – We noted on the

1  3042 response that the District Attorney of Riverside County

2  indicated their opposition to a finding of parole suitability."

3  (Exhibit 1, HT1, p. 87, L 9:13.)

4      4.  "In addition, the Panel concluded that your previous

5  attempts on Mr. Paulsen's [sic] life, when taken together with

6  the fact that you were found guilty of conspiracy to commit

7  murder, indicates to us – to us when you put those two together,

8  that's a contributing factors contributing to a pattern which

9  results in unsuitability."  (Exhibit 1, HT1, p. 87, L 13:20.)

10     The four "factors" the Board used to demonstrate that

11  petitioner is currently a threat to public safety if released on

12  parole are arbitrary and capricious.  Nowhere in the Board's

13  regulations are any of the above cited "factors" published.

14  Therefore, the Board cannot rely on any of these factors to

15  prove that petitioner is currently a threat to society.

16     "A statute (or regulation) is void for vagueness 'if it

17  fails to give adequate notice to people of ordinary intelligence

18  concerning the conduct it proscribes, or if it invites arbitrary

19  and discriminatory enforcement.'"  (United States v. Doremus,

20  888 F.2d 630, 634 (9th Cir. 1989).)  "[T]he court need only

21  examine the vagueness challenge under the facts of a particular

22  case and decide whether, under a reasonable construction of the

23  statute or regulation, the conduct in question is prohibited."

24  (United States v. Hogue, 752 F.2d 1503, 1504 (9th Cir. 1985).)

25  Based on the regulations cited above [CCR, supra, § 2402 (c)],

26  it is clear that this court should find that petitioner did not

27  have adequate notice that these factors would apply to him.

28  Accordingly, the Board's decision denying parole should be

16

1 | reversed.

2 | "The test is not whether some evidence supports the *reasons*
3 | the [Board] cites for denying parole, but whether some evidence
4 | indicates a parolee's release *unreasonably endangers public*
5 | *safety*. (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole
6 | denied if prisoner 'will pose an unreasonable risk of danger to
7 | society if released from prison']; see e.g. *In re Scott* (2005)
8 | 133 Cal.App.4th 573, 595 ['The commitment offense can negate
9 | suitability [for parole] only if circumstances of the crime...
10 | rationally indicate the offender will present an unreasonable
11 | public safety risk if released from prison'].) Some evidence of
12 | the existence of a particular factor does not necessarily equate
13 | to some evidence the parolee's release unreasonably endangers
14 | public safety." (*In re Lee* (2006) 49 Cal.Rptr.3d 931, 936-937.)

15 | The Board, and the Superior Court, failed to demonstrate or
16 | cite any reliable evidence which would indicate that
17 | petitioner's release would unreasonably endanger public safety
18 | as required by statute. Based on California law the Board's
19 | decision resulted in a violation of petitioner's due process
20 | rights.

**V**

22 | *Claim*: The Board's continued reliance on unchanging
23 | factors resulted in a due process violation.

24 | *Argument*: In finding petitioner unsuitable at his sixth
25 | parole suitability hearing, the panel relied exclusively on an
26 | unchanging factor: the commitment offense. In Biggs, the Ninth
27 | Circuit stated that the Board was "*initially* justified" in
28 | finding Mr. Biggs unsuitable based on the circumstances of the

1  offense and his conduct prior to imprisonment.  The Ninth

2  Circuit added that "[a] continued reliance in the future on an

3  unchanging factor, the circumstance of the offense and conduct

4  prior to imprisonment, runs contrary to the rehabilitative goals

5  espoused by the prison system and could result in a due process

6  violation."  (*Biggs*, *supra,* 334 F.3d at 917.)

7      One district court has explained the rationale underlying

8  this aspect of Biggs as follow:

9      "Whether the facts of the crime of conviction, or other
        unchanging criteria, affect the parole eligibility decision
10      can only be predicated on the "predictive value" of the
        unchanged circumstance.  Otherwise, if the unchanged
11      circumstance per se can be used to deny parole eligibility,
        sentencing is taken out of the hands of the judge and
12      totally reposited in the hands of the BPT.  That is, parole
        eligibility could be indefinitely and forever delayed based
13      on the nature of the crime even though the sentence given
        set forth the possibility of parole – a sentence given with
14      the facts of the crime fresh in the mind of the judge.
        While it would not be a constitutional violation to forego
15      parole altogether for certain crimes, what the state cannot
        constitutionally do is have a sham system where the judge
16      promises the possibility of parole, but because of the
        nature of the crime, the BPT effectively deletes such from
17      the system.  Nor can a parole system, where parole is
        mandated to be determined on someone's future potential to
18      harm the community, constitutionally exist where despite 20
        or more years of prison life which indicates the absence of
19      danger to the community in the future, the BPT
        commissioners revulsion towards the crime itself, or some
20      other unchanged circumstance, constitutes the alpha and
        omega of the decision.  Nobody elected the BPT
21      commissioners as sentencing judges.  Rather, in some
        realistic way, the facts of the unchanging circumstance
22      must indicate a present danger to the community if
        released, and this can only be assessed not in a vacuum,
23      after four or five eligibility hearings, but counterpoised
        against the backdrop of prison events."

24

25  (*Bair v. Folsom State Prison*, 2005 WL 2219220 (E.D.Cal. 2005),

26  report and recommendation adopted by 2005 WL 3081634 (E.D.Cal.

27  2005)

28      Another district court explained:

18

1   "More important ... in assessing any due process violation
2   is the fact that continued reliance on unchanging
    circumstances transforms an offense for which California
3   law provides eligibility for parole into a de facto life
    imprisonment without the possibility of parole.  The court
4   asks rhetorically – what is it about the circumstances of
    petitioner's crime or motivation which are going to change?
5   The answer is nothing.  The circumstances of the crime will
    always be what they were, and petitioner's motive for
6   committing them will always be trivial.  Petitioner has no
    hope for ever obtaining parole except perhaps that a panel
7   in the future will arbitrary hold that the circumstances
    were not that serious or the motive was more than trivial.
8   Given that *no one* seriously contends lack of seriousness or
    lack of triviality at the present time, the potential for
9   parole in this case is remote to the point on non-
    existence.  Petitioner's liberty interest should not be
10  determined by such an arbitrary, remote possibility." n2

11  n2 "To a point, it is true, the circumstances of the crime
    and motivation for it may indicate a petitioner's
12  instability, cruelty, impulsiveness, violent tendencies and
    the like.  However, after fifteen or so years in the
13  caldron of prison life, not exactly an ideal therapeutic
    environment to say the least, and after repeated
14  demonstrations that despite the recognized hardships of
    prison, this petitioner does not possess those attributes,
15  the predictive ability of the circumstances of the crime in
    near zero."

16

17  (*Irons v. Warden of California State Prison – Solano,* 358

18  F.Supp.2d 936, 949.)

19      In the circumstances of this case, the Board's continued

20  reliance upon the nature of petitioner's crime to deny him

21  parole in 2006 violates due process.  Continued reliance upon

22  the unchanging facts of petitioner's crime makes a sham of

23  California's parole system and amounts to an arbitrary denial of

24  petitioner's liberty interest.  Petitioner has been denied

25  parole on five occasions prior to the determination he now

26  challenges.  (See Exhibits 8, 9, 10, 11, and 12.)  Continued

27  reliance upon the unchanging characterization of petitioner's

28  offense amounts to converting petitioner's sentence of 25 years

1   to life to a term of life without the possibility of parole.

2   The Board's continued reliance on the commitment offense
3   violates due process because it resulted in an arbitrary
4   decision and because the facts surrounding the offense do not
5   now constitute "some evidence" possessing "some indicia of
6   reliability" that petitioner pose a danger to the community.
7   (See *Hill*, 472 U.S. at 455; *Biggs*, 344 F.3d at 917; *Irons*, 358
8   F.Supp.2d at 947; *Masoner v. State*, 2004 WL 1080177 at *1-2
9   (C.D.Cal. 2004) ["Although the gravity of the commitment offense
10  and other pre-conviction factors alone may be sufficient to
11  justify the denial of a parole date at a prisoner's initial
12  hearing, subsequent BPT decisions to deny a parole date must be
13  supported by some post-conviction evidence that the release of
14  an inmate is against the interest of public safety].)

15  Beside not being especially atrocious, heinous or callous,
16  petitioner's crimes have little, if any, predictive value for
17  future criminality. Simply from the passing of time,
18  petitioner's crimes 25 years ago have lost much of their
19  usefulness in foreseeing the likelihood of future offenses than
20  if he had committed them five or ten years ago. (*In re Scott*,
21  133 Cal.App.4th at 573 [past crime's value for predicting future
22  crime diminishes over time].)

23  Because there is no reliable evidence supporting the
24  Board's conclusions that petitioner is unsuitable for parole,
25  that determination violates due process. (*Hill*, 472 U.S. at
26  455.)

27                           **CONCLUSION**

28      The California rules governing parole in murder cases, for

                              20

1  which parole eligibility is provided by statute, [See CCR §
2  2402] are as follows: "[P]arole eligibility is the rule, rather
3  than the exception." (*In re Scott, (2004)* 119 Cal.App.4th at p.
4  891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting
5  Penal Code § 3041 (a)].)  The murder giving rise to the
6  prisoner's incarceration must be "particularly egregious" for
7  parole to be denied.  (*In re Rosenkrantz, supra*, 29 Cal.4th at
8  p. 683.)   Indeed, a murder must be "heinous, atrocious or cruel"
9  if, as here, the offense is to serve as the basis for parole
10  denial. (CCR § 2402 (c)(1).)  In addition, in such cases, the
11  prisoner must *presently* present a danger to society.  (Penal
12  Code § 3401 (b).)  In short, in petitioner's case, the
13  circumstances surrounding the crime or the manner in which it
14  was committed must show not only that the conspiracy to commit
15  first degree murder at issue was more cruel or vicious than the
16  ordinary first degree murder, but also that petitioner would
17  likely pose a current risk to public safety if released.   The
18  record in this case contains absolutely *no* evidence that would
19  meet *either* of the two requirements.  The record establishes
20  that petitioner does not pose an unreasonable risk to public
21  safety.   Any contrary conclusion lacks any evidentiary support.
22  Thus, there can be little doubt that the Board violated the
23  applicable laws and regulations when it found petitioner
24  unsuitable for parole.

25

26      WHEREFORE, petitioner respectfully requests that this court:
27      1.   Take judicial notice of the full record;
28      2.   Issue a Writ of Habeas Corpus or Order to Show Cause to

1   the Director of Corrections and the Chairperson, Board of Parole

2   Hearings, to inquire into the illegal and unconstitutional

3   actions stated in the petition;

4       3.   Appoint counsel;

5       4.   Declare the rights of the parties;

6       5.   Not allow intuitional transfer until the full outcome of

7   this case; and

8       6.   Grant any other and further relief the court deems just.

9

10  DATED:   May 13, 2007                    Respectfully submitted,

11

12                                           R. K. Mauzy
                                             R. K. Mauzey

13                                           Petitioner, In Pro Per

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## VERIFICATION

I, R. K. Mauzey, state:

I am the petitioner in this action.  All the facts in the above document, not otherwise supported by citations to the record, attachments, or other documents, are true of my own personal knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 13, 2007, at the Correctional Training Facility, Soledad, California.

R. K. Mauzey

23

# LIST OF EXHIBITS

Attachment One
> Petition for Writ of Habeas Corpus (Case No. RIC 466177), Superior Court of Riverside County

Attachment Two
> Order Denying Petition for Writ of Habeas Corpus Superior Court of Riverside County

**A T T A C H M E N T**

**ONE**

Petition for Writ of Habeas Corpus
Superior Court of Riverside County

Name     R. K. Mauzey

Address     P. O. Box 705, WA-326U

Soledad, CA 93960-0705

CDC or ID Number     C-61868

MC-275

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 16 2007

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE
(Court)

R. K. Mauzey
Petitioner

vs.

Board of Parole Hearings, et al.
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. RIC 4060 177
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction      ☒ Parole

☐ A sentence      ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name:  R. K. Mauzey

2. Where are you incarcerated?  Correctional Training Facility

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Conspiracy to Commit First Degree Murder

   b. Penal or other code sections:  § 182

   c. Name and location of sentencing or committing court:  Superior Court of the State of California, County of Riverside

   d. Case number:  4 CRIM 14860 (Sup. Ct. NO.: 18817NF)

   e. Date convicted or committed:  December 1, 1982

   f. Date sentenced:  February 8, 1983

   g. Length of sentence:  25 Years to Life

   h. When do you expect to be released?  Unknown

   i. Were you represented by counsel in the trial court?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address:

   Samuel A. Kahn, retired, address unknown

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

7. Ground 2 or Ground _____ *(if applicable):*

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

PETITION FOR WRIT OF HABEAS CORPUS

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes. ☐ No. If yes, give the following information:

  a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

    N/A

  b. Result _____  c. Date of decision: _____

  d. Case number or citation of opinion, if known: _____

  e. Issues raised: (1) _____

    (2) _____

    (3) _____

  f. Were you represented by counsel on appeal?  ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

    _____

9. Did you seek review in the California Supreme Court?  ☐ Yes ☐ No. If yes, give the following information:

  a. Result  N/A  _____  b. Date of decision: _____

  c. Case number or citation of opinion, if known: _____

  d. Issues raised: (1) _____

    (2) _____

    (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    N/A

11. Administrative Review:

  a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    N/A

  b. Did you seek the highest level of administrative review available?  ☐ Yes. ☐ No.

  *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   _____

   _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

   N/A _____

   _____

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

   _____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

   _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   N/A _____

   _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: February 11, 2007

▶ R. K. Mary
(SIGNATURE OF PETITIONER)

1  R. K. Mauzey
   P. O. Box 705, WA-326U
2  Soledad, CA 93960-0705

3  Petitioner, In Pro Per

4

5

6

7

8

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      COUNTY OF RIVERSIDE

12

13

14  _____
                                          )
15  R. K. Mauzey,                         )
                                          )    Case No.
16            Petitioner,                 )
          v.                              )    **PETITION FOR WRIT OF**
17                                        )    **HABEAS CORPUS**
    Board of Parole Hearings, et al.,     )
18                                        )
              Respondent.                 )
19  _____)

20

21        **TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF**
          **CALIFORNIA, IN AND FOR THE COUNTY OF RIVERSIDE**
22

23      Petitioner hereby petition for a Writ of Habeas Corpus and

24  by this verified petition states as follows:

25                              **I**

26                        **INTRODUCTION**

27      1.  The Board of Parole Hearings [hereinafter Board] failed

28  to make its suitability determination in a manner consistent

                              1

1  with its obligation under the California Penal Code, California
2  Code of Regulations and settled California law.  The Board's
3  decision failed to follow or apply controlling legal principles
4  and its own regulations in finding petitioner unsuitable for
5  parole, the decision was devoid of the "some evidence" required
6  by law, and was arbitrary and capricious resulting in a due
7  process violation of Article 1, § 7 of the California
8  Constitution and the Fifth and Fourteenth Amendments to the
9  United States Constitution.  The Board's continued reliance on
10 unchanging factors to deny parole resulted in a due process
11 violation.  For these reasons the Board's finding that
12 petitioner is unsuitable for parole should be reversed.

                              II

14   2.   Petitioner R. K. Mauzey is a prisoner of the State of
15 California and is currently incarcerated at the Correctional
16 Training Facility in Soledad, California.

17   3.   Respondent Ben Curry is the Acting Warden of the
18 Correctional Training Facility, Soledad, California.

19   4.   Respondent J. Dovey is the Director of the California
20 Department of Corrections and Rehabilitation.

21   5.   Respondent James Davis is the Chairperson of the Board
22 of Parole Hearings and is responsible for its operations.
23 (Penal Code § 5075.)

24   6.   Respondent Arnold Schwarzenegger is the Governor of the
25 State of California and is responsible for the Board's
26 operations.  (Penal Code §§ 5075, 3041.1 and 3041.2.)

27

28

                              2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III

### STATEMENT OF FACTS

7.   Petitioner was convicted of conspiracy to commit first degree murder on December 1, 1982.

8.   On May 4, 2006, Petitioner's fifth Parole Consideration Hearing was held before the Board. Petitioner was denied parole for the maximum period of two years.

9.   Petitioner has no other plain or adequate remedy in the ordinary course of the law. This petition is addressed to this courts original habeas corpus jurisdiction because the issues raised are of constitutional dimension, questioning the legality of petitioner's confinement. A petition for a Writ of Habeas Corpus based upon factual allegations to be determined by reviewing court is generally first brought in the Superior Court. (*In re Hillery* (1972) 202 Cal.App.2nd 293.) Petitioner alleges that the Board violated his due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest. The Fifth and Fourteenth Amendments of the United States Constitution and the California Constitution, Article I, section 7, subdivision (a), prohibit the government from depriving an inmate of life, liberty, or property without due process of law. Petitioner has been denied due process of law in violation of not only the United States Constitution but also the Constitution of the State of California, the California Penal Code, the California Code of Regulations, and established law. This is petitioner's first request for habeas relief, and thus is properly filed in this court.

3

1         10.    The accompanying Memorandum of Points and Authorities

2    and factual allegations contained herein, as well as the

3    exhibits appended to this petition, are incorporated herein by

4    reference.

5        WHEREFORE, petitioner respectfully prays that this Court:

6        A.    Issue a Writ of Habeas Corpus directing the Director of

7    the Department of Corrections and Rehabilitation to inquire into

8    the legality of petitioner's incarceration;

9        B.    Order the immediate release of the petitioner; or

10        C.    Order the Board to schedule and commence a new term-

11    fixing hearing within thirty days, and to render a new

12    determination in strict accordance with both the letter and

13    spirit of the regulations and law;

14        D.    Conduct an evidentiary hearing;

15        E.    Appoint counsel;

16        F.    Declare the rights of the parties; and

17        G.    Grant any and all relief the court deems appropriate.

18

19

20    DATE:    February 11, 2007                    Respectfully submitted,

21

22

23                                                R. K. May
                                                R. K. Mauzey

24                                                Petitioner, In Pro Per

25    ///

26    ///

27    ///

28    ///

4

## **VERIFICATION**

I, R. K. Mauzey, state:

I am the petitioner in this action.  I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on February 11, 2007.

R. K. Mauzey
R. K. Mauzey
Petitioner, In Pro Per

5

1

2

## MEMORANDUM AND POINTS OF AUTHORITY

### INTRODUCTION

3     "The Board of Prison Terms is authorized by statute to

4   determine parole suitability, and to exercise its discretion in

5   deciding whether to grant or deny parole." (*In re Rosenkrantz*

6   (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

7     Penal Code section 3041 sets forth criteria for determining

8   parole and provides in pertinent part: "(a) ... One year prior

9   to the inmate's minimum eligible release date a panel consisting

10  of at least two commissioners on the Board of Prison Terms shall

11  ... meet with the inmate and shall normally set a parole release

12  date.... The release date shall be set in a manner that will

13  provide uniform terms for offenses of similar gravity and

14  magnitude in respect to their threat to the public, and that

15  will comply with the sentencing rules that the Judicial Council

16  may issue and any sentencing information relevant to the setting

17  of parole release dates.  The Board shall establish criteria for

18  setting of parole release dates and in doing so shall consider

19  the number of victims of the crime for which the prisoner was

20  sentenced and other factors in mitigation or aggravation of the

21  crime ...  [¶] (b) The panel or board shall set a release date

22  unless it determines that the gravity of the current convicted

23  offenses, or the timing and gravity of current or past convicted

24  offense, or offenses, is such that consideration of the public

25  safety requires a more lengthy period of incarceration for this

26  individual, and that a parole date, therefore, cannot be fixed

27  at this meeting."

28

6

1    The California Code of Regulations (hereinafter CCR), title

2    15, division 2, chapter 3, article 11, section 2400 et seq. set

3    forth additional criteria for determining parole suitability for

4    persons found guilty of murders committed after November 7,

5    1978.  Subdivision (a) of section 2402 provides: "The panel

6    shall first determine whether the life prisoner is suitable for

7    release on parole.  Regardless of the length of time served, a

8    life prisoner shall be found unsuitable for and denied parole if

9    in the judgment of the panel the prisoner will pose an

10   unreasonable risk of danger to society if released from prison."

11       Subdivision (b) of section 2402 directs the Board to

12   consider "[a]ll relevant, reliable information available to the

13   panel ... in determining suitability for parole.  Such

14   information shall include [(1)] the circumstances of the

15   prisoner's social history; [(2)] past and present mental state;

16   [(3)] past criminal history; including involvement in other

17   criminal misconduct which is reliable documented; [(4)] the base

18   and other commitment offenses, including behavior before, during

19   and after the crime; [(5)] past and present attitude towards the

20   crime; [(6)] any conditions of treatment or control, including

21   the use of special conditions under which the prisoner may

22   safely be released to the community; and [(7)] any other

23   information which bears on the prisoner's suitability for

24   release.  Circumstances which taken alone may not firmly

25   establish unsuitability for parole may contribute to a pattern

26   which results in a finding of unsuitability."

27       Subdivision (c) of section 2402 sets forth the

28   "circumstances tending to show unsuitability" for parole, which

7

1  "include:   [¶]  (1) Commitment Offense.   The prisoner committed
2  the offense in an especially heinous, atrocious or cruel manner.
3  The factors to be considered include: [¶] (A) Multiple victims
4  were attacked, injured or killed in the same or separate
5  incidents.   [¶]  (B) The offense was carried out in a
6  dispassionate and calculated manner, such as an execution-style
7  murder.   [¶]  (C) The victim was abused, defiled or mutilated
8  during or after the offense.   [¶]  (D) The offense was carried
9  out in a manner which demonstrates an exceptionally callous
10  disregard for human suffering.   [¶]  (E) The motive for the crime
11  is inexplicable or very trivial in relation to the offense.   [¶]
12  (2) Previous Record of Violence.   The prisoner on previous
13  occasions inflicted or attempted to inflict serious injury on a
14  victim, particularly if the prisoner demonstrated serious
15  assaultive behavior at an early age.   [¶]  (3) Unstable Social
16  History.   The prisoner has a history of unstable or tumultuous
17  relationships with others.   [¶]  (4) Sadistic Sexual Offenses.
18  The prisoner has previously sexually assaulted another in a
19  manner calculated to inflict unusual pain or fear upon the
20  victim.   [¶]  (5) Psychological Factors.   The prisoner has a
21  lengthy history of severe mental problems related to the
22  offense.   [¶]  (6) Institutional Behavior.   The prisoner has
23  engaged in serious misconduct in prison or jail."

24      Subdivision (d) of section 2402 sets forth the
25  "circumstances tending to show suitability" for parole, which
26  "include: [¶] (1) No Juvenile Record.   The prisoner does not
27  have a record of assaulting others as a juvenile or committing
28  crimes with a potential of personal harm to victims.   [¶]  (2)

8

1  Stable Social History.  The prisoner has experienced reasonably
2  stable relationships with others.  [¶] (3) Signs of Remorse.
3  The prisoner performed acts which tend to indicate the presence
4  of remorse, such as attempting to repair the damage, seeking
5  help for or relieving suffering of the victim, or indicating
6  that he understands the nature and magnitude of the offense.
7  [¶]  (4) Motivation for Crime.  The prisoner committed his crime
8  as the result of significant stress in his life, especially if
9  the stress has built over a long period of time. ...  [¶] (6)
10 Lack of Criminal History.  The prisoner lacks any significant
11 history of violent crime.  [¶] (7) Age.  The prisoner's present
12 age reduces the probability of recidivism.  [¶] (8)
13 Understanding and Plans for Future.  The prisoner has made
14 realistic plans for release or has developed marketable skills
15 that can be put to use upon release.  [¶] (9) Institutional
16 Behavior.  Institutional activities indicate an enhanced ability
17 to function within the law upon release."

18     In *Rosenkrantz*, our Supreme Court held "that the judicial
19 branch is authorized to review the factual basis of a decision
20 of the Board denying parole in order to ensure that the decision
21 comports with the requirements of due process of law, but that
22 in conducting such a review, the court may inquire only whether
23 *some evidence* in the record before the Board supports the
24 decision to deny parole, based upon *the factors specified by*
25 *statute and regulation.*  If the decision's consideration of the
26 specified factors is not supported by some evidence in the
27 record and thus is devoid of a factual basis, the court should
28 grant the prisoner's petition for writ of habeas corpus and

9

1  should order the Board to vacate its decision denying parole and
2  therefore to proceed in accordance with due process of law."
3  (*In re Rosenkrantz*, 29 Cal.4th 616, 658, emphasis added.)

4      In *Dannenberg* the Supreme Court held "In that regard, we
5  noted that 'the nature of the prisoner's offense, alone, can
6  constitute a sufficient basis for denying parole. [Citations.]'
7  (*Rosenkrantz, supra,* 29 Cal.4th 616, 682.)   While neither the
8  board nor the Governor may adopt a blanket no-parole policy for
9  particular offenses, we said, 'the [parole] authority properly
10  may weigh heavily the degree of violence used and the amount of
11  viciousness shown by a defendant.'   (*Id.,* at p. 683.)   [¶]
12  However, we cautioned, sole reliance on the commitment offense
13  might, in particular cases, violate section 3041, subdivision
14  (a)'s provision that a parole date 'shall normally be set' under
15  'uniform term' principles, and might thus also contravene the
16  inmate's constitutionally protected expectation of parole.   We
17  explained that such a violation could occur, 'for example[,]
18  where no circumstances of the offense reasonable could be
19  considered more aggravated or violent than the minimum necessary
20  to sustain a conviction for that offense.'   (*Rosenkrantz, supra,*
21  29 Cal.4th 616, 683.)   Quoting *Ramirez, supra,* 94 Cal.App.4th
22  549, 570, we suggested that, in order to prevent the parole
23  authority's case-by-case suitability determinations from
24  swallowing the rule that parole should 'normally' be granted, an
25  offense must be '*particularly egregious*' to justify the denial
26  of parole.   *(Rosenkrantz, supra,* at 683.)"   (*In re Dannenberg,*
27  (2005) 34 Cal.4th 1061, 1094-1095.)

28

10

1   The Supreme Court then held "As we have explained, however,
2   the Board must apply detailed standards when evaluating whether
3   an individual inmate is unsuitable for parole on public safety
4   grounds.  (See § 3041, subd. (b); CCR § 2402.)  When the Board
5   bases unsuitability on the circumstances of the commitment
6   offense, it must cite 'some evidence' of aggravating facts
7   *beyond the minimum elements of that offense.  (Rosenkrantz,*
8   *supra,* 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg, supra,* 34
9   Cal.4th 1061, 1095.)

10   Therefore, the Board must follow and apply the standards
11   set forth above in determining that the circumstances of the
12   commitment offense were "particularly egregious" and support
13   that determination with "some evidence" in the record.  As will
14   be shown below, the Board failed to meet this requirement, as
15   well as controlling legal principles, which resulted in a
16   violation of petitioner's due process rights and other state and
17   federal constitutional rights.

I

19   *Claim:*  The Board failed to follow or apply the controlling
20   legal principles, the decision was devoid of the "some evidence"
21   required by law, and was arbitrary and capricious resulting in a
22   due process violation of Article I, § 7 of the California
23   Constitution and the Fifth and Fourteenth Amendment to the
24   United States Constitution.

25   Argument:  In finding petitioner unsuitable for parole the
26   Board relied on CCR, § 2402, subdivisions (c)(1)(E), (c)(2),
27   (c)(5), (c)(6), and (d)(8) as "some evidence" that petitioner is

28

11

1  unsuitable for parole and *currently* poses a threat to public

2  safety.  Petitioner addresses each of these findings below.

3  A.  The Board's decision lacked the "some evidence"
        demonstrating that petitioner's offense was "particularly
4      egregious" as required by law.

5      First, a cursory review of the record in this case

6  demonstrates that the Board's decision was unreasonable under

7  the applicable "some evidence" rule.  The record simply does not

8  contain *any* evidence that petitioner's act of conspiracy to

9  commit first degree murder was *particularly* egregious.  Nor does

10  it contain *any* evidence that petitioner is currently a threat to

11  society.  Given that both findings are required by California

12  law, there is *zero* evidence in the record to support the Board's

13  decision.

14      The nature of the offense may justify a denial of parole if

15  the crime was committed in an "especially heinous, atrocious or

16  cruel manner."  An offense that was "no more aggravated or

17  violent than the minimum necessary to sustain a conviction" for

18  conspiracy to commit first degree murder does not justify a

19  finding of unsuitability for parole.  (*Rosenkrantz* at p. 683.)

20      To guide this determination, CCR, § 2402, subd. (c)(1)(A)-

21  (E) establishes the specified criteria the Board must rely on to

22  demonstrate that a prisoner committed his offense in an

23  "especially heinous, atrocious or cruel manner."  It is

24  axiomatic that absent the required "some evidence" supporting

25  any of the specified factors the decision would be arbitrary and

26  capricious and result in a due process violation.

27      The Board's finding that petitioner committed his offense

28  "in an especially heinous, atrocious or cruel manner," relied

12

1  solely on § 2402, subd. (c)(1)(E), "The motive for the crime,
2  very trivial in relation to the offense...." (See Exhibit 1,
3  Subsequent Parole Consideration Hearing Transcript, May 4, 2006
4  [hereinafter HT1], p. 84, L 20:21.) The record contains no
5  evidence supporting this determination, however.

6      "The epistemological and ethical problems in the
7  ascertainment and evaluation of motive are among the reasons the
8  law has sought to avoid the subject. As one authority has
9  stated, '[h]ardly any part of penal law is more definitely
10 settled than that motive is irrelevant.' (Hall, General
11 Principles of Criminal Law (2d ed. 1960) at p. 88; see also
12 Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
13 Justice Ethics 3.) ... The offense committed by most prisoners
14 serving life terms is, of course, murder. Given the high value
15 our society places upon life, there is no motive for unlawfully
16 taking the life of another human being that could not reasonably
17 be deemed 'trivial.' The Legislature has foreclosed that
18 approach, however, by declaring that murderers with life
19 sentences must 'normally' be given release dates when they
20 approach their minimum eligible parole date. (Pen. Code, §
21 3041, subd. (a).) The governing statute also states the Board
22 shall set a release date 'unless it determines that the gravity
23 of current convicted offense or offenses, or the timing and
24 gravity of the current or past convicted offense or offenses, is
25 such that consideration of the public safety requires a more
26 lengthy period of incarceration for this individual, and that a
27 parole date, therefore cannot be fixed at this meeting.' (Pen.
28 Code, § 3041, subd. (b).) This language means a 'more lengthy

13

1   period of incarceration' is called for where the gravity of the
2   offence or offenses of the prisoner in question is more
3   indicative of a danger to the public if the prisoner is released
4   than would ordinarily be the case. The reference in Board
5   regulations to motives that are 'very trivial in relationship to
6   the offense' therefore requires comparisons; to fit the
7   regulatory description, the motive must be materially less
8   significant (or more 'trivial') than those which conventionally
9   drive people to commit the offense in question, and therefore
10  more indicative of a risk of danger to society if the prisoner
11  is released than is ordinarily presented." (In re Scott (2004)
12  119 Cal.App.4th 871, 893.)

13       The "evidence" articulated by the Board in support of their
14  finding that the "motive" was "very trivial" was that petitioner
15  had been convicted of the crime. (Exhibit 1, HT1, p. 84, L
16  21:26.) Although this "fact" is reliably documented, it fails
17  to make the required comparison of how the "motive" was "very
18  trivial" in relation to other conspiracies to commit murder or
19  how it was indicative of a risk of danger to society.

20       Second, the circumstance of petitioner's crime do not
21  amount to some evidence supporting the conclusion that
22  petitioner poses an unreasonable risk of danger if release.
23  "[I]n the parole context, the requirements of due process are
24  met if some evidence supports the decision." (Biggs v. Terhune,
25  334 F.3d 910, 915 (9th Cir. 2003.) "Some evidence," however
26  does not mean literally "any" evidence. If it did, the
27  protection afforded by due process would be meaningless. In
28  addition, the evidence underlying the decision must possess some

14

1   indicia of reliability." (Biggs at 914 [internal quotations
2   omitted]; Caswell, 363 F.3d at 839; see Hill at 455-456.)
3   Evidence that lacks any real probative value cannot constitute
4   "some evidence." (See Cato, 924 F.2d at 705.) Otherwise, the
5   requirement of "some evidence" could be satisfied by baseless
6   speculation, superstition, or stereotyping. That, too, would
7   reduce the requirement of "some evidence" to a sham or a
8   mockery.

9       The California rules governing parole in murder cases, for
10  which parole eligibility is provided by statute, [CCR, supra, §
11  2402] are as follows: "[P]arole eligibility is the rule, rather
12  than the exception." (In re Scott, supra, 119 Cal.App.4th at p.
13  891.) "[P]arole is 'normally' to be granted." [Id. (quoting
14  Cal. Pen. Code § 3041 (a)).] The murder giving rise to the
15  prisoner's incarceration must be "particularly egregious" for
16  parole to be denied. (In re Rosenkrantz, supra, 29 Cal.4th at
17  p. 683.) Indeed, a murder must be "heinous, atrocious or cruel"
18  if, as here, the offense is to serve as the basis for parole
19  denial. In addition, in such cases, the prisoner must presently
20  present a danger to society. (Cal. Pen. Code § 3401 (b).) In
21  short, in petitioner's case, the circumstances surrounding the
22  crime or the manner in which it was committed must show not only
23  that the conspiracy to commit first degree murder at issue was
24  more cruel or vicious than the ordinary conspiracy to commit
25  murder, but also that petitioner would likely pose a current
26  risk to public safety if released. The record in this case
27  contains absolutely no evidence that would meet either of the
28  two requirements. Thus, there can be little doubt that the

15

1  Board violated the applicable rules when it denied petitioner

2  parole on the basis of his commitment offense.

3  B.    The Board's finding that petitioner had a previous record
      of violence is not supported by the facts.

4

5      CCR, § 2402 (c)(2), states, "Previous Record of Violence.

6  The prisoner on previous occasions inflicted or attempted to

7  inflict serious injuries on a victim, particularly if the

8  prisoner demonstrated serious assaultive behavior at an early

9  age."

10     In support of this finding the Board stated, "Your record

11 of violent behavior is evidenced by the statement of fact,

12 wherein on July 1981, you went to the victim's home, kicked the

13 door down and you shot him twice with a rifle.  And also the

14 behavior continued in 1995, when you received a 115 for force

15 and violence with another inmate."  (Exhibit 1, HT1, p. 85, L

16 13:19.)

17     The finding of fact by the Board is incorrect for the

18 following reasons.  First, petitioner went to the victim's home

19 in June 1981, not July 1981.  Second, the victim was not shot

20 twice as the Board stated, but once.  (Exhibit 2, Probation

21 Officer's Report, p. 4. L 10:13.)  Third, petitioner was found

22 guilty and the sentence was stayed for the attempted murder.

23 (Exhibit 3, Abstract of Judgment.)  Fourth, there is no evidence

24 in the record of any serious assaultive behavior at an early

25 age.

26     The Board's decision failed to rise to the level of the

27 some evidence standard.  Therefore, the decision is arbitrary

28 and capricious.

                              16

1  C.   The Board's finding that due to psychological factors
        petitioner was unsuitable for parole and a threat to
2       society if released is not supported by the evidence or
        regulations.

3

4       CCR, § 2402 (c)(5) states, "Psychological Factors.  The

5  prisoner has a lengthy history of severe mental problems related

6  to the offense."

7       The Board stated, "[T]he psychological report that was

8  written by Doctor Zika indicated that due to your history of

9  violence and history of involvement with alcohol and drugs, your

10 potential is somewhat higher than that of the average citizen in

11 the community."  (Exhibit 1, HT1, p. 86, L 5:11.)  "The

12 psychological report dated 9/26/03, authored by Dr. Shafer, was

13 not totally supportive of release.  He [sic] indicated at the

14 present time, his remorse is more of an intellectual than

15 emotional experience.  If released to the community, his

16 violence potential is somewhat higher than that of the average

17 citizen in the community, due to his history of violence and the

18 history of involvement with alcohol and drugs."  (Exhibit 1,

19 HT1, p. 86, L 15:24.)

20      This statement of reason by the Board is both incorrect and

21 inaccurate.  First, Dr. Zika never authored the psychological

22 report attributed to him.  Dr. Zika, at the time the

23 psychological evaluation was prepared, was the Senior

24 Supervising Psychologist and signed off on the report that was

25 prepared by Dr. Shafer.  (Exhibit 4, p. 4.)  Second, the

26 psychological evaluation prepared by Dr. Shafer stated that

27 petitioner does not have a mental disorder which would

28 necessitate treatment.  (Exhibit 4, p. 3, section XV, ¶ B.)  (It

17

1 | should be noted that all of the previous psychological
2 | evaluations also state that petitioner does not have a history
3 | of mental problems.) (Exhibits 5, 6 and 7.) Third, for this
4 | unsuitability factor to apply to petitioner the Board is
5 | required to demonstrate that there is or was a "lengthy history
6 | of severe mental problems related to the offense." (CCR, § 2402
7 | (c)(5).)

8 | The Board has failed to meet this regulatory requirement.
9 | Absent some, or any, evidence to support this finding, the
10 | Board's decision is arbitrary and capricious and cannot stand.
11 | D.  The Board's finding that petitioner engaged in serious
   |     misconduct is a misapplication of this factor and is not
12 |     some evidence of current dangerousness

13 | CCR, § 2402 (c)(6), states "Institutional Behavior.  The
14 | prisoner has engaged in serious misconduct in prison or jail."

15 | The Board states, "But when you to up to 2402 (d)(6), your
16 | engagement in serious misconduct in prison was also taken into
17 | account.  You have six 115's since your last Board appearance."
18 | (Exhibit 1, HT1, p. 85, L 25:26 to p. 86, L 1:3.)

19 | The "serious" misconduct the Board relies on is six Rules
20 | Violation Reports (CDC-115's), five classified as serious
21 | violations for refusing a direct order to interview and one
22 | classified as an administrative violation for failure to
23 | perform.  The Board cites no evidence of any serious assaultive
24 | behavior during petitioner's 25 years of incarceration, with the
25 | exception of the 1995 violation for being involved in a physical
26 | altercation.  Petitioner has no record of physically assaulting
27 | or stabbing either other inmates or prison staff.  The Board
28 | uses the fact that five of the CDC-115's referred to were

18

1  classified as serious "Division F" offenses.  The California
2  Department of Corrections and Rehabilitations has a grading
3  system for serious rule violations.  The most serious
4  classification is a "Division A" offense and the least serious
5  classification is a "Division F" offense, the only other
6  classification being the "Administrative" classification.  (See
7  California Code of Regulations, title 15, division 3, article 5,
8  sections 3310 to 3323.)

9      The Board is well aware that once a parole release date is
10  established petitioner will be assessed the loss of credit for
11  each of the serious rules violations.  Thus, petitioner will be
12  punished twice for each of the rules violation.  Once when the
13  Board uses them as a "factor" in finding him unsuitable for
14  parole and again after a parole release date has been set.  This
15  is double jeopardy.

16      The Board's decision to use the rule violations as a
17  contributing factor in support of an unsuitability determination
18  is a misapplication of the regulations.

19  E.   The Board's finding that petitioner had unrealistic parole
        plans are unsupported by the regulations and statutes.
20

21      CCR, § 2402 (d)(8) states, "Understanding and Plans for
22  Future.  The prisoner has made realistic plans for release or
23  has developed marketable skills that can be put to use upon
24  release."

25      The Board states, "Your parole plans considered by this
26  Panel are marginal, where you do have residential plans that
27  your mom said that you -- she would give you a place to stay and
28  that you plan to start a -- your business back up and in -- your

19

1  corporation back up again.  But the Panel was not given any
2  documents to show that you had either made an attempt to do this
3  or to even apply and take the necessary steps so that we can
4  assure that you would, in fact, be able to do that.  You do have
5  a marketable skill."  (Exhibit 1, HT1, p. 86, L 24:26 to p. 87,
6  L 1:9.)

7      The California Business and Professions Code, Licenses,
8  Div. 1.5, § 480, states, "The board may deny a license pursuant
9  to this subdivision only if the crime or act is substantially
10 related to the qualifications, functions or duties of the
11 business or professions for which application is made."
12 Therefore, petitioner, by law, can form a corporation and obtain
13 a contracting license.  It would be costly and unproductive for
14 petitioner to incorporate and procure his contracting license at
15 this time and the Board's requirement for him to do so in order
16 to be found suitable for parole is unrealistic.

17     The regulation states that applicants for parole must
18 either have realistic plans for the future or marketable skills.
19 Petitioner has both.  Petitioner has provided the Board with
20 verifiable parole plans, proof of a place to reside upon parole,
21 and that he will have financial support from his family.
22 (Exhibit 13, Letter of Support.)  The Board even acknowledges
23 that petitioner has marketable skills.  Therefore, this factor
24 should apply to him as indicating suitability for parole.

25     The Board's characterization of a factor indicating
26 suitability to demonstrate unsuitability is demonstrative that
27 petitioner's parole hearing was a sham.  The Board's decision is
28

1 | arbitrary and capricious because it is inconsistent with the law
2 | and its own regulations.

3 | F.   The Board's use of factors not listed or included in its
      regulations is a violation of petitioner's due process
4 |      rights.

5 |    The Board relied on four other "factors" in determining
6 | that petitioner posed an unreasonable risk of danger to society
7 | if released at this time.  However, none of these "factors" are
8 | mentioned in the Board's regulations.

9 |    The factors set forth in CCR, § 2402 (c) used by the Board
10 | to determined whether the prisoner is unsuitable for parole are
11 | objective, i.e. easily verifiable, and subjective, i.e. based on
12 | the opinion of the decision-maker.  As will be discussed below,
13 | because the objective factors used by the Board to find
14 | petitioner unsuitable are easily verifiable, petitioner did not
15 | have reasonable notice that they would apply to him.  The four
16 | factors are:

17 |    1.   "You have done very little programming while you've
18 | been incarcerated."  (Exhibit 1, HT1, p. 85, L 19:21.)  "In
19 | addition, Title XV, paragraph nine, talks about institutional
20 | behavior for suitability.  Act – institutional activities
21 | indicate an enhanced ability to function within the law upon
22 | release."  (Exhibit 1. HT1, p. 85, L 21:25.)

23 |    2.   "And also the fact that the record reflects that you
24 | were arrested and convicted of driving under the influence
25 | August the 12th, 1980, where you received a three-year
26 | probation."  (Exhibit 1, HT1, p. 86, L 11:15.)

27 |    3.   "The District Attorney of Riverside – We noted on the
28 | 3042 response that the District Attorney of Riverside County

21

indicated their opposition to a finding of parole suitability." (Exhibit 1, HT1, p. 87, L 9:13.)

4. "In addition, the Panel concluded that your previous attempts on Mr. Paulsen's [sic] life, when taken together with the fact that you were found guilty of conspiracy to commit murder, indicates to us – to us when you put those two together, that's a contributing factors contributing to a pattern which results in unsuitability." (Exhibit 1, HT1, p. 87, L 13:20.)

The four "factors" the Board used to demonstrate that petitioner is currently a threat to public safety if released on parole are arbitrary and capricious. Nowhere in the Board's regulations are any of the above cited "factors" published. Therefore, the Board cannot rely on any of these factors to prove that petitioner is currently a threat to society.

"A statute (or regulation) is void for vagueness 'if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.'" (*United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989).) "[T]he court need only examine the vagueness challenge under the facts of a particular case and decide whether, under a reasonable construction of the statute or regulation, the conduct in question is prohibited." (*United States v. Hogue*, 752 F.2d 1503, 1504 (9th Cir. 1985).)

Based on the regulations cited above [*CCR*, *supra*, § 2402 (c)], it is clear that this court should find that petitioner did not have adequate notice that these factors would apply to him. Accordingly, the Board's decision denying parole should be reversed.

1

II

2      *Claim:*   The Board's continued reliance on unchanging
3   factors resulted in a due process violation.

4      *Argument:*   In finding petitioner unsuitable at his sixth
5   parole suitability hearing, the panel relied exclusively on an
6   unchanging factor: the commitment offense.   In Biggs, the Ninth
7   Circuit stated that the Board was *"initially* justified" in
8   finding Mr. Biggs unsuitable based on the circumstances of the
9   offense and his conduct prior to imprisonment.   The Ninth
10   Circuit added that "[a] continued reliance in the future on an
11   unchanging factor, the circumstance of the offense and conduct
12   prior to imprisonment, runs contrary to the rehabilitative goals
13   espoused by the prison system and could result in a due process
14   violation."   (*Biggs, supra,* 334 F.3d at 917.)

15      One district court has explained the rationale underlying
16   this aspect of Biggs as follow:

17      "Whether the facts of the crime of conviction, or other
       unchanging criteria, affect the parole eligibility decision
18      can only be predicated on the "predictive value" of the
       unchanged circumstance.   Otherwise, if the unchanged
19      circumstance per se can be used to deny parole eligibility,
       sentencing is taken out of the hands of the judge and
20      totally reposited in the hands of the BPT.   That is, parole
       eligibility could be indefinitely and forever delayed based
21      on the nature of the crime even though the sentence given
       set forth the possibility of parole – a sentence given with
22      the facts of the crime fresh in the mind of the judge.
       While it would not be a constitutional violation to forego
23      parole altogether for certain crimes, what the state cannot
       constitutionally do is have a sham system where the judge
24      promises the possibility of parole, but because of the
       nature of the crime, the BPT effectively deletes such from
25      the system.   Nor can a parole system, where parole is
       mandated to be determined on someone's future potential to
26      harm the community, constitutionally exist where despite 20
       or more years of prison life which indicates the absence of
27      danger to the community in the future, the BPT
       commissioners revulsion towards the crime itself, or some
28      other unchanged circumstance, constitutes the alpha and

23

1   omega of the decision. Nobody elected the BPT
    commissioners as sentencing judges. Rather, in some
2   realistic way, the facts of the unchanging circumstance
    must indicate a present danger to the community if
3   released, and this can only be assessed not in a vacuum,
    after four or five eligibility hearings, but counterpoised
4   against the backdrop of prison events."

5
    (*Bair v. Folsom State Prison*, 2005 WL 2219220 (E.D.Cal. 2005),
6
    report and recommendation adopted by 2005 WL 3081634 (E.D.Cal.
7
    2005)
8
        Another district court explained:
9
        "More important ... in assessing any due process violation
10      is the fact that continued reliance on unchanging
        circumstances transforms an offense for which California
11      law provides eligibility for parole into a de facto life
        imprisonment without the possibility of parole. The court
12      asks rhetorically – what is it about the circumstances of
        petitioner's crime or motivation which are going to change?
13      The answer is nothing. The circumstances of the crime will
        always be what they were, and petitioner's motive for
14      committing them will always be trivial. Petitioner has no
        hope for ever obtaining parole except perhaps that a panel
15      in the future will arbitrary hold that the circumstances
        were not that serious or the motive was more than trivial.
16      Given that *no one* seriously contends lack of seriousness or
        lack of triviality at the present time, the potential for
17      parole in this case is remote to the point on non-
        existence. Petitioner's liberty interest should not be
18      determined by such an arbitrary, remote possibility." n2

19      n2 "To a point, it is true, the circumstances of the crime
        and motivation for it may indicate a petitioner's
20      instability, cruelty, impulsiveness, violent tendencies and
        the like. However, after fifteen or so years in the
21      caldron of prison life, not exactly an ideal therapeutic
        environment to say the least, and after repeated
22      demonstrations that despite the recognized hardships of
        prison, this petitioner does not possess those attributes,
23      the predictive ability of the circumstances of the crime in
        near zero."
24
25  (*Irons v. Warden of California State Prison – Solano,* 358
26  F.Supp.2d 936, 949.)
27      In the circumstances of this case, the Board's continued
28  reliance upon the nature of petitioner's crime to deny him

24

1  parole in 2006 violates due process.  Continued reliance upon
2  the unchanging facts of petitioner's crime makes a sham of
3  California's parole system and amounts to an arbitrary denial of
4  petitioner's liberty interest.  Petitioner has been denied
5  parole on five occasions prior to the determination he now
6  challenges.  (See Exhibits 8, 9, 10, 11, and 12.)  Continued
7  reliance upon the unchanging characterization of petitioner's
8  offense amounts to converting petitioner's sentence of 25 years
9  to life to a term of life without the possibility of parole.

10      The Board's continued reliance on the commitment offense
11  violates due process because it resulted in an arbitrary
12  decision and because the facts surrounding the offense do not
13  now constitute "some evidence" possessing "some indicia of
14  reliability" that petitioner pose a danger to the community.
15  (See *Hill*, 472, U.S. at 455; *Biggs*, 344 F.3d at 917; *Irons*,
16  358 F.Supp.2d at 947; *Masoner v. State*, 2004 WL 1080177 at *1-2
17  (C.D.Cal. 2004) ["Although the gravity of the commitment offense
18  and other pre-conviction factors alone may be sufficient to
19  justify the denial of a parole date at a prisoner's initial
20  hearing, subsequent BPT decisions to deny a parole date must be
21  supported by some post-conviction evidence that the release of
22  an inmate is against the interest of public safety].)

23      Beside not being especially atrocious, heinous or callous,
24  petitioner's crimes have little, if any, predictive value for
25  future criminality.  Simply from the passing of time,
26  petitioner's crimes 25 years ago have lost much of their
27  usefulness in foreseeing the likelihood of future offenses than
28  if he had committed them five or ten years ago.  (*In re Scott*,

25

1  133 Cal.App.4th at 573 [past crime's value for predicting future
2  crime diminishes over time].)

3      Because there is no reliable evidence supporting the
4  Board's conclusions that petitioner is unsuitable for parole,
5  that determination violates due process.  (*Hill*, 472, U.S. a5
6  455.)

7                              **CONCLUSION**

8      The Board's statement of decision is cryptic at best.  It
9  merely recites the commitment offense as the primary basis upon
10 which it denied parole.  It does not explain what it is about
11 the commitment offense that makes petitioner "an unreasonable
12 risk of danger to society if released," or how the commitment
13 offense was "particularly egregious."  A determination of
14 unsuitability is simply shorthand for a finding that a prisoner
15 currently would pose an unreasonable risk of danger if released
16 at this time.  Absent any evidence in support, the Board's
17 decision finding petitioner unsuitable for parole is arbitrary
18 and capricious and resulted in a due process violation.

19

20     WHEREFORE, petitioner prays the Court will grant this
21 petition.

22

23 DATE:  February 11, 2007                    Respectfully Submitted

24

25

26                                            R. K. Mauzey
27                                            Petitioner, In Pro Per

28

                                  26

TABLE OF EXHIBITS

EXHIBIT 1
     Subsequent Parole Consideration Hearing Transcript
     May 4, 2006

EXHIBIT 2
     Probation Officer's Report
     December 28, 1982

EXHIBIT 3
     Abstract of Judgment
     February 8, 1983

EXHIBIT 4
     Psychological Evaluation
     September 25, 2003

EXHIBIT 5
     Psychological Evaluation
     November 15, 1995

EXHIBIT 6
     Psychological Evaluation
     November 7, 1997

EXHIBIT 7
     Psychological Evaluation
     December 10, 1999

EXHIBIT 8
     Initial Parole Consideration Hearing Transcript
     February 20, 1996

EXHIBIT 9
     Subsequent Parole Consideration Hearing Transcript
     February 25, 1998

EXHIBIT 10
     Subsequent Parole Consideration Hearing Transcript
     October 31, 2000

EXHIBIT 11
     Subsequent Parole Consideration Hearing Transcript
     September 24, 2002

EXHIBIT 12
     Subsequent Parole Consideration Hearing Transcript
     January 9, 2004

EXHIBIT 13
     Letter of Support
     November 28, 2003

E X H I B I T

1

Subsequent Parole Consideration Hearing Transcript
May 4, 2006

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number C-61868
Hearing of:               )
                          )
RONALD MAUZEY             )     **INMATE**
_____)     **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 4, 2006

PANEL PRESENT:

ARCHIE JOE BIGGERS, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

RONALD MAUZEY, Inmate
KATERA E. RUTLEDGE, Attorney for Inmate
LINDA DUNN, Deputy District Attorney
CORRECTIONAL OFFICER, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Sandra Triplett, Peters Shorthand Reporting**

ii

# INDEX

Page

Proceedings ........................................ 1

Case Factors ..................................... 14

Pre-Commitment Factors ........................... 20

Post-Commitment Factors .......................... 26

Parole Plans ..................................... 45

Closing Statements ............................... 66

Recess ........................................... 83

Decision ......................................... 84

Adjournment ...................................... 91

Transcriber Certification ........................ 92

--oOo--

1

1     P R O C E E D I N G S

2          **DEPUTY COMMISSIONER MEJIA:**  We're on

3     record.

4          **PRESIDING COMMISSIONER BIGGERS:**  This is a

5     Subsequent Parole Consideration Hearing for

6     Ronald Mauzey.  How do you --

7          **INMATE MAUZEY:**  Mauzey.

8          **PRESIDING COMMISSIONER BIGGERS:**  Mauzey.

9     CDC number is C-61868.  Today's date is May the

10    4th, 2006.  We're located at the Correctional

11    Training Facility at Soledad.  The inmate was

12    received on March the 3rd, 1983, from Riverside

13    County.  The life term began also on March the

14    3rd, 1983.  And the Minimum Eligible Parole Date

15    is November 28th, 1996.  The controlling offense

16    for which the inmate has been committed for is

17    -- Excuse me, conspiracy to commit murder, first

18    degree.  Case number was CR18817, which was

19    count four, and was a violation of Penal Code

20    182/187.  There was some additional counts of PC

21    187, attempted murder first degree.  Same case

22    number, one count.  Use of a firearm, which is a

23    violation of PC 12022.5; same case number, one

24    count.  And GBI, great bodily injury, PC

25    12022.7; same case number.  Those last three

26    offenses were stayed by the court.  The inmate

27    received a term of 25 years to life with, as I

2

1    said earlier, with a Minimum Eligible Parole

2    Date of November 28, 1996.  This hearing is

3    being tape-recorded.  For the purposes of voice

4    identification, each of us will state our first

5    and last name, spelling our last name.  When it

6    is your turn, Mr. Mauzey, after spelling your

7    last name, please give us your CDC number.  My

8    name is Archie Joe Biggers, B-I-G-G-E-R-S, and I

9    will move to my left.

10        **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia,

11   M-E-J-I-A, Deputy Commissioner.

12        **DEPUTY DISTRICT ATTORNEY DUNN:**  Linda

13   Dunn, D-U-N-N, Riverside County District

14   Attorney's Office.

15        **ATTORNEY RUTLEDGE:**  Katera E. Rutledge,

16   R-U-T-L-E-D-G-E, Attorney for Mr. Mauzey.

17        **INMATE MAUZEY:**  Ronald K. Mauzey,

18   M-A-U-Z-E-Y, C-61868.

19        **PRESIDING COMMISSIONER BIGGERS:**  Thank

20   you, Mr. Mauzey.  There's a -- where you have

21   your green folder there, there's an ADA

22   Statement under that.  Would you please read

23   that for us?

24        **INMATE MAUZEY:**  ADA, Americans with

25   Disabilities Act.

26        "The Americans with Disabilities

27        Act, ADA, is a law to help people

1          with disabilities.  Disabilities

2          are problems that make it harder

3          for some people to see, hear,

4          breathe, talk, walk, learn, think,

5          work or take care of themselves

6          than it is for others.  Nobody can

7          be kept out of public places or

8          activities because of a

9          disability.  If you have a

10         disability, you have the right to

11         ask for help to get -- help to get

12         ready for your BPT hearing, get to

13         the hearing, talk, read forms and

14         papers and understand the hearing

15         process.  BPT will look at what

16         you asked for to make sure that

17         you have a disability that is

18         covered by the ADA, and that you

19         have asked for the right kind of

20         help.  If you do not get help or

21         if you don't think you got the

22         kind of help you need, ask for the

23         BPT 1074 Grievance Form.  You can

24         get help filling it out."

25     **PRESIDING COMMISSIONER BIGGERS:**  Do you

26  understand what that means, sir?

27     **INMATE MAUZEY:**  Yes, Sir.

4

1      PRESIDING COMMISSIONER BIGGERS:  And in

2  your own words, what do -- what does that mean

3  to you?

4      INMATE MAUZEY:  That if I have a

5  recognized ADA claim, that the state will give

6  me whatever help necessary to represent myself

7  for this hearing.

8      PRESIDING COMMISSIONER BIGGERS:  That's

9  correct.  Do you have -- I see you're wearing

10  glasses.  Are those -- Those are prescription

11  glasses, I assume.

12      INMATE MAUZEY:  Yes, Sir.

13      PRESIDING COMMISSIONER BIGGERS:  Did you

14  use those when you reviewed your Olson file?

15      INMATE MAUZEY:  I didn't -- Yes, Sir.

16      PRESIDING COMMISSIONER BIGGERS:  When you

17  reviewed your C-File?

18      INMATE MAUZEY:  I didn't review the

19  C-File.

20      PRESIDING COMMISSIONER BIGGERS:  Why not?

21      INMATE MAUZEY:  I know what's in there,

22  Sir.

23      PRESIDING COMMISSIONER BIGGERS:  You know

24  what's in there.  Regardless, how long has it

25  been since you've seen your C-File?

26      INMATE MAUZEY:  Two years.

27      PRESIDING COMMISSIONER BIGGERS:  Two

5

1    years.  Okay, do you -- Have you been -- ever

2    been included in a Triple CMS or EOP Program?

3         **INMATE MAUZEY:**  No, Sir.

4         **PRESIDING COMMISSIONER BIGGERS:**  Have you

5    -- Are you on any psychotropic medication?

6         **INMATE MAUZEY:**  None.

7         **PRESIDING COMMISSIONER BIGGERS:**  Okay, so

8    do you suffer from any disability that would --

9    Excuse me.  Do you suffer from any disability

10   that would prevent you from participating in

11   today's hearing?

12        **INMATE MAUZEY:**  No.

13        **PRESIDING COMMISSIONER BIGGERS:**  Thank

14   you.  I see that you signed a 1073 on November

15   the 15th, '05, indicating you had no ADA issues.

16   Is that still correct?

17        **INMATE MAUZEY:**  Yes.

18        **PRESIDING COMMISSIONER BIGGERS:**  Okay,

19   this hearing is being conducted pursuant to

20   Penal Code Section 3041 and 3042 and the rules

21   and regulations of the Board of Prison Terms

22   governing Parole Consideration Hearings for life

23   inmates.  The purpose of today's hearing is to

24   once again consider the nature and number of the

25   crimes you were committed for, your prior

26   criminal and social history and your behavior

27   and programming since your commitment.  We've

6

1    had the opportunity to review your Central File

2    and your prior transcript, and you will be given

3    the opportunity to correct or clarify the

4    record.  We will reach a decision today and

5    inform you whether or not we find you suitable

6    for parole and the reasons for our decision.  If

7    you're found suitable, the length of your

8    confinement will be explained to you.  Do you

9    understand that?

10    **INMATE MAUZEY:**  Yes.

11    **PRESIDING COMMISSIONER BIGGERS:**  Okay,

12    nothing that happens here today will change the

13    finding of the court.  This Panel is not here to

14    retry your case.  Do you understand that?

15    **INMATE MAUZEY:**  Yes.

16    **PRESIDING COMMISSIONER BIGGERS:**  This

17    Panel is here for the sole purpose of

18    determining your suitability for parole.  Do you

19    understand that?

20    **INMATE MAUZEY:**  Yes.

21    **PRESIDING COMMISSIONER BIGGERS:**  Okay, the

22    hearing will be conducted in three phases.  I

23    will discuss with you your committing offense,

24    your prior criminal and social history.  Then

25    Deputy Commissioner Mejia will discuss with you

26    your progress since your commitment, your

27    counselor's report, your psychological

7

1   evaluation, your parole plans and letters of
2   support.  And I will return and talk to you
3   about any opposition letters that may be in your
4   file.  Once that is concluded, both
5   Commissioners, the District Attorney and your
6   attorney will be given the opportunity to ask
7   you questions.  Questions from the District
8   Attorney will be asked through the Chair and you
9   should direct your answers to this Panel.  Next
10  the District Attorney, then your attorney, then
11  you will be given an opportunity to make a final
12  statement regarding your parole suitability.
13  Your statement should include why you feel you
14  are suitable for parole.  Is that understood?
15          **INMATE MAUZEY:**  Yes.
16          **PRESIDING COMMISSIONER BIGGERS:**  Okay, the
17  Panel will then recess, clear the room and
18  deliberate.  Once the deliberations are
19  complete, the Panel will resume the hearing and
20  announce its decision.  Now the California Code
21  of Regulations state that regardless of time
22  served, a life inmate shall be found unsuitable
23  for and denied parole if in the judgment of the
24  Panel, the inmate would pose an unreasonable
25  risk of danger to society if released from
26  prison.  You have certain rights.  Those rights
27  include a right to a timely notice of this

8

1   hearing, the right to review your Central File.

2   Now since you didn't review your Central File,

3   did you sign a waiver?

4       INMATE MAUZEY:  Yes.

5       PRESIDING COMMISSIONER BIGGERS:  Okay,

6   thank you.  And the right to present relevant

7   documents.  I'm going to ask your attorney, does

8   -- have your client's rights been met?

9       ATTORNEY RUTLEDGE:  We do have documents

10  to submit at this time.

11      PRESIDING COMMISSIONER BIGGERS:  Okay.

12      ATTORNEY RUTLEDGE:  And other than that,

13  my client's rights have been met.

14      PRESIDING COMMISSIONER BIGGERS:  Okay, you

15  also have the right to be heard by an impartial

16  Panel.  Do you have any objections to the Panel

17  Members?

18      INMATE MAUZEY:  None.

19      PRESIDING COMMISSIONER BIGGERS:  Okay,

20  thank you.  You will receive a written copy of

21  our tentative decision today.  That decision

22  become effective within 120 days.  A copy of the

23  decision and a copy of the transcript will be

24  sent to you and you will have 90 days from that

25  date to appeal if you so desire.  The Board has

26  eliminated its appeal process.  If you disagree

27  with anything in today's hearing, you have the

9

1  right to go directly to the court with your

2  complaint.  You're not required to admit your

3  offense or discuss your offense.  However, the

4  Panel does accept the findings of the court to

5  be true.  Do you understand that?

6  **INMATE MAUZEY:**  Yes.

7  **PRESIDING COMMISSIONER BIGGERS:**  Deputy

8  Commissioner Mejia, is there any confidential

9  information in the files, and if so, will it be

10  used?

11  **DEPUTY COMMISSIONER MEJIA:**  We have

12  confidential information and we will use

13  confidential information.

14  **PRESIDING COMMISSIONER BIGGERS:**  Thank

15  you.

16  **DEPUTY COMMISSIONER MEJIA:**  Oh, wait a

17  minute.  I -- We may or we may not use

18  confidential information in our -- during our

19  deliberation.

20  **PRESIDING COMMISSIONER BIGGERS:**  Okay, if

21  we does, then we'd let them know that we are, in

22  fact, using it.  Okay, I'm going to pass over to

23  your attorney and to the District Attorney what

24  I will mark as Exhibit One, so that we can make

25  sure that we all run -- working off the same set

26  of documents.  Please note, both Counselors,

27  that it says that there is an Appellate Decision

10

1    there.   There is not one in any files.   What is

2    this?   See this?

3        **ATTORNEY RUTLEDGE:**   We have those

4    documents.

5        **DEPUTY DISTRICT ATTORNEY DUNN:**   I have the

6    documents, Commissioner.

7        **PRESIDING COMMISSIONER BIGGERS:**   Okay,

8    thank you.   The additional documents that you

9    gave us there, Counselor, has to do -- These are

10   taken primarily from Title XV?

11       **ATTORNEY RUTLEDGE:**   No, Sir.   Up to page

12   four, it is.   Beginning with page five, it

13   addresses the post-commitment factors.   On page

14   six, it advises the Panel of Mr. Mauzey's parole

15   plans; pages six and seven.   Page eight -- I can

16   read page eight when it gets -- Some of these

17   I'll read when it gets to the proper time, but

18   we wanted the Panel to have everything in

19   writing to incorporate into the record.

20       **PRESIDING COMMISSIONER BIGGERS:**   We can do

21   that by going through the transcript.   I mean we

22   will --

23       **DEPUTY COMMISSIONER MEJIA:**   Yeah, we've

24   got it down.

25       **PRESIDING COMMISSIONER BIGGERS:**   Is the --

26   Well, let me ask you this.   Are there any

27   preliminary objections at this point?

11

1       **ATTORNEY RUTLEDGE:**  No.

2       **PRESIDING COMMISSIONER BIGGERS:**  Okay,

3   will the inmate be speaking to the Panel?

4       **ATTORNEY RUTLEDGE:**  Wait, I'm sorry.

5   There is one thing I forgot.  Are we going to

6   throw this letter out or is it going to be

7   considered today?

8       **PRESIDING COMMISSIONER BIGGERS:**  Well, the

9   letter -- the District Attorney is here.  The

10  letter -- We will be using (indiscernible) the

11  letter.  The letter was mailed out on the --

12  April the 4th.  So what is your objection with

13  the letter?

14      **ATTORNEY RUTLEDGE:**  Well, Commissioner, on

15  the second to last page, I don't see -- Page

16  three, the second to last paragraph, the very

17  last sentence again is the -- is pure spec --

18  prejudicial speculation by the District

19  Attorney's Office.

20      **PRESIDING COMMISSIONER BIGGERS:**  Again, I

21  thought we mentioned that before.  In accordance

22  with 20 -- I think it was 2402, we will consider

23  the letter.

24      **ATTORNEY RUTLEDGE:**  All right, but did you

25  read the last sentence and what it says?

26      **PRESIDING COMMISSIONER BIGGERS:**  Yes.  We

27  will take --

12

1      **ATTORNEY RUTLEDGE:**  Are you going to

2      consider that sentence?

3      **PRESIDING COMMISSIONER BIGGERS:**  We will

4      take whatever information that we feel is

5      appropriate.  We may or may not utilize that

6      last sentence.

7      **ATTORNEY RUTLEDGE:**  All right, but it's

8      untrue.

9      **PRESIDING COMMISSIONER BIGGERS:**

10     Counselor, we will determine whether or not it

11     is untrue or not.

12     **ATTORNEY RUTLEDGE:**  All right, we're

13     objecting then to use of that.

14     **PRESIDING COMMISSIONER BIGGERS:**  Okay,

15     objection noted.  Okay, any other preliminary

16     objections?

17     **ATTORNEY RUTLEDGE:**  No.

18     **PRESIDING COMMISSIONER BIGGERS:**  Will the

19     inmate be speaking to the Panel?

20     **INMATE MAUZEY:**  Yes.

21     **PRESIDING COMMISSIONER BIGGERS:**  At that

22     point then, sir, I need you to raise your right

23     hand.  Do you solemnly swear or affirm that the

24     testimony you give at this hearing will be the

25     truth and nothing but the truth?

26     **INMATE MAUZEY:**  I do.

27     **PRESIDING COMMISSIONER BIGGERS:**  Thank

13

1   you.   Before I go on, are you going to be

2   testifying to anything -- everything that's in

3   this panel -- in this package?

4       **INMATE MAUZEY:**   Some of it, yes.

5       **PRESIDING COMMISSIONER BIGGERS:**   Some of

6   it.   Okay.

7       **INMATE MAUZEY:**   My attorney will, some of

8   the other.

9       **PRESIDING COMMISSIONER BIGGERS:**   Okay

10   then, why was it necessary for you to give this

11   to us?

12       **ATTORNEY RUTLEDGE:**   We have a right to

13   submit documents.

14       **PRESIDING COMMISSIONER BIGGERS:**   I

15   understand that, Counselor.   I'm asking your

16   client a question.

17       **INMATE MAUZEY:**   I want to make sure it's

18   in the record, Sir.

19       **PRESIDING COMMISSIONER BIGGERS:**   Okay, do

20   you know that the -- that the record has, in

21   fact, is being tape-recorded?

22       **INMATE MAUZEY:**   Yes, Sir, but in previous

23   hearings, not all the information that's

24   supposed to be covered in the Title XV that I'm

25   allowed to interject have been covered during

26   the hearing.   So I wanted to make sure by

27   presenting this, that all these were covered.

14

```
 1      PRESIDING COMMISSIONER BIGGERS:  All
 2  right, make sure it gets in there.
 3      DEPUTY COMMISSIONER MEJIA:  We will.
 4      PRESIDING COMMISSIONER BIGGERS:  Okay, I
 5  will --
 6      DEPUTY COMMISSIONER MEJIA:  We'll use it
 7  as part of our deliberation.
 8      PRESIDING COMMISSIONER BIGGERS:  Yeah, I
 9  will read into the record, a summary of the
10  crime from the September 2003 Board report.
11          "On November the 20th, 1981,
12          detectives received information
13          that an informant had been
14          solicited by Mr. Mauzey to kill a
15          subject named John Paullin,
16          P-A-U-L-L-I-N.  Detectives were
17          aware that Mauzey, M-A-U-Z-E-Y,
18          had previously been arrested for
19          the attempted murder of
20          Mr. Paullin.  The victim had
21          testified against Mauzey and who
22          was then held to answer in
23          Superior Court.  On November the
24          30th, 1991, and December the 7th,
25          1981, detectives contacted
26          Carranza, C-A-R-R-A-N-Z-A, who
27          indicated that someone after --
```

15

1        somewhere after August 1981,
2        Mauzey had taken a liking to him
3        and invited him to live in his
4        home.  On several occasions,
5        solicited him to kill Mr. Paullin,
6        because Paullin was the only
7        person who could identify Mauzey
8        regarding the attempted murder.
9        Mauzey offered to buy Carranza a
10       house, give him a job in his
11       construction company and pay him
12       $4,000 a month, not only for
13       killing Mr. Paullin, but also for
14       assisting in illicit sales of
15       cocaine.  A slip of paper that
16       Mauzey had given Carranza with
17       John Paullin's name, make of car,
18       home and business address were
19       seized as evidence.  Carranza
20       advised the detectives that Mauzey
21       drove him by Paullin's residence
22       and business and suggested sniping
23       Paullin while in route to his
24       office.  Carranza advised
25       detectives that he did not want to
26       commit the murder himself;
27       however, contacted another subject

16

1    that would.  It was later

2    determined that Mauzey's telephone

3    records, that in October 1981,

4    Carranza called Felix Salsedo,

5    S-A-L-S-E-D-O, for the purpose of

6    soliciting the murder of

7    Mr. Paullin for Mauzey.  For the

8    purpose of the investigation, it

9    was determined that Carranza would

10   contact Mauzey and should Mauzey

11   be inclined to solicit

12   Mr. Paulsen's murder, Detective

13   Brian McAuley, M-C-A-U-L-E-Y,

14   would be introduced as Wolf, a

15   paid killer.  December 8th, 1981,

16   Carranza met Mauzey at his

17   residence, and during a taped

18   conversation, Mauzey made several

19   comments regarding wanting

20   Mr. Paullin killed.  Appropriate

21   payment for the killing was

22   discussed and reference was made

23   to one grand, a kilo or some coke.

24   On December 9th, 1981, Detective

25   McAuley telephoned Mauzey as Wolf

26   regarding the solicitation for

27   murder.  In the recorded

17

 1          conversation, Mauzey provided the
 2          detective with information
 3          concerning Mr. Paullin, and
 4          indicated he still wanted Paullin
 5          killed.  On December the 10th,
 6          1981, Carranza contacted Mauzey
 7          regarding Wolf killing Paullin on
 8          Friday, December the 11th, 1981.
 9          Mauzey indicated it was too soon
10          to kill Mr. Paulsen -- Paullin and
11          he wanted to postpone the killing
12          until he was able to pay half down
13          and the other half upon completion
14          of the job.  On December the 11th,
15          1981, an arrest warrant was
16          obtained and Mauzey was arrested
17          without incident."
18     Is this a true depiction of the crime as it was
19     presented in the court?
20          **INMATE MAUZEY:**  As it was presented in the
21     court, yes.
22          **PRESIDING COMMISSIONER BIGGERS:**  Okay,
23     thank you.  I was going over and ready your
24     versions well, Mr. Mauzey, and they indicated
25     that in the same Board report that you didn't
26     mean to solicit murder in the taped
27     conversation, and that you made a statement that

18

1   if you wanted him killed, you would have done it

2   yourself with something under than a .22 caliber

3   rifle.

4       INMATE MAUZEY:  For the purpose of this

5   hearing, Sir, I accept the findings of the

6   courts and I don't want to discuss the crime.

7       PRESIDING COMMISSIONER BIGGERS:  Okay,

8   that is your right, sir.

9       INMATE MAUZEY:  Thank you.  The

10  circumstances of the crime are never going to

11  change they are -- what they are.

12      PRESIDING COMMISSIONER BIGGERS:  Okay, so

13  you don't want to discuss the details of the

14  crime or you just don't want to discuss the

15  crime itself?

16      INMATE MAUZEY:  The crime, period.

17      PRESIDING COMMISSIONER BIGGERS:  The

18  crime, period.  How about the other crime?

19      INMATE MAUZEY:  Which crime?

20      PRESIDING COMMISSIONER BIGGERS:  There was

21  multiple crimes.

22      INMATE MAUZEY:  You mean the stayed

23  counts?

24      PRESIDING COMMISSIONER BIGGERS:  Yes.

25      INMATE MAUZEY:  All right.  I don't see

26  how they have a fact -- how they play in this.

27      PRESIDING COMMISSIONER BIGGERS:  Well,

19

1   they do, because -- Do you want to discuss the

2   stayed counts?

3        **INMATE MAUZEY:**  No, Sir.

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay, do

5   you want to discuss any remorse for the crimes?

6        **INMATE MAUZEY:**  Yes.

7        **PRESIDING COMMISSIONER BIGGERS:**  Okay,

8   well what is your remorse?  How do you feel

9   about what took place; not getting into the

10  crime.

11       **INMATE MAUZEY:**  I maintain my innocence in

12  the solicit -- I mean the conspiracy to commit

13  murder.

14       **PRESIDING COMMISSIONER BIGGERS:**  So if you

15  maintain your innocence, that means you don't

16  have any remorse for what has --

17       **INMATE MAUZEY:**  Well, if I'm innocent,

18  then how can I have remorse?

19       **PRESIDING COMMISSIONER BIGGERS:**  The court

20  has found you guilty, sir.  And we're asking,

21  since the court has found you guilty, do you

22  have any remorse for being either found guilty

23  or being guilty?

24       **ATTORNEY RUTLEDGE:**  Nothing per 2236.

25       **INMATE MAUZEY:**  Yeah.

26       **ATTORNEY RUTLEDGE:**  (Indiscernible) 2236

27  doesn't require you to --

1      **INMATE MAUZEY:**  I wonder if I got that.

2    There it is.  According to Penal Code Section

3    5011(b), the Board of Prison Terms shall not

4    require when setting parole dates, an admission

5    of guilt to any crime for which an inmate was

6    committed.

7      **PRESIDING COMMISSIONER BIGGERS:**  I'm well

8    aware of the -- of that, sir.  I asked you one

9    question, and you said that you wanted -- I

10   asked you did you have any remorse about the

11   crime.  I'm not asking you about the crime. Do

12   you have any remorse?

13     **INMATE MAUZEY:**  If I maintain my

14   innocence, Sir, how could I have remorse for

15   something I didn't do?

16     **PRESIDING COMMISSIONER BIGGERS:**  Okay, all

17   right, we will go into your personal factors.

18   Were you 35 years old at the time of the

19   commitment, sir?

20     **INMATE MAUZEY:**  Yes.

21     **PRESIDING COMMISSIONER BIGGERS:**  Okay,

22   you're the oldest of three children, born to

23   Wayne and Ruth Mauzey.

24     **INMATE MAUZEY:**  Correct.

25     **PRESIDING COMMISSIONER BIGGERS:**  You

26   graduated from Ponca, P-O-N-C-A, Military

27   Academy in Oklahoma.

21

1    **INMATE MAUZEY:**  Yes.

2    **PRESIDING COMMISSIONER BIGGERS:**  1964.

3    **INMATE MAUZEY:**  Yes.

4    **PRESIDING COMMISSIONER BIGGERS:**  Served in

5    the United States Army from '65 through '68, and

6    received an honorable discharge.

7    **INMATE MAUZEY:**  Yes.

8    **PRESIDING COMMISSIONER BIGGERS:**  Okay,

9    there was a little hesitation.  Was it an

10   honorable discharge?

11   **INMATE MAUZEY:**  Yes, it was.

12   **PRESIDING COMMISSIONER BIGGERS:**  Okay,

13   attended Cypress College from 1968 to 1971, and

14   Cal State University in Fullerton.

15   **INMATE MAUZEY:**  Yes.

16   **PRESIDING COMMISSIONER BIGGERS:**  Okay, did

17   you graduate?

18   **INMATE MAUZEY:**  No.

19   **PRESIDING COMMISSIONER BIGGERS:**  Okay, and

20   you went to the University of Tulsa, what, in

21   1974?

22   **INMATE MAUZEY:**  Yes.

23   **PRESIDING COMMISSIONER BIGGERS:**  Okay,

24   majored in Business Administration.  But it says

25   here did not obtain any degrees.  Have you done

26   any work since you've been here at the

27   institution to follow up on that through

22

1    correspondence courses or anything?

2         INMATE MAUZEY:  No.

3         PRESIDING COMMISSIONER BIGGERS:  Your

4    major was Business Administration.  Okay, you

5    were self-employed as a general contractor and

6    was a business owner.

7         INMATE MAUZEY:  Yes.

8         PRESIDING COMMISSIONER BIGGERS:  You owned

9    your own business.

10        INMATE MAUZEY:  Yes.

11        PRESIDING COMMISSIONER BIGGERS:  Okay,

12   what is it called, Ronco Framing Incorporated?

13        INMATE MAUZEY:  Yes, Sir.

14        PRESIDING COMMISSIONER BIGGERS:  Okay, and

15   Lombard Commodities Incorporated and W.H. Nash

16   Trucking Incorporated.  So you had three

17   businesses?

18        INMATE MAUZEY:  Actually it was Lombard.

19        PRESIDING COMMISSIONER BIGGERS:  Okay,

20   Lombard.

21        INMATE MAUZEY:  Lumber.

22        PRESIDING COMMISSIONER BIGGERS:  Well, it

23   says L-U-M-B-E-R or B-A-R?

24        INMATE MAUZEY:  B-E-R.

25        PRESIDING COMMISSIONER BIGGERS:  Okay,

26   well they'll -- I'll make sure they change that.

27        INMATE MAUZEY:  That's how they

23

1    incorporate in the state of California.

2        **PRESIDING COMMISSIONER BIGGERS:** Okay, so

3    it did Lombard?

4        **INMATE MAUZEY:** Lumber.

5        **PRESIDING COMMISSIONER BIGGERS:** Okay.

6        **INMATE MAUZEY:** As in --

7        **PRESIDING COMMISSIONER BIGGERS:** So you

8    got -- you had three businesses going at the

9    same time?

10       **INMATE MAUZEY:** Yes, Sir.

11       **PRESIDING COMMISSIONER BIGGERS:** Okay, and

12   you married Elke -- Let me spell the last name.

13   S-T-E-F-F-A-N-O-W-K-I, on October the 22nd,

14   1967.

15       **INMATE MAUZEY:** Yes.

16       **PRESIDING COMMISSIONER BIGGERS:** And you

17   have two sons as a result of this union.

18       **INMATE MAUZEY:** Yes.

19       **PRESIDING COMMISSIONER BIGGERS:** Okay, and

20   the two of you were divorced on November the

21   13th, 1981.

22       **INMATE MAUZEY:** Yes.

23       **PRESIDING COMMISSIONER BIGGERS:** Okay, and

24   then on May the 21st, 1985, you married Kathleen

25   Misty Vellante.

26       **INMATE MAUZEY:** Vellante, yes.

27       **PRESIDING COMMISSIONER BIGGERS:** Vellante,

24

1   V-E-L-L-A-N-T-E.  And you two were -- remained

2   married until August the 2nd, 1988, when you got

3   divorced again.

4       **INMATE MAUZEY:**  Yes.

5       **PRESIDING COMMISSIONER BIGGERS:**  Then on

6   June the 25th, 1990, you married Lydia Sue

7   Stevens.

8       **INMATE MAUZEY:**  Yes.

9       **PRESIDING COMMISSIONER BIGGERS:**  And you

10  were divorced on the 27th of December, 1993.  Is

11  that correct?

12      **INMATE MAUZEY:**  Yes.

13      **PRESIDING COMMISSIONER BIGGERS:**  Okay,

14  thank you.  Let's look at your priors.  Excuse

15  me just one second here, I lost my place here.

16  All right, so you had no juvenile record at all?

17      **INMATE MAUZEY:**  None, Sir.

18      **PRESIDING COMMISSIONER BIGGERS:**  Okay, on

19  your adult convictions, on August the 12th,

20  1980, you had a -- was it a driving under the

21  influence?

22      **INMATE MAUZEY:**  Yes.

23      **PRESIDING COMMISSIONER BIGGERS:**  And you

24  received a three-year probation and $365 fine.

25      **INMATE MAUZEY:**  I think that's correct.

26      **PRESIDING COMMISSIONER BIGGERS:**  And then

27  you had a reckless driving charge back in

26

1  **DEPUTY COMMISSIONER MEJIA:**  No, because

2  he's actually denying that he's guilty of the --

3  **PRESIDING COMMISSIONER BIGGERS:**  Okay.

4  **DEPUTY COMMISSIONER MEJIA:**  -- what you've

5  been committed for.  And he's right, I can't --

6  It's hard to gauge remorse or insight as to why

7  the offense happened.  Is that correct?

8  **INMATE MAUZEY:**  I'm sorry, I didn't

9  understand the question.

10  **DEPUTY COMMISSIONER MEJIA:**  You're denying

11  the -- your culpability for the crime that you

12  have been in prison for?

13  **INMATE MAUZEY:**  The conspiracy to commit

14  murder, yes.

15  **DEPUTY COMMISSIONER MEJIA:**  And,

16  therefore, I'm saying I -- there's no need for

17  remorse or ask you for remorse if there's -- if

18  you're not guilty, you don't -- you can't have

19  remorse or insight into the commitment offense.

20  I have no further questions.

21  **PRESIDING COMMISSIONER BIGGERS:**  Okay,

22  then, will you please go into the post-

23  conviction factors.

24  **DEPUTY COMMISSIONER MEJIA:**  Yeah, the last

25  Board appearance was in January 9th, 2004.  You

26  received a two-year denial.  The recommendations

27  was for him to remain disciplinary free,

1  participate in self-help. Custody level is

2  Medium A.  Classification Score is 19.  Current

3  work assignment, teacher's age -- aide,

4  (indiscernible) program.  Are you still working

5  there?

6          INMATE MAUZEY:  They deactivated the job.

7          DEPUTY COMMISSIONER MEJIA:  Okay.

8          INMATE MAUZEY:  I'm waiting to be

9  reassigned.

10         DEPUTY COMMISSIONER MEJIA:  So you're on

11  the waiting list.  When did they -- When was the

12  last time you were working for the teacher's

13  aide?

14         INMATE MAUZEY:  We've been on lockdown

15  since February 7th, so I got the deactivation

16  notice just before that, I believe.

17         DEPUTY COMMISSIONER MEJIA:  And you're

18  unassigned.  What waiting list are you on?

19         INMATE MAUZEY:  To be honest, I don't

20  know.

21         DEPUTY COMMISSIONER MEJIA:  When was the

22  last time you went to Classification?

23         INMATE MAUZEY:  I don't remember.

24         DEPUTY COMMISSIONER MEJIA:  Let me look at

25  your file here.  Your waiting list on the -- It

26  say -- It says a waiting list -- on a waiting

27  list assignment.  You were removed from the

1    culinary as a porter, 2005.  You (indiscernible)

2    a teacher's aide.  I guess it's unclear.  They

3    just put you on the waiting list.  I don't know

4    which waiting list they put you.  And when you

5    were working as a teacher's aide, you were --

6    you have satisfactory to above average work

7    reports.  And you have a -- it's like the

8    Commissioner discussed.  I saw your diploma from

9    the Ponca Military -- Ponca Military Academy;

10   high school diploma.  1964, you have a 12.9 GPL.

11   You're 30 short of your B.A.  Vocational program

12   history -- Did you complete any vocation while

13   in prison?

14          **INMATE MAUZEY:**  No.

15          **DEPUTY COMMISSIONER MEJIA:**  Okay.  And you

16   were a program administrator clerk in 1992?

17          **INMATE MAUZEY:**  Yes.

18          **DEPUTY COMMISSIONER MEJIA:**  So you have

19   clerical skills?

20          **INMATE MAUZEY:**  Yes.

21          **DEPUTY COMMISSIONER MEJIA:**  Yeah, I saw

22   the letter from (Indiscernible), so you're going

23   to be transferred.  So you've been working

24   around the administrative -- the program

25   administrator's office.  When was the last time

26   you've been a clerical; in a clerical position?

27          **INMATE MAUZEY:**  At Donovan.

1        **DEPUTY COMMISSIONER MEJIA:**  At --

2        **INMATE MAUZEY:**  When I left in '97.

3        **DEPUTY COMMISSIONER MEJIA:**  So what kind

4    of work are you going to be do -- doing on the

5    streets?

6        **INMATE MAUZEY:**  I'm going to start my

7    businesses up again.

8        **DEPUTY COMMISSIONER MEJIA:**  Okay.

9                    (Off the record)

10       **DEPUTY COMMISSIONER MEJIA:**  So what kind

11   of business again?

12       **INMATE MAUZEY:**  I'm going to form another

13   corporation, state of California, get back my

14   B(1) contractor's license.  File with the

15   Secretary of State for that.  Then I'm going to

16   file with California State Contractor's Board

17   for an RMO, which is a responsible managing

18   officer, which they then grant the corporation

19   its own contracting license and go back into

20   contracting, until such time as I get successful

21   bids, I will refresh myself in the actual

22   construction field by driving to different job

23   sites and making my services available, which is

24   the way it's done in the business.

25       **DEPUTY COMMISSIONER MEJIA:**  Okay, the --

26   It wasn't a requirement for you from the last

27   time anyway to get a -- any vocations or it

30

1    looks like they -- the other Board has already

2    indicated that you might -- you have marketable

3    skills, based on your history and your

4    employment background.  No self-help.  Did I --

5    I looked at your file.  I've been looking for

6    it. Do you attend any self-help group?

7        **INMATE MAUZEY:**  No.

8        **DEPUTY COMMISSIONER MEJIA:**  And why is

9    that?

10       **INMATE MAUZEY:**  Well, they have no self-

11   help here.  What type of self-help is you -- are

12   you talking about?

13       **DEPUTY COMMISSIONER MEJIA:**  Anything about

14   -- Well, something to help you out when it comes

15   to your coming to terms with what happened in

16   your life.  Any books?  Have you read books?

17       **INMATE MAUZEY:**  In the appendix section --

18       **DEPUTY COMMISSIONER MEJIA:**  What about AA?

19   You said you have a problem with number eight.

20   That's why you don't want anything religious.

21       **INMATE MAUZEY:**  Well, yeah, because

22   Alcohol Anonymous and NA are both Twelve-Step

23   Programs.

24       **DEPUTY COMMISSIONER MEJIA:**  I asked you

25   that.

26       **INMATE MAUZEY:**  I've read the booklets to

27   both of them and each have eight steps which

31

1   speak to a (indiscernible) and a God, and I'm an

2   atheist.

3       **DEPUTY COMMISSIONER MEJIA:**  Do you have

4   anything that you have read when it comes to

5   improvement, self-improvement?

6       **INMATE MAUZEY:**  I've written two letters.

7   Actually, more than that to the Senior

8   Supervising Psych here at -- some psychologist,

9   psychiatrist here at R.J. Donovan.  I mean

10  excuse me here, at CTF-Central, and part of the

11  letter is in the appendix in the package I gave

12  you.  He says there is no self-help available to

13  life inmates unless they've been diagnosed with

14  a severe mental disorder.

15      **DEPUTY COMMISSIONER MEJIA:**  I am aware of

16  that, but there are other things that you can do

17  as -- on self-help.  You can go to the library,

18  read books and make a list of the books that

19  you've read.  Anything about self-improvement.

20      **INMATE MAUZEY:**  Well, I've --

21      **DEPUTY COMMISSIONER MEJIA:**  It

22  (indiscernible) got to be --

23      **INMATE MAUZEY:**  -- covered Seven Habits

24  for Effective People.  Is that what you're

25  speaking of?

26      **DEPUTY COMMISSIONER MEJIA:**  Yeah, did you

27  read that?  That's good.

32

1      **INMATE MAUZEY:**  Oh, yeah, I continue to --

2    I get books in all the time.  I continued my

3    education here in self-books; Covey's Book, I'm

4    trying to get five.

5      **DEPUTY COMMISSIONER MEJIA:**  What about

6    education are you continuing in here?

7      **INMATE MAUZEY:**  Math, mythology, history.

8      **DEPUTY COMMISSIONER MEJIA:**  Okay, where is

9    that?  Is that documented anywhere?

10      **INMATE MAUZEY:**  I have the -- I have the

11   books.

12      **DEPUTY COMMISSIONER MEJIA:**  Is it back

13   there?  Did you list the books that you read in

14   there?

15      **INMATE MAUZEY:**  No, I didn't.  I --

16      **ATTORNEY RUTLEDGE:**  He listed there, just

17   the sources.  I mean that -- I mean the topics

18   -- and also Spanish.  I think it is noted that

19   he can read (indiscernible) all right with

20   (indiscernible).

21      **DEPUTY COMMISSIONER MEJIA:**  No, I saw

22   that.  Spanish is good.  It helps you

23   communicate.

24      **INMATE MAUZEY:**  I'm going to have to

25   take --

26      **DEPUTY COMMISSIONER MEJIA:**  Bilingual.

27      **INMATE MAUZEY:**  -- (indiscernible) English

33

1  better too.

2      **DEPUTY COMMISSIONER MEJIA:**  All right,

3  anything else that -- Not AA or NA?  Any --

4  Seven Habits of Effective -- Highly Effective

5  People.  That's good.  Any other books?  What do

6  you think -- From the time that you were

7  incarcerated for the commitment of the crime and

8  the time that you were -- in 1983, up to this

9  point in time, what have you done to tell me

10  that you're a better person?

11      **INMATE MAUZEY:**  I haven't physically -- I

12  haven't assaulted anybody.  I've done everything

13  the CDC has required me to do.

14      **DEPUTY COMMISSIONER MEJIA:**  And can you

15  honestly say that?  You've done everything the

16  CDC has required you to do?

17      **INMATE MAUZEY:**  Yes.

18      **DEPUTY COMMISSIONER MEJIA:**  Didn't they

19  ask you about rule violations?  You have six of

20  that, after your last hearing.

21      **INMATE MAUZEY:**  Yes, Sir.

22      **DEPUTY COMMISSIONER MEJIA:**  Is that -- Can

23  you honestly say that you've been tell -- you're

24  doing everything that the CDC wanted you to do?

25      **INMATE MAUZEY:**  Yes, I can.  If you'll let

26  me, I'll speak to those 115s.  One of those was

27  administrative, because I have a medical

34

1   condition that's documented that I have either

2   arthritis or bursitis in the lumbar portion of

3   my back.  And they assigned me to the paint

4   maintenance crew, which I physically could not

5   do.

6       **DEPUTY COMMISSIONER MEJIA:**  Okay, let's go

7   one at a time then, because there's six of these

8   here.  Let's start with --

9       **INMATE MAUZEY:**  Oh, I can wrap it up and

10  make it real easy for you, Sir.

11      **DEPUTY COMMISSIONER MEJIA:**  Let me finish,

12  please.

13      **INMATE MAUZEY:**  All right.

14      **DEPUTY COMMISSIONER MEJIA:**  2000, March,

15  right after 2000 -- And let's see, your last

16  hearing was in January 2004.  You refused a

17  direct order.  So what happened there?

18      **INMATE MAUZEY:**  There was actually five of

19  them there for the same thing.

20      **DEPUTY COMMISSIONER MEJIA:**  Okay, and what

21  was -- Why?

22      **INMATE MAUZEY:**  All five of those were

23  they were conducting interviews, and asked me to

24  close the door and sit down.  I expected I have

25  -- I want -- I would like to exercise my Fifth

26  Amendment right against self-incrimination, and

27  also that I'd like to have a lawyer present

1    during our questioning.  That and the fact that

2    I was told by certain people in the wing that if

3    I sit down and shut the door, I'd be considered

4    a rat and be dealt with accordingly.  My options

5    were either to politely and respectfully disobey

6    the direct order or to be physically assaulted.

7    I chose to go ahead and disobey the direct

8    order.

9        **DEPUTY COMMISSIONER MEJIA:**  Okay.

10       **INMATE MAUZEY:**  I don't think that being

11   beat up and stabbed is part of the price I --

12       **DEPUTY COMMISSIONER MEJIA:**  You were found

13   guilty --

14       **INMATE MAUZEY:**  -- have to pay for being a

15   prisoner.

16       **DEPUTY COMMISSIONER MEJIA:**  -- of these.

17   Correct?

18       **INMATE MAUZEY:**  Yes, Sir, I was.  All five

19   of them.

20       **DEPUTY COMMISSIONER MEJIA:**  How about

21   failure to participate in a program?

22       **INMATE MAUZEY:**  That was the maintenance

23   job that I physically couldn't do.

24       **DEPUTY COMMISSIONER MEJIA:**  Okay, you were

25   found guilty of that?

26       **INMATE MAUZEY:**  Yes, Sir, I was.

27       **DEPUTY COMMISSIONER MEJIA:**  Disobeying a

36

1    direct order, on 11 -- on November 10th, 2004.

2         **INMATE MAUZEY:**  Same thing.

3         **DEPUTY COMMISSIONER MEJIA:**  What do you

4    mean same thing?

5         **INMATE MAUZEY:**  If you're talking about

6    the one -- 115s --

7         **DEPUTY COMMISSIONER MEJIA:**  November 21st,

8    2004.  It's the same thing as the counselor's

9    stuff?

10        **INMATE MAUZEY:**  If you're seeing there's

11   six 115s there, one of them shouldn't be there,

12   because I 602'ed that and partially was granted

13   that it was supposed to be-issued and re-heard.

14        **DEPUTY COMMISSIONER MEJIA:**  Okay, this

15   should be the re-hearing then.

16        **INMATE MAUZEY:**  They never had the re-

17   hearing.

18        **DEPUTY COMMISSIONER MEJIA:**  Not yet?

19        **INMATE MAUZEY:**  No, Sir.

20        **DEPUTY COMMISSIONER MEJIA:**  This is

21   9/20/2005 and July 21, 2004.  9/20/2005 is your

22   most recent.  That's when the -- you don't want

23   to incriminate yourself.  Is that correct?

24        **INMATE MAUZEY:**  On all five of those, yes.

25        **DEPUTY COMMISSIONER MEJIA:**  So let me just

26   put this together here.  Let's see, you've got a

27   pending one again?  No, that's not the one.

1    Okay, March 2nd, 2004, refusing direct order.

2    June 28th, 2004, refusing a direct order.  July

3    21st, 2004, refusing a direct order.  August 30,

4    2004, failure to participate in a program.

5    November 10th, 2004, disobeying orders.  And

6    July -- September 20, 2005, refusing to follow

7    direct order.  You have no -- You have six 128s.

8    The last being in March 4, 2005, for covering

9    cell window.  Let's go to the psych report.  I

10   don't see any gang affiliation on file.  And

11   this psych report was dated September 26th,

12   2003.  This is written by a Psychologist, Doctor

13   Shafer, S-H-A-F-E-R.  Diagnose -- Clinical

14   assessment -- mental status treatment -- Inmate

15   Mauzey's current mental status is within normal

16   limits.  Assessment of dangerousness --  Well,

17   let me read the review.

18          "When asked to review his

19          commitment offense, inmate Mauzey

20          denied that he conspired to kill

21          the victim.  He acknowledged that

22          he did shoot the victim, but said

23          it was an accident.  He took

24          responsibility for exercising

25          extremely poor judgment in going

26          into the victim's residence with a

27          rifle.  He stated that he believed

1           that he had diminished capacity at

2           the time, but could not give no

3           reason for his belief other than

4           the fact that he took his rifle to

5           the scene of the crime, because he

6           believed that the victim had a

7           gun.  He expressed remorse for the

8           pain he had caused his victim and

9           his children and grandchildren.

10          It doesn't -- At this, the present

11          time, Mr. Mauzey has more of

12          intellectual (indiscernible) than

13          emotional experience.  Assessment

14          of dangerousness, inmate Mauzey

15          has no criminal -- prior criminal

16          history.  He has only one

17          disciplinary report for violence

18          while in CDC; occurred in 1995 for

19          being involved in (indiscernible)

20          shoving match with another

21          inmate."

22     1995, shoving match?  I think it's listed here

23     as --

24          **INMATE MAUZEY:**  Are you asking that I

25     address that?

26          **DEPUTY COMMISSIONER MEJIA:**  No, let me

27     just put this on record, then you can address

1    it.  You have the right to address that.

2    Because it's actually different from the --

3    unless I read this.  I have to read this and

4    see.  But it's really a shoving match.  But is

5    that what you told the psychologist or is that

6    something that the -- that he [sic] included

7    during this interview?  1995?

8        **INMATE MAUZEY:**  I think he -- Ms. Shafer

9    got it slightly wrong.  It wasn't a shoving

10   match.  I said something to him and eventually

11   he charged me.  I threw him down a step back,

12   and that was the entire thing.

13       **DEPUTY COMMISSIONER MEJIA:**  Yeah, because

14   the 2/3/95 violence -- force and violence 115

15   indicated that on February 3, 1995, while -- at

16   1205 hours, while performing my duties as a

17   housing unit officer, the lieutenant from the

18   afternoon (indiscernible) culinary covers had

19   observed two inmates involved in a physical

20   altercation involved in housing unit two

21   (indiscernible).  The two inmates were involved

22   in a pushing and shoving match.  Which is --

23   Maybe that's what it -- she got it from.  I

24   sounded my alarm and proceeded towards the

25   inmates.  The two inmates who were involved were

26   separated and placed in mechanical restraints.

27   You were found guilty and you said, you know, he

1    had words, he charged me, I threw him to the

2    ground, then I backed off.  No punches were

3    drawn.  So I could see why she would say shoving

4    match, because it's right in the report.  But

5    then you were still found guilty of it.  Right?

6        **INMATE MAUZEY:**  Yes, Sir.

7        **DEPUTY COMMISSIONER MEJIA:**

8            "He has functioned well within

9            CDC.  He appears to be of a lower

10           -- Let's see.  It's notable that

11           inmate Mauzey didn't take

12           responsibility for his actions at

13           the time, presenting them as

14           justifiable self-defense.  He

15           acknowledges that he was involved

16           in a fight, but points out that it

17           was many years ago.  Another

18           concerning rules violation in

19           1997, when inmate Mauzey was found

20           to have a note in his pocket,

21           which contained instructions for

22           the -- for the manufacturing of

23           methamphetamine.  He did not take

24           responsibility for this

25           infraction.  Other rule violation

26           is for -- are for occasional

27           uncooperativeness and

41

```
 1          contentiousness.  He has
 2          functioned well within CDC.
 3          Appears to be lower than the
 4          average risk for violence compared
 5          to Level Three inmates."
 6   I don't see how he can say that he functioned
 7   well within CDC, if he's uncooperative and
 8   contentious.
 9          "If released to the community, his
10          violence potential is somewhat
11          higher than that of the average
12          citizen in the community due to
13          his history of violence and
14          history of -- with alcohol and
15          drugs.  His violence potential is
16          somewhat higher than that of the
17          average citizen in the community
18          due to the high history of
19          violence and history of
20          involvement with alcohol and
21          drugs.  (Indiscernible) reason is
22          -- substance abuse history --
23          inmate Mauzey reported he was
24          using cocaine during the same two,
25          three week period when he abused
26          alcohol.  He strongly feels that
27          he is not an alcoholic or addict
```

42

1    and does not wish substance abuse

2    treatment of any kind.  Clinical

3    observations and recommendations

4    -- the inmate has been -- has

5    functioned well within the

6    institution.  He does not have a

7    mental disorder, which would

8    necessitate treatment either

9    during his incarceration period or

10    following parole.  Allowing --

11    Although he denies having an

12    alcohol or drug problem, and is

13    resistant to attending Alcoholics

14    Anonymous, it would be reasonable

15    to monitor his drug and alcohol

16    consumption through urine testing

17    on a random basis if he were

18    granted parole.  It would also be

19    advisable that the -- he have

20    parole conditions prohibiting the

21    use of alcohol and drugs and

22    access to a weapon."

23  Any additions, sir?  Counsel?  Before I go to

24  the parole plans or comments or you want to make

25  corrections on?

26    **ATTORNEY RUTLEDGE:**  No.  No, Sir.

27    **INMATE MAUZEY:**  May I clarify a point?

43

1        **DEPUTY COMMISSIONER MEJIA:**  Sure.

2        **INMATE MAUZEY:**  You spoke about the

3    diminished capacity.  That was not -- it has

4    nothing to do with the life crime for which I'm

5    committed for.

6        **DEPUTY COMMISSIONER MEJIA:**  Right, I --

7        **INMATE MAUZEY:**  That's part of -- That's

8    one of the stayed --

9        **DEPUTY COMMISSIONER MEJIA:**  Yeah.

10        **INMATE MAUZEY:**  I just want to be clear as

11    there was a two or three month period prior to

12    Mr. Paullin being injured that there was -- and

13    I received -- I had -- was receiving

14    professional help for stress at that particular

15    point in time.  After that, there was no further

16    history of it whatsoever; of either.

17        **DEPUTY COMMISSIONER MEJIA:**  Was there

18    anything that says here diminished capacity?

19        **INMATE MAUZEY:**  Pardon?

20        **DEPUTY COMMISSIONER MEJIA:**  It didn't say

21    anything about diminished capacity.

22        **ATTORNEY RUTLEDGE:**  Yeah, in the --

23        **DEPUTY COMMISSIONER MEJIA:**  Or did it say

24    when I -- Where did I read it at?  I'm

25    forgetting what I'm reading.

26        **ATTORNEY RUTLEDGE:**  It's in the psych

27    report, Commissioner, on page three, under

44

1   review of --

2        **DEPUTY COMMISSIONER MEJIA:**  Okay.

3        **ATTORNEY RUTLEDGE:**  -- the life crime.

4        **DEPUTY COMMISSIONER MEJIA:**  But I didn't

5   read it though, huh?  Did I read it?

6        **INMATE MAUZEY:**  Yeah.

7        **DEPUTY COMMISSIONER MEJIA:**  Okay.

8        **ATTORNEY RUTLEDGE:**  No, I don't -- I don't

9   believe you read it, but it's part of the --

10        **DEPUTY COMMISSIONER MEJIA:**  Yeah.

11        **ATTORNEY RUTLEDGE:**  He wanted to clarify

12   the report.

13        **DEPUTY COMMISSIONER MEJIA:**  Okay, all

14   right.  Good, it was -- it's on the number 13,

15   review of life crime that it was noted he had

16   diminished capacity at that time.  Thank you.

17   Anything else?

18        **INMATE MAUZEY:**  No

19        **PRESIDING COMMISSIONER BIGGERS:**  Just for

20   the record, that was -- that was for the crime

21   where you took responsibility for exercising

22   poor judgment going to the victim's residence

23   with the rifle.  He said he believed he had

24   diminished capacity at the time, but could give

25   no reason for this belief other than the fact

26   that he took his rifle to the scene of the crime

27   because it believe -- he believed the victim had

1    a gun.  Is that not correct?

2         **INMATE MAUZEY:**  Yes, Sir.

3         **PRESIDING COMMISSIONER BIGGERS:**  Thank

4    you.

5         **DEPUTY COMMISSIONER MEJIA:**  Parole plans.

6         **INMATE MAUZEY:**  The parole plans was

7    actually stated earlier; to restart the

8    businesses.

9         **DEPUTY COMMISSIONER MEJIA:**  Okay, let me

10   just look at the Board report.  It says the same

11   as the last one, so we'll go back to 2003.

12   Residence -- Inmate Mauzey plans to reside with

13   his mother, Ruth Mauzey, at 3742 Harding Street,

14   Riverside, California, 92506.  Is that correct?

15        **INMATE MAUZEY:**  That's correct.

16        **DEPUTY COMMISSIONER MEJIA:**  Is that still

17   good?  The inmate is not married at this time.

18   So are you going to be staying with your mother?

19        **INMATE MAUZEY:**  No, she's living in

20   Oklahoma.

21        **DEPUTY COMMISSIONER MEJIA:**  Now?

22        **INMATE MAUZEY:**  Well, she owns houses in

23   California and property in Oklahoma both.

24        **DEPUTY COMMISSIONER MEJIA:**  Ruth Mauzey.

25   So this Harding Street, Riverside, is her house?

26        **INMATE MAUZEY:**  One of her houses here in

27   California.

46

1        **DEPUTY COMMISSIONER MEJIA:**  One of her

2    houses?

3        **INMATE MAUZEY:**  Yeah.

4        **DEPUTY COMMISSIONER MEJIA:**  That's where

5    you're going to be staying.

6        **INMATE MAUZEY:**  Yes.

7        **DEPUTY COMMISSIONER MEJIA:**  Inmate Mauzey

8    plans to return to his former application as a

9    general contractor and reopen his former

10   business.  He stated he had owned Ronco Framing

11   Incorporated, Lumber Commodities Incorporated,

12   Nash Trucking Incorporated, but lost them due to

13   the incarceration for the current offense.  At

14   the time of his arrest, he had been a member of

15   the carpenters union since 1968.  Do you have

16   any other support letters that you submitted to

17   us?

18       **INMATE MAUZEY:**  No.

19       **PRESIDING COMMISSIONER BIGGERS:**  Excuse

20   me.  You said no support letters?

21       **DEPUTY COMMISSIONER MEJIA:**  I don't see

22   anything on file.

23       **PRESIDING COMMISSIONER BIGGERS:**  All

24   right, you said no --

25       **INMATE MAUZEY:**  Just the one from my

26   mother, yes.

27       **DEPUTY COMMISSIONER MEJIA:**  There's one

47

1    from your mother?

2        **INMATE MAUZEY:**  That's it.

3        **PRESIDING COMMISSIONER BIGGERS:**  That's

4    the one that's in here.  It's in the sheet that

5    he gave us.

6        **INMATE MAUZEY:**  It's also part of the

7    appendix of that.

8        **DEPUTY COMMISSIONER MEJIA:**  I didn't see

9    it.  Okay.

10       **INMATE MAUZEY:**  That was the problem at

11   the last hearing.  It didn't make it in my

12   C-File.

13       **DEPUTY COMMISSIONER MEJIA:**  Okay.

14       **INMATE MAUZEY:**  Prior to the hearing.

15       **DEPUTY COMMISSIONER MEJIA:**  It may -- It

16   should be -- It should be here now.  Is it maybe

17   this one, 1999?

18       **PRESIDING COMMISSIONER BIGGERS:**  Do you

19   want to turn it off?

20       **DEPUTY COMMISSIONER MEJIA:**  It's already

21   off.

22       [Thereupon, the tape was turned over.]

23       **PRESIDING COMMISSIONER BIGGERS:**  No

24   current letters.

25       **DEPUTY COMMISSIONER MEJIA:**  November 28th,

26   2003, letter of support, R.K. Mauzey.

27           "This letter is to inform you that

1    I will provide parole assistance

2    for my son, R.K. Mauzey.  I will

3    provide a shelter for my son in

4    one of two residences I own in

5    Riverside, California, and I will

6    provide the money for an

7    apartment.  I will provide the

8    funds for transportation and will

9    provide a vehicle.  I will also

10   provide any and all financial

11   assistance necessary for my son to

12   make a successful transition from

13   inmate to citizen.  This letter

14   shall remain in force until

15   written notification of recension

16   is proffered.  It is -- It is

17   cruel of the Board of Prison Terms

18   to raise the expectation of my

19   son's release by requiring me to

20   write this same letter every one,

21   two or three years.  Your

22   attention to this matter will be

23   appreciated.  If you have any

24   questions..."

25   Signed by R.I. Mauzey.  Okay, thank you, sir.

26   Anything else?  And it's on file.  It's in your

27   C-File.  Okay, let me return this back to the

1   Chair.

2   **PRESIDING COMMISSIONER BIGGERS:** When

3   Deputy Commissioner Mejia asked you about

4   substance abuse, you indicated that you had no

5   reason to get involved in self-help or anything.

6   But I understand in reviewing your case, it

7   indicated that at one time you were involved in

8   substance abuse.

9   **INMATE MAUZEY:** I admitted that, yes.

10   **PRESIDING COMMISSIONER BIGGERS:** Yes,

11   okay. And you don't feel that taking any self-

12   help on substance abuse would be beneficial to

13   you?

14   **INMATE MAUZEY:** No, Sir, because there's

15   no prior history of any substance abuse other

16   than a two -- in a two or three month window

17   there, and then nothing subsequent to the last

18   24 years. There's no documentation whatsoever

19   of me ever been -- involved with alcohol or any

20   drugs whatsoever. I don't --

21   **PRESIDING COMMISSIONER BIGGERS:** But you

22   do admit the fact that on -- well, we can't talk

23   about your committing offense. But you did

24   (indiscernible) to --

25   **INMATE MAUZEY:** Excuse me, Mr. Biggers,

26   the -- if you're talking about the diminished

27   capacity where Mr. Paullin was inadvertently --

50

1    **PRESIDING COMMISSIONER BIGGERS:**  I'm not
2    talking about that.

3        **INMATE MAUZEY:**  -- (indiscernible) shot,
4    this was the time period where the drugs and
5    alcohol were being abused.  And there was a
6    period of time of -- That was in June, and the
7    commitment offense that I'm also in here for was
8    committed over the period from then until
9    December when I was arrested.  There's no
10   history of any further drug or alcohol use in
11   that -- in the time period.

12       **PRESIDING COMMISSIONER BIGGERS:**  At any
13   time prior to this offense taking place, were
14   there anything that you did where alcohol was
15   involved?

16       **INMATE MAUZEY:**  Other than what I've
17   mentioned, no.

18       **PRESIDING COMMISSIONER BIGGERS:**  So other
19   -- Okay.

20       **DEPUTY COMMISSIONER MEJIA:**  Like you
21   (indiscernible) -- Yeah, you don't think that
22   you have a problem.  It wasn't a contributing
23   factor to your friend?

24       **INMATE MAUZEY:**  No, it was not involved in
25   the life crime at all.  There's no -- nothing in
26   the transcripts, the trial, the record or
27   anywhere that says there's any alcohol or drug

51

1   abuse.

2       **PRESIDING COMMISSIONER BIGGERS:**  I wasn't

3   speaking in terms of the trial.  I asked a

4   general question.

5       **INMATE MAUZEY:**  I'm sorry.

6       **PRESIDING COMMISSIONER BIGGERS:**  About

7   your social values -- social factors, where I

8   indicated to you, have you ever had a situation

9   where you have either abused or alcohol or

10  drugs?

11      **INMATE MAUZEY:**  No, Sir, other than that

12  mentioned.

13      **PRESIDING COMMISSIONER BIGGERS:**  Not other

14  than.  Either yes or no, sir.

15      **INMATE MAUZEY:**  Well, I just wanted to

16  tell the truth, and there was a three-month

17  period that was true.  But there's the rest of

18  my life where it wasn't true.

19      **PRESIDING COMMISSIONER BIGGERS:**  Okay, but

20  then there was a three-month timeframe when you

21  did, in fact, abuse drugs.

22      **INMATE MAUZEY:**  Yes.

23      **PRESIDING COMMISSIONER BIGGERS:**  Okay, and

24  now you're saying that there -- you don't feel,

25  because you used drugs at one time, that any

26  self-help program is not necessary because you

27  don't -- you're not using now?

1        **INMATE MAUZEY:**  No, I haven't used since.
2        **PRESIDING COMMISSIONER BIGGERS:**  That's
3   all I need to hear.  Okay, do you have anything
4   else there, Mr. Mejia?

5        **DEPUTY COMMISSIONER MEJIA:**  When you -- On
6   the review of life crime, on the psych report,
7   I'm not going to go into the -- your actual life
8   crime.  The review of life crime, there was a
9   statement that you gave the psychologist here
10  that you were exercising extremely poor
11  judgment.  That you believed that he [sic] had
12  the diminished capacity at that time.  What do
13  you think was that?  What -- How do you get to
14  that stage of diminished capacity?

15       **INMATE MAUZEY:**  The problems that I was
16  having with my wife over that period of time had
17  built up.  When she separated, I was seeing
18  professional psychiatric help to help me deal
19  with the stress that I was feeling with the
20  businesses and the children and the wife left,
21  and me having total responsibility with no one
22  to figure it out.  That's when I started
23  drinking a little bit and subsequently took a
24  little -- some drugs.  The night that I went
25  over to Mr. Paullin's house, I was under the
26  influence of both alcohol and cocaine.  And
27  that's where when I talked to the Forensic

53

1    Psychiatrist, that's when he said I qualified

2    for diminished capacity as a defense on that --

3    on that aspect.

4        **DEPUTY COMMISSIONER MEJIA:**  Okay.

5        **INMATE MAUZEY:**  And when I -- You asked me

6    earlier about remorse. That's what I'm

7    remorseful for.  Mr. Paullin should have never

8    got injured or shot.  That was total bad

9    judgment. And then that's why I am remorseful

10   for that.  But --

11       **DEPUTY COMMISSIONER MEJIA:**  Okay, but

12   let's --

13       **INMATE MAUZEY:**  -- because that, and I

14   take responsibility for it.  It was that

15   Mr. Paullin did nothing to have provoked that.

16   Nothing he did should have resulted in something

17   like that happening.  That was total bad

18   judgment on my part and I take full

19   responsibility for that.

20       **DEPUTY COMMISSIONER MEJIA:**  What in your

21   -- You said that you had been reading books on

22   self-help that would tell me, even make me

23   confident that you'll be able to handle the

24   stresses that you, if given a parole date today,

25   that you'll be able to handle the stressors of

26   life while you're out there on the streets and

27   not result into something similar.  Now that

54

1    what have -- what have -- what have you equipped

2    yourself during the last -- how many years

3    you've been --

4         **INMATE MAUZEY:**  Over 24.

5         **DEPUTY COMMISSIONER MEJIA:**  24 years, and

6    what have you equipped yourself in order for you

7    not to be able to go to that extent again of

8    killing someone?

9         **INMATE MAUZEY:**  I'm not the same person

10   now that I was 24 years ago.

11        **DEPUTY COMMISSIONER MEJIA:**  What did you

12   say, Counselor?

13        **PRESIDING COMMISSIONER BIGGERS:**  He didn't

14   kill him.  He shot him.  He didn't kill him.

15   You said kill him.

16        **DEPUTY COMMISSIONER MEJIA:**  Shooting

17   somebody.  I'm sorry.

18        **INMATE MAUZEY:**  I'm sorry?

19        **DEPUTY COMMISSIONER MEJIA:**  Thank you.  Go

20   ahead.

21        **PRESIDING COMMISSIONER BIGGERS:**  All

22   right.

23        **DEPUTY COMMISSIONER MEJIA:**  So what was

24   your -- What would -- What would tell me that

25   you're not going to be in the same predicament

26   again?

27        **INMATE MAUZEY:**  Well, first of all, I'm

55

1   not married and don't have the two children.

2       **DEPUTY COMMISSIONER MEJIA:**  Anything else?

3       **INMATE MAUZEY:**  I'm --

4       **DEPUTY COMMISSIONER MEJIA:**  There's other

5   stressors other than being married and having

6   two children.

7       **INMATE MAUZEY:**  Well, actually when

8   Mr. Paullin was calling my children, telling

9   them that he would be a better father to them

10  than I was.  My wife was doing the same thing.

11  Told her oldest son that she no longer wanted

12  him anymore, because it was a choice between him

13  and Mr. Paullin.  She opted for Mr. Paullin,

14  which hurt my son tremendously.  Both stressors

15  are no longer a factor in my life.  It was a

16  situational crime.  That situation is not going

17  to happen again.  That was a once in a lifetime

18  proposition.

19      **DEPUTY COMMISSIONER MEJIA:**  So did you

20  read any books on how to -- What kind of self-

21  help did you -- So you're telling me that it's

22  not going to happen again.  That's the bottom

23  line.  Because you don't -- you're not in the

24  same predicament anymore.

25      **INMATE MAUZEY:**  No, the circumstances that

26  surrounded this incident happening no longer

27  exist and there's no --

56

1       **DEPUTY COMMISSIONER MEJIA:**   Do you think
2   that one would not exist when you're out there
3   on the streets?

4       **INMATE MAUZEY:**   No, I'm not going to be
5   married again and have another 12-year old and
6   nine-year old son at the same time.

7       **DEPUTY COMMISSIONER MEJIA:**   Okay, no
8   further questions.

9       **INMATE MAUZEY:**   And the fact that I've
10   matured somewhat since -- in the last 24 years
11   and realize that there's other alternatives to
12   solving one's problems besides drinking and so
13   forth and violence.

14       **DEPUTY COMMISSIONER MEJIA:**   Okay.

15       **PRESIDING COMMISSIONER BIGGERS:**   In going
16   through the documents that you submitted, sir,
17   one of them you gave us was from a private
18   investigator.   Since I'm not being able to talk
19   about the crime, what is the purpose of this
20   document that you gave us concerning the private
21   investigator?

22       **INMATE MAUZEY:**   It helps substantiate the
23   fact that I -- that I was not guilty, because
24   this is the -- this is Mr. Carranza's statement
25   in 1984, after I'd been sentenced, that he was
26   -- there was -- never really was a conspiracy.
27       **PRESIDING COMMISSIONER BIGGERS:**   But what

57

1    I'm saying to you, sir, is we have to go on the

2    record.  The record has found you guilty.

3         **INMATE MAUZEY:**  All of it unreliable

4    information.

5         **PRESIDING COMMISSIONER BIGGERS:**  In any

6    case, that you're guilty of the crime.  And

7    until such time as an Appeals Court overturns

8    that verdict, we have to go on -- if you recall,

9    I read into the record earlier.  We rely on the

10   facts of the case.

11        **INMATE MAUZEY:**  Yes, Sir.

12        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

13        **ATTORNEY RUTLEDGE:**  Wouldn't it be like a

14   police report that The People submitted when the

15   court has already made certain findings, and

16   then they speculate on stuff.  He's just trying

17   to support his innocence.

18        **PRESIDING COMMISSIONER BIGGERS:**  But that

19   still has no place here, Counselor.  Okay, are

20   there any other questions?

21        **DEPUTY COMMISSIONER MEJIA:**  No other

22   questions.

23        **PRESIDING COMMISSIONER BIGGERS:**  Okay, at

24   this point, then I'll ask the District Attorney,

25   do you have any questions for the inmate?

26        **DEPUTY DISTRICT ATTORNEY DUNN:**  I have a

27   few that don't relate to the life crime,

1    Commissioner.

2         **PRESIDING COMMISSIONER BIGGERS:**    Thank

3    you.

4         **DEPUTY DISTRICT ATTORNEY DUNN:**    I'd like

5    to ask the inmate first if he feels that he is

6    guilty and responsible for all eight of the CDC

7    115s he's gotten here at CTF.

8         **INMATE MAUZEY:**    Yes.

9         **DEPUTY DISTRICT ATTORNEY DUNN:**    And does

10   the inmate also feel that he is guilty and

11   responsible for the CDC 115s that he received at

12   R.J. Donovan in 1997 and 1995?

13        **INMATE MAUZEY:**    Yes.

14        **DEPUTY DISTRICT ATTORNEY DUNN:**    The one

15   that he got 2/3/95, at R.J. Donovan for force

16   and violence for fighting, could he explain the

17   circumstances and why he was fighting?

18        **INMATE MAUZEY:**    I'm sorry.  I don't

19   understand the question.

20        **DEPUTY COMMISSIONER MEJIA:**    It was in '95?

21        **DEPUTY DISTRICT ATTORNEY DUNN:**    Yes,

22   correct.  I have 2/3/95, R.J. Donovan, force and

23   violence.

24        **PRESIDING COMMISSIONER BIGGERS:**    Did you

25   receive a 115 in '95 at R.J. Donovan?

26        **DEPUTY COMMISSIONER MEJIA:**    There's only

27   one that's documented that we already --

1      **PRESIDING COMMISSIONER BIGGERS:**  You

2  already talked about.

3      **DEPUTY COMMISSIONER MEJIA:**  1995.

4      **PRESIDING COMMISSIONER BIGGERS:**  For

5  fighting.

6      **DEPUTY COMMISSIONER MEJIA:**  Let me double-

7  check here, yeah.  That's the one that the

8  psychiatric -- the psychologist quoted as a

9  shoving match.  That he --

10      **PRESIDING COMMISSIONER BIGGERS:**  Okay,

11  next question, Counselor.

12      **DEPUTY DISTRICT ATTORNEY DUNN:**  The next

13  question is does he feel that he is responsible

14  for the CDC 115s that he received while at

15  Chuckawalla State Prison?  Two of them, one in

16  '90 -- both of them in March of '98.

17      **INMATE MAUZEY:**  Could you refresh my

18  memory on those?

19      **ATTORNEY RUTLEDGE:**  Oh, I've got them

20  right here.

21      **INMATE MAUZEY:**  I would take exception to

22  those two.

23      **PRESIDING COMMISSIONER BIGGERS:**  Take

24  exception?  Were you found guilty of those two,

25  sir?

26      **INMATE MAUZEY:**  Yes, I was.  The one was,

27  I trimmed my mustache to comply and the officer

60

1    said it was good and the other officer wrote me

2    up.

3        **PRESIDING COMMISSIONER BIGGERS:**  Okay,

4    what I'm saying, sir, were you found guilty of

5    those?

6        **INMATE MAUZEY:**  Yes, Sir, I was.

7        **PRESIDING COMMISSIONER BIGGERS:**  Okay,

8    next question, Counsel.

9        **DEPUTY DISTRICT ATTORNEY DUNN:**  And then

10   the last CDC that I see, does he admit that he

11   was guilty of a CDC 115 at California Men's

12   Colony, 7/10 of '90, for disclosing confidential

13   information for which he was placed in Ad Seg?

14       **INMATE MAUZEY:**  Yes.

15       **DEPUTY DISTRICT ATTORNEY DUNN:**  And then

16   my question as to his parole plans, the inmate

17   told us that he would like to form a

18   corporation.  Does the inmate have

19   correspondence from the Secretary of State's

20   Office indicating that he would be allowed to do

21   so, given the fact that he's been convicted of

22   multiple serious felonies?

23       **INMATE MAUZEY:**  It's my understanding of

24   the California Corporate law and the California

25   Contracting Board that the felony has nothing to

26   do with contracting, and therefore, I would not

27   be precluded from forming a corporation in this

61

1   state or acquiring -- re-acquiring my

2   contractor's license.

3       **DEPUTY DISTRICT ATTORNEY DUNN:**  Does the

4   inmate have any documentation to that effect,

5   Commissioner?

6       **ATTORNEY RUTLEDGE:**  Is it law?  Is it in

7   the law?

8       **INMATE MAUZEY:**  It's in the State

9   Contractor's Licensing Book.

10      **DEPUTY DISTRICT ATTORNEY DUNN:**  I'll take

11  that as a no.  No further questions.

12      **PRESIDING COMMISSIONER BIGGERS:**  Okay,

13  Ms. Rutledge?

14      **ATTORNEY RUTLEDGE:**  Yeah, would you like

15  to explain to the Board the 115 that you got,

16  the disclosing confidential information, if it's

17  necessary.

18      **INMATE MAUZEY:**  I was working in the

19  captain -- programming office writing computer

20  application programs for the institutional use.

21  And someone find a kite concerning a rat,

22  confidential informant, on the yard I was, gave

23  me the kite.  I looked at it.  He left.  I tore

24  it up and flushed it and went back and told two

25  individuals this guy was no good.  And that's

26  what generated that 115.

27      **PRESIDING COMMISSIONER BIGGERS:**  You said

62

1    told him they were no good -- Excuse me.

2        ATTORNEY RUTLEDGE:  Tell me -- Tell them

3    what you told me about what you told your guys

4    and --

5        INMATE MAUZEY:  Well I told to individuals

6    not to go near this individual, because he was

7    lying.  And one of them turned out to be a rat.

8        ATTORNEY RUTLEDGE:  Did you catch that

9    question?

10        PRESIDING COMMISSIONER BIGGERS:  No, I did

11    not.

12        ATTORNEY RUTLEDGE:  Do you want me to --

13        DEPUTY COMMISSIONER MEJIA:  Yeah.

14        PRESIDING COMMISSIONER BIGGERS:  Please

15    sum it up for me.

16        ATTORNEY RUTLEDGE:  Okay, he told -- he

17    got this kite that was saying that this one

18    person that they had been friends with was a

19    rat.  And so he told two of his friends, don't

20    trust this guy.  And then it turned out that one

21    of those two friends was -- because he had read

22    it on a kite.  One of those two friends was a

23    rat -- also an informant.

24        PRESIDING COMMISSIONER BIGGERS:  Well, but

25    then he got a 115 for taking -- for passing that

26    information on.  Right?

27        ATTORNEY RUTLEDGE:  Right.  That's just

63

1    what -- he just wanted to explain the

2    circumstances, but he was found guilty of that.

3        **DEPUTY COMMISSIONER MEJIA:**  Just for the

4    record, the 115 that is -- the circumstances are

5    written as this:

6            "On Tuesday, July 10, 1990, inmate

7            Mauzey, C-61868, room 3367, was

8            identified as the individual

9            responsible for taking

10           confidential information from his

11           job assignment and is disclosing

12           it to the general population

13           inmates housed in B Quad."

14   Were you working as a clerk then?

15       **INMATE MAUZEY:**  I was working as a

16   computer programmer.

17       **DEPUTY COMMISSIONER MEJIA:**  All right,

18   that's the -- that's the -- that's what we have

19   on -- That's your version and this is the

20   version in the 115.  Go ahead.

21       **ATTORNEY RUTLEDGE:**  Have you done any

22   other things for the institution besides

23   computer programming?

24       **INMATE MAUZEY:**  Other than the clerical

25   field, yes.

26       **ATTORNEY RUTLEDGE:**  In the clerical field,

27   what have you done as a clerk?

64

1          **INMATE MAUZEY:**  I was a -- at Tracy, I was

2     a staff assignment lieutenant's clerk.  We did

3     post assignment schedules.  We scheduled annual

4     vacations, anything that deal with staff;

5     vacations, swaps, timekeeping.

6          **ATTORNEY RUTLEDGE:**  And now the

7     Commissioner started to ask you about or he did

8     ask you about coping with the stresses.  Now

9     while you were married before any of the

10    offenses, were you faced with stressful

11    situations?

12         **INMATE MAUZEY:**  Yes, I was.

13         **ATTORNEY RUTLEDGE:**  And how did you

14    (indiscernible)?

15         **INMATE MAUZEY:**  I just dealt with them.  I

16    didn't let them bother me.

17         **ATTORNEY RUTLEDGE:**  All right, and then --

18         **INMATE MAUZEY:**  At first there wasn't --

19    there was the problems that my wife and I were

20    having, but there was no violence involved.  And

21    it just continually build and build and build

22    and build until it finally escalated.

23         **ATTORNEY RUTLEDGE:**  And how many years

24    were you married?

25         **INMATE MAUZEY:**  13 and a half.

26         **ATTORNEY RUTLEDGE:**  And during that time

27    before the commitment offense and you were

65

1    running those companies, were you faced with

2    stress on your -- stresses on your job?

3        **INMATE MAUZEY:** Oh yeah, I had 75

4    individuals working for me and they were

5    counting on me to provide work for them so they

6    provide for their families.

7        **ATTORNEY RUTLEDGE:** All right, and but no

8    violence resulted in those situations.

9        **INMATE MAUZEY:** None.

10        **ATTORNEY RUTLEDGE:** How many years did you

11    have your businesses?

12        **INMATE MAUZEY:** I had sole proprietorship

13    for approximately four years, and then I

14    incorporated and had it for another like two

15    years before I was arrested.

16        **ATTORNEY RUTLEDGE:** Okay, and since you've

17    been in prison, have you dealt with any

18    stressful situations?

19        **INMATE MAUZEY:** Many stressful situations.

20        **ATTORNEY RUTLEDGE:** And how have you been

21    able to -- How are you handling the stressful

22    situations that you're facing in prison?

23        **INMATE MAUZEY:** I just don't buy into it

24    anymore. If I'm faced with confrontation, I try

25    to neutralize the situation. If I can't, I just

26    extricate myself from the area. And I do it in

27    such a way that doesn't make it -- make me look

66

1    weak, but yet I don't have to resort to violence

2    or arguing or any verbalization or physical

3    responses.

4        **ATTORNEY RUTLEDGE:**  So would you say

5    that's like self-taught conflict resolution

6    or --

7        **INMATE MAUZEY:**  Well, that's --

8        **ATTORNEY RUTLEDGE:**  -- have you learned it

9    -- I mean how did you learn to do that?

10       **INMATE MAUZEY:**  Well, I matured. There's I

11   never was confrontational prior to the one

12   incident, and I haven't been since.  And there's

13   just --

14       **ATTORNEY RUTLEDGE:**  No further questions.

15       **PRESIDING COMMISSIONER BIGGERS:**  Okay,

16   thank you very much.  At this point I'm going to

17   ask Ms. Dunn to give her closing statement,

18   please.

19       **DEPUTY DISTRICT ATTORNEY DUNN:**  Thank you.

20   The District Attorney's Office is opposed to the

21   parole of inmate Ronald Mauzey.  We believe that

22   he's unsuitable for parole.  As set forth in my

23   letter, and as I will briefly summarize today,

24   Mr. Mauzey was convicted of attempted murder

25   with use of a weapon and great bodily injury on

26   John Paullin.  He was also convicted of

27   conspiracy to commit murder, and the overt acts

1    were found to be true by the jury.  He was

2    convicted of solicitation of murder of

3    Mr. Paullin.  He was 36 years old.  He was a

4    mature man at the time.  In fact, a man who had

5    had the benefit of both being in the Military

6    and having gone to college and lived a

7    productive life.  He chose to commit a crime

8    that could best be characterized as cruel,

9    vicious and showing an exceptionally callous

10   disregard for human suffering.  Mr. Mauzey shows

11   no remorse for his crime.  When questioned today

12   and given an opportunity, he says, quote, "If

13   I'm innocent, how can I have remorse."  End

14   quote.  He doesn't have any insight into his

15   crime.  He has received numerous disciplinary

16   markers while incarcerated from a number of

17   different institutions.  He seems to have an

18   explanation for many of them, but it indicates

19   that this is a man with difficulty in following

20   rules.  Following rules that other inmates seem

21   to be able to follow. Even inmates who had none

22   of the advantages that he did.  And when you

23   look at the inmate today, he presents as a law-

24   abiding individual.  But if you look at what he

25   said to Mr. Carranza, the one he tried to hire

26   to kill John Paullin, the inmate, who presented

27   a different picture back then and still hasn't

68

1　changed, said, quote -- pardon my language,

2　"That fucker will be dead by Christmas, because

3　I'm going to shoot the son of bitch myself."

4　End quote.  That's what he said to Mr. Carranza

5　and said quite a few other things about his

6　feeling toward Mr. Paullin.  Since there's no

7　insight into his life crime on his part and no

8　remorse, he's completely unsuitable.  Since he

9　hasn't been able to get along in prison, he's

10　completely unsuitable.  Since he hasn't

11　participated adequately in self-help and has

12　evasive answers for why not, he's unsuitable.

13　And his parole plans are not realistic.  He is

14　of the opinion that he's going to be able to

15　form a corporation, get a license and get bids.

16　He thinks he's the -- in the same position he

17　was out on the streets.  He's going to be sorely

18　let down if and when he ever paroles to find --

19　　　　　**PRESIDING COMMISSIONER BIGGERS:**  That's an

20　opinion there, so just -- we'll --

21　　　　　**DEPUTY DISTRICT ATTORNEY DUNN:**  All right,

22　thank you.  This may not happen.  I would like

23　to ask the Board to consider the psychologist

24　reports, because we have no other answers as to

25　why Mr. Mauzey did what he did, because he

26　hasn't given us any and we have no clue.  The

27　psychological reports, if you look at several of

1    them, indicate that there is something going on

2    with Mr. Mauzey, they can't quite put their

3    fingers on it.  Quoting from the 2003 report

4    prepared by Doctor Shafer, S-H-A-F-E-R, on the

5    top of page three -- I expect this is a she.

6    She concludes that at the present time his

7    remorse is more of an intellectual than

8    emotional experience.  That appears to be a

9    cogent analysis of Mr. Mauzey.  Back in 1999,

10   Doctor Carswell, C-A-R-S-W-E-L-L, gave

11   Mr. Mauzey the diagnosis on Axis II of Anti

12   Social Personality Disorder Improved.  And prior

13   to that, in 1991, Doctor Bradley gave him a

14   diagnosis of Anti Social Personality Disorder.

15   And as the Commissioners are aware, that

16   disorder, if found to be true, might explain

17   some of the behaviors the inmate has

18   participated in in his life.  We would ask that

19   he be found unsuitable since we believe he

20   presents an unreasonable risk of harm to the

21   public if released.  We would ask also for a

22   two-year denial.  Thank you.

23        **PRESIDING COMMISSIONER BIGGERS:**  Thank

24   you.  Ms. Rutledge.

25        **ATTORNEY RUTLEDGE:**  I would just point out

26   that the psych report from '97, by Doctor

27   Faulkenstein also notes that Mr. Mauzey has

```
 1    adjusted well to the prison environment.
 2    Psychologically, he's a stable man.  When he is
 3    released, I'm confident that he will do well in
 4    the free community.  And then in the '99, it
 5    says -- it has -- it says Anti Social
 6    Personality Disorder Much Improved.  But we
 7    don't know if they're relying upon the
 8    commitment offense or if any testing was done.
 9    And then again, as the Deputy Commissioner read
10    in 2003, another psych notes that he's
11    functioning well.  Turning to Title XV, the
12    suitability factors, under 2402(c)(1)(a), the
13    petitioner's commitment offense did not involve
14    multiple victims.  Under (b), this was not --
15    this crime was not an execution style murder.
16    Under (c), no victims were abused, defiled or
17    mutilated during or after the offense.  Under
18    (d), there's no evidence in the record that
19    demonstrates that the level of violence and
20    egregiousness was more than minimally necessary
21    to convict petitioner of the offense for which
22    he is confined.  In fact, there was no violence
23    or viciousness associated with petitioner's
24    crime, exceptionally callous or otherwise.
25    Under (e), there is no motive for unlawfully
26    conspiring to take the life of another human
27    being that could not reasonably be deemed
```

71

1    inexplicable or trivial.  The reference in Board

2    regulations to motives that are inexplicable or

3    trivial in relation to the offense requires

4    comparisons.  To fit the regulatory description,

5    the motive must be material as significant than

6    those which conventionally drive people to

7    commit the offense in question.  The evidence

8    does not permit this conclusion in petitioner's

9    case.  As note -- As just noted, there is no

10   evidence in the record that petitioner committed

11   the offense in a heinous, atrocious or cold

12   manner, let alone in a way that could be

13   considered especially so.  Under previous record

14   of violence, petitioner has no history of

15   assaultive behavior at any early age.  Again, he

16   was 36 when he committed this offense.  Under

17   unstable social history, he has no history of

18   unstable or tumultuous relationships with others

19   and has maintained family ties throughout his

20   incarceration.  The sadistic sexual offense is

21   not applicable here.  The petitioner has no

22   history of mental problems, and there is no

23   evidence that he is currently -- that he

24   currently has a psychiatric or psychological

25   disorder.  Petitioner has no psychopathology

26   related to the criminal behavior.  And also, I

27   would note, hasn't been -- that hasn't been

1    repeated or anything like it since he's been in

2    custody.  Institutional behavior, the nature of

3    petitioner's disciplinary reports do not reflect

4    on petitioner's ability to function in society

5    upon release or -- nor are any infractions of a

6    violent nature, whereas the circumstances

7    tending to show suitability under Section

8    2402(d), he has no juvenile record.  There's

9    nothing in the record to show any type of

10   violence.  Prior to this, he was married for 13

11   years.  He has a stable social history.  He had

12   raised two boys and a wife.  In fact, was a

13   single parent at the time of this offense and

14   was running several companies.  He's maintained

15   close relationships with his family.  It's noted

16   in the file that he has two sons and two

17   grandchildren.  He's had an excellent employment

18   history prior to incarceration, as is noted in

19   his resume and also somewhat in the file.

20   Petitioner has attempted to apologize to the

21   victim and petitioner understands the nature and

22   magnitude of the offense.  He noted here today

23   that he is innocent of the crime.  It's so

24   inapplicable; however, as far as the shooting of

25   Mr. Paullin goes, he definitely has spoken to

26   his remorse in that category.  The petitioner

27   had significant stress in his life brought on by

1    the relationship between he, his spouse and
2    harassing of his children by the victim.   This
3    stress had been built over several months as he
4    had told the Panel he was seeking help for that
5    at the time, which does show insight that he had
6    -- he was able to recognize, okay, I'm having a
7    problem here and I need assistance.   Lack of
8    criminal history, we kind of spoke on that.
9    He's a first term -- He's a first termer.   At
10   this point, he is 59 years of age.   There's
11   numerous studies that show prisoners of his age
12   have an extremely low probability of recidivism.
13   And that's --

14       **DEPUTY DISTRICT ATTORNEY DUNN:**   I'm going
15   to object to that part of the statement.   That's
16   not in the record and it's not a fact.

17       **ATTORNEY RUTLEDGE:**   You don't have -- She
18   can't make an objection.

19       **PRESIDING COMMISSIONER BIGGERS:**   Just a
20   second, just a --

21       **ATTORNEY RUTLEDGE:**   You can't object to
22   anything.

23       **PRESIDING COMMISSIONER BIGGERS:**   You know,
24   all right, please read that statement to me
25   again.

26       **ATTORNEY RUTLEDGE:**   All right.   I said
27   there are numerous studies on the matter that

74

1    I've read and that my client is citing that have

2    shown that -- and it's one of the suitability

3    factors.  That prisoners' and petitioners' age

4    have an --

5          PRESIDING COMMISSIONER BIGGERS:  Yeah,

6    but --

7          ATTORNEY RUTLEDGE:  -- extremely low

8    probability --

9          PRESIDING COMMISSIONER BIGGERS:  But

10   that's a --

11         ATTORNEY RUTLEDGE:  -- of recidivism.

12         PRESIDING COMMISSIONER BIGGERS:  But

13   that's an opinion that we were talking about

14   earlier.

15         ATTORNEY RUTLEDGE:  It's a study.

16         PRESIDING COMMISSIONER BIGGERS:  It

17   doesn't matter.  It's still an opinion.

18         ATTORNEY RUTLEDGE:  It lays a suitability

19   factor.

20         PRESIDING COMMISSIONER BIGGERS:  It's an

21   -- It's an opinion and will not -- and it's --

22   your --

23         ATTORNEY RUTLEDGE:  But I would ask the

24   District Attorney be admonished that they don't

25   -- she doesn't have standing to object to my

26   statements.

27         PRESIDING COMMISSIONER BIGGERS:  You were

1    objecting to hers.

2       **ATTORNEY RUTLEDGE:**  I do, but I'm allowed

3    to; she's not.

4       **PRESIDING COMMISSIONER BIGGERS:**  This is

5    not a court of law.

6       **ATTORNEY RUTLEDGE:**  No, under Title --

7       **PRESIDING COMMISSIONER BIGGERS:**  This is

8    an Administrative --

9       **ATTORNEY RUTLEDGE:**  -- the Title XV --

10      **PRESIDING COMMISSIONER BIGGERS:**  This is

11   an Administrative Hearing.  I will not let any

12   opinions go in.  Counselor, please read the

13   facts.

14      **ATTORNEY RUTLEDGE:**  Okay, understanding

15   and plans for the future -- Let's see.  The

16   petitioner has made realistic parole plans that

17   can be put into effect upon release as outlined

18   below.  He understands the law; that he's able

19   to form a corporation, he can be a contractor.

20   He's got a ton of experience.  He's got the full

21   support of his mother; financial support.  He

22   also has numerous marketable skills, as outlined

23   in his resume.  And also shown in his record of

24   the different jobs he's had in the institution.

25   As far as institutional behavior goes, he's

26   completed the first and second semesters of a

27   video Spanish class called Destinos, and he had

1   received the appropriate certificates.  He's
2   furthered his music and language studies by
3   purchasing and studying books and materials from
4   outside prison sources, as well as completing
5   various music classes in prison.  He has not
6   participated in the prison-structured self-help
7   programs for two reasons.  First, as he is
8   noted, as he's documented in the letter from
9   Doctor Zika, there are no self-help programs
10  available at the institution that would aide
11  petitioner becoming suitable for parole. Second,
12  without a specific recommendation from either
13  the Board or a mental health expert, no
14  individual (indiscernible) treatment is
15  available.  He's also noted why he's not
16  participating in NA and AA, which he's
17  represented to the Panel.  Post-commitment
18  factors, none of his rules violations have
19  included any kind of violence or indication of
20  unreasonable risk.  There were no -- There were
21  no violations of any state or federal law.  They
22  were administrative-type violations.  Self-help
23  programs, without a specific recommendation or
24  diagnosis from a Board certified psychiatrist or
25  psychologist, the California Department of
26  Corrections and Rehabilitation will not allow
27  inmates to participate in psychotherapy.  And

1   there are no individual therapy programs

2   available within the CDCR. Petitioner, through

3   numerous books and other materials provided from

4   outside sources, has completed his education,

5   has furthered his studies in history, mythology,

6   language, philosophy and music. This has been

7   accomplished by in-cell study and by his own

8   testimony to this Board today. We already

9   reviewed his parole plans, where he lays out to

10  the Board his various marketable job skills

11  where he's got nine that are listed here. All

12  in the construction area where he worked

13  previously. Also, on business management, the

14  skills that he learned running his business that

15  are listed under B, under marketable job skills.

16  He's already articulated to the Board what his

17  plans are, his specific plans upon release to

18  work. And financial support is well documented.

19  In conclusion, based on all of the relevant and

20  reliable evidence presented, Mr. Mauzey should

21  be found suitable for parole and a base term

22  fixed for the following reasons: One, none of

23  the criteria for unsuitability is applicable to

24  petitioner. Two, all of the criteria for

25  suitability is applicable to petitioner. Three,

26  during petitioner's 24 plus years of

27  incarceration, he has not committed any violent

1  acts or violated any federal or state laws.  He

2  has no mental health disorders.  He has

3  reasonable and realistic parole plans.  His

4  underlying commitment offense was situational,

5  and the factors that were originally present, no

6  longer exist.  The probability of reoccurrence,

7  in our opinion, is zero, and it was committed

8  under -- in mitigation, under a time of a lot of

9  stress, which is documented.  There is no

10  evidence to suggest or support a conclusion that

11  this man poses an unreasonable risk or threat to

12  society if released on parole.  And we believe

13  that the preponderance of evidence was totally

14  in favor of his suitability and that the Board

15  should fix a parole date.  Thank you.

16  **PRESIDING COMMISSIONER BIGGERS:**  Thank

17  you.  Now, Mr. Mauzey, you have the opportunity

18  to tell the -- this Panel why you feel you are

19  suitable for parole.  Is this the letter that

20  you gave us or do you want to read it or do you

21  want us to read it?

22  **INMATE MAUZEY:**  I'd like to read it into

23  the record, Sir.

24  **PRESIDING COMMISSIONER BIGGERS:**  Go ahead,

25  please.

26  **INMATE MAUZEY:**  First, I'd like to express

27  my deeply felt sorrow and remorse over any

1    suffering I may have caused Mr. Paullin.  In

2    1982, I sent a letter of apology and

3    acknowledgment that Mr. Paullin had nothing to

4    fear from me and that I harbor no malice or ill

5    will against him.  I stated that I sincerely

6    hoped that he might be able to forgive me at

7    some future date.  I have made no further

8    attempts to contact Mr. Paullin nor have I made

9    any threats, either verbally or in writing,

10   against him.  I have matured while incarcerated

11   and have come to understand the nature and

12   magnitude of my actions.  There is no excuse

13   that I can offer and I greatly regret what I

14   have done to not only Mr. Paullin, but to his

15   and my family as well. Second, I· would like to

16   address the issue of self-help.  At my five

17   previous parole hearings, each Panel has stated

18   that they would not require an admission of

19   guilt in order to arrive at a suitability

20   decision.  Each Panel then went on to state that

21   I was unsuitable for parole and posed a threat

22   to society because I have yet to deal with the

23   causation factors, which led to the commitment

24   offense or the life crime.  How can a prisoner,

25   who maintains his innocence, come to fully

26   understand and deal with the causation factors

27   which led to the commitment offense to the

80

1  Board's satisfaction?  I wrote to the Senior
2  Supervising Psychologist, Doctor B. Zika,
3  concerning the self-help and therapy programming
4  the previous Hearing Panel spoke of.  Doctor
5  Zika informed me that the mental health section
6  of the medical department is staffed by health
7  care services in Sacramento to treat severe
8  mental disorders, and that because of the demand
9  on limited resources by inmates with severe
10  mental disorders, no therapy sessions are
11  available to me.  A copy of Doctor Zika's letter
12  is attached to the parole consideration hearing
13  package, as well as a memorandum from Doctor
14  Terrini, stating that psychotherapy is not
15  provided within the California Department of
16  Corrections to lifer inmates to deal with their
17  commitment offense.  Also, there is -- are no
18  other programs available through the California
19  Department of Corrections and Rehabilitation
20  that would fulfill the Board's requirements.  I
21  would like the Panel to note that I have never
22  been diagnosed with any form of mental disorder,
23  severe or otherwise.  Third, the previous Panels
24  have concluded that my commitment offense was
25  carried out in a violent manner, a calculated
26  manner and in a manner which demonstrates a
27  disregard for human life.  Since no murder

81

1    actually took place, how can -- how was the

2    crime carried out in a violent manner?  And

3    because the commitment offense was conspiracy, a

4    certain amount of calculation had to have taken

5    place for there to have been a conviction.  The

6    California Supreme Court in their recent

7    decision in Dannenberg state that the violence

8    or viciousness in the inmate's crime must be

9    more than minimally necessary to convict him of

10   the offense for which he is confined.  I would

11   like to request that this Panel please provide

12   me with an explanation or delineate the

13   supporting evidence which establishes the more

14   than minimally necessary requirement.  I ask the

15   Panel what is it about the circumstances of my

16   crime which are ever going to change.  The

17   circumstances of the crime will always be what

18   they were and the motive for the -- committing

19   it will always be trivial.  I have no hope of

20   ever obtaining parole except perhaps that a

21   Panel in the future will arbitrarily hold that

22   the circumstances were not that serious or the

23   motive was more than trivial.  Lastly, I have

24   participated in and performed any and all tasks

25   and program assignments that have been asked of

26   me by the California Department of Corrections

27   and Rehabilitation.  I have performed these

82

1    tasks and assignments at an average or above

2    average manner throughout the entire period of

3    my incarceration.  None of the six circumstances

4    show unsuitability apply to me and all of the

5    circumstances, with exception to Battered

6    Women's Syndrome, apply to me, in my opinion.  I

7    have realistic parole plans as well as numerous

8    demonstrable job skills.  I have full financial

9    support from my mother, as her letter and you've

10   read.  There's no evidence in the record showing

11   that the elements of the commitment offense were

12   greater than the minimum necessary to sustain a

13   conviction.  There is no post-conviction

14   evidence that I currently pose a threat to the

15   public or society.  Therefore, I would request

16   that a date be set at this time.

17          **PRESIDING COMMISSIONER BIGGERS:**  Are you

18   finished, sir?

19          **INMATE MAUZEY:**  Excuse me, just a second.

20          **PRESIDING COMMISSIONER BIGGERS:**  Go ahead,

21   sir.

22          **INMATE MAUZEY:**  I'd like to also address

23   something.  That the District Attorney has not

24   provided any input or any post-conviction

25   evidence whatsoever of my unsuitability.  Thank

26   you.

27          **PRESIDING COMMISSIONER BIGGERS:**  I asked

83

1    you for a statement concerning your -- how you

2    feel that you are suitable, sir.  With that, we

3    will recess for our deliberations.

4                      **R E C E S S**

5                        --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

84

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER MEJIA:**  We're now on

4     record.

5          **PRESIDING COMMISSIONER BIGGERS:**  Let the

6     record reflect that everyone that was present

7     when we went into deliberation are now presently

8     back in the room.  Before I go with the -- with

9     the decision, Mr. Mauzey, we did, in fact, look

10    at the confidential information that's in the

11    file and we've used some part of it in making

12    our determination.  In the matter of Ronald

13    Mauzey, M-A-U-Z-E-Y, CDC number 61868, the Panel

14    has reviewed all the information received from

15    the public and relied on the following

16    circumstances in concluding that the prisoner is

17    not suitable for parole and would pose an

18    unreasonable risk of danger to society or a

19    threat to public safety if released from prison.

20    The motive for the crime, very trivial in

21    relation to the offense, in that you were

22    convicted by jury trial for conspiracy to commit

23    murder by soliciting a Mr. Carranza,

24    C-A-R-R-A-N-Z-A, to help you kill the victim,

25    Mr. Paullin.  The victim, who is now the husband

26    of your ex-wife.

27    **RONALD MAUZEY C-61868   DECISION PAGE 1   5/4/06**

85

1      **ATTORNEY RUTLEDGE:**  They're divorced now,
2      Sir.

3      **PRESIDING COMMISSIONER BIGGERS:**  I mean of
4      ex-wife.

5      **ATTORNEY RUTLEDGE:**  I mean no, the victim
6      is divorced from his ex-wife.

7      **PRESIDING COMMISSIONER BIGGERS:**  Okay,
8      yeah, well that was the former [sic] victim of
9      your ex-wife.  Your record of violent -- of
10     violent behavior is evidenced by the statement
11     of facts, where -- Let me back up a minute.
12     That was taken from the record -- from the Board
13     report of September 2003.  Your record of
14     violent behavior is evidenced by the statement
15     of fact, wherein on July 1981, you went to the
16     victim's home, kicked the door down and you shot
17     him twice with a rifle.  And also the behavior
18     continued in 1995, when you received a 115 for
19     force and violence with another inmate.  You
20     have done very little programming while you've
21     been incarcerated.  In addition, Title XV,
22     paragraph nine, talks about institutional
23     behavior for suitability.  Act -- institutional
24     activities indicate an enhanced ability to
25     function within the law upon release.  But when
26     you to up to 2402(d)(6), your engagement in
27     **RONALD MAUZEY C-61868   DECISION PAGE 2   5/4/06**

86

1    serious misconduct in prison was also taken into

2    account.  You have six 115s since your last

3    Board appearance.  You have refused to take part

4    in a substance abuse program, saying you don't

5    have a substance abuse problem, although the

6    psychological report that was written by Doctor

7    Zika indicated that due to your history of

8    violence and history of involvement with alcohol

9    and drugs, your potential is somewhat higher

10    than that of the average citizen in the

11    community.  And also the fact that and the

12    record reflect that you were arrested and

13    convicted of driving under the influence August

14    the 12th, 1980, where you received a three-year

15    probation.  The psychological report dated

16    9/26/03, authored by Dr. Shafer, was not totally

17    supportive of release.  He [sic] indicated at

18    the present time, his remorse is more of an

19    intellectual than emotional experience.  If

20    released to the community, his violence

21    potential is somewhat higher than that of the

22    average citizen in the community, due to the

23    history of violence and the history of

24    involvement with alcohol and drugs.  Your parole

25    plans considered by this Panel are marginal,

26    where you do have residential plans that your

27    **RONALD MAUZEY C-61868    DECISION PAGE 3    5/4/06**

87

1    mom said that you -- she would give you a place

2    to stay and that you plan to start a -- your

3    business back up and in -- your corporation back

4    up again.  But the Panel was not given any

5    documents to show that you had either made an

6    attempt to do this or to even apply and take the

7    necessary steps so that we can assure that you

8    would, in fact, be able to do that.  You do have

9    a marketable skill.  The District Attorney of

10   Riverside -- We noted on the 3042 response that

11   the District Attorney of Riverside County

12   indicated their opposition to a finding of

13   parole suitability.  In addition, the Panel

14   concluded that your previous attempts on

15   Mr. Paulsen's [sic] life, when taken together

16   with the fact that you were found guilty of

17   conspiracy to commit murder, indicates to us --

18   to us when you put those two together, that's a

19   contributing factor contributing to a pattern

20   which results in unsuitability.  We were -- The

21   positive factors that we want to commend you for

22   was some -- a couple of -- there were a couple

23   of chronos where you were given above -- you

24   were getting average and above average work

25   reports.  But those positive aspects do not

26   outweigh the factors of unsuitability.  In a

27   **RONALD MAUZEY C-61868    DECISION PAGE 4    5/4/06**

88

1    separate decision, the Hearing Panel finds that

2    it's not reasonable to expect that parole would

3    be granted at a hearing during the next -- the

4    following two years.  The reason for that, as I

5    mentioned before, is the motive was -- for the

6    crime was inexplicable or trivial in that you

7    conspired to hire a person to kill Mr. Paulsen

8    [sic], the victim you had previously shot.  And

9    secondly, your recent -- your six 115 violations

10   since your last Board hearing.  The time is

11   now --

12       **DEPUTY COMMISSIONER MEJIA:**  Let me -- Let

13   me just say something.

14       **PRESIDING COMMISSIONER BIGGERS:**  Go ahead,

15   please, Commissioner.

16       **DEPUTY COMMISSIONER MEJIA:**  I know this is

17   an issue and it's been an issue for a while; the

18   self-help participation.  And I know the

19   attorney -- the counsel had put into record that

20   he tried, which on April 26th, 2004, to see if

21   he could get some self-help.  You can -- It says

22   in here the -- he understands that the

23   recommendation in regard and position you are in

24   when they say you need to participate in kind of

25   -- in this kind of activity, you have -- but you

26   have not been able to find it within the

27   **RONALD MAUZEY C-61868    DECISION PAGE 5    5/4/06**

1    institution.   There are numbers of opportunities

2    for self-help programming within the

3    institutions.   This is particularly true in

4    another facility where they offer Impact classes

5    and Project Change classes.   Both of these are

6    designed to encourage self-help, and many

7    inmates have taken these courses.   There, of

8    course, is also AA and NA available to many

9    inmates who have a history of substance abuse.

10   The other side of this issue is therapy is

11   available to inmates to help -- to help them

12   cope with stress in a more constructive manner.

13   The mental health section of the medical

14   department is staffed with health services in

15   Sacramento to treat severe mental disorders.

16   This means we do not have enough staff to

17   provide therapy.   Okay, so let's distinguish

18   between therapy and self-help.   You need -- the

19   only -- You may not need therapy, because you're

20   not -- you're not going to get it because you're

21   not under the Triple CMS or Mental Heath

22   Delivery System.   But you can still participate

23   in self-help.   You can participate in self-help

24   by reading books that's anything that will be

25   related to or regarding substance abuse.   You

26   don't have to go to AA or NA if you think that

27   **RONALD MAUZEY C-61868    DECISION PAGE 6    5/4/06**

90

1    it's against your religion.  But you have to

2    have self-book -- self-help -- participate in

3    self-help that addresses substance abuse, anger

4    management, victims awareness.  If you can read

5    it, go ahead and just make a list of all those

6    things that you read.

7         **PRESIDING COMMISSIONER BIGGERS:**  And

8    document it.

9         **DEPUTY COMMISSIONER MEJIA:**  And document

10   it.  And, you know, I could understand the

11   therapy you can't get.  A lot of people can't.

12   But compared to the people that we've seen here

13   before, had a lot of -- was able to complete

14   self-help groups that are available on the yard.

15   So, you know, I just want to make sure that you

16   understand that you have to take those, as a

17   recommendation from us.  And in short, we must

18   be confident that you are not the same person

19   that you were coming in and that you are now,

20   other than getting old.  And that concludes this

21   hearing.

22        **PRESIDING COMMISSIONER BIGGERS:**  No, no,

23   no, no.  The Panel recommends the prisoner do

24   the following:  Okay, become and remain

25   disciplinary free.  Participate in self-help.

26   And we're also going to order a psychological --

27   **RONALD MAUZEY C-61868    DECISION PAGE 7   5/4/06**

91

1    a new psychological evaluation, so we ask you to

2    cooperate with the clinicians in the completion

3    of a clinical evaluation.  And that concludes

4    the hearing.  It is now 4:30.

5         INMATE MAUZEY:  May I have the -- my

6    sheet, please?

7         DEPUTY COMMISSIONER MEJIA:  Here you go.

8         INMATE MAUZEY:  Thank you.

9         DEPUTY COMMISSIONER MEJIA:  Thank you.

10                    --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS        SEP  1 2006

24   THIS DECISION WILL BE FINAL ON _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED

27   RONALD MAUZEY C-61868   DECISION PAGE 8   5/4/06

92

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Sandra Triplett, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 91, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RONALD MAUZEY, CDC No. C-61868 on MAY 4, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 5, 2006 at Sacramento County, California.


Sandra Triplett
Transcriber
**PETERS SHORTHAND REPORTING**

E X H I B I T

2

Probation Officer's Report
December 28, 1982

A-135109

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE

PROBATION OFFICER'S REPORT

PEOPLE vs RONALD KEITH MAUZEY                    CR-18817 MF (CR-19283)

LEGAL STATUS:

On July 26, 1982, a third Amended Information was filed charging the defendant with attempt violation of Section 187 of the Penal Code (Attempt Murder), in Count I, with violation of Section 653f(b) of the Penal Code (Solicitation for Murder), in Counts II and III, and with violation of Section 182 of the Penal Code (Conspiracy to Commit Murder), in Count IV, all felonies. Further, the Information alleged that at the time of the commission of the offense, as to Count I, the defendant personally used a firearm, to wit, a rifle, within the meaning of Penal Code Section 12022.5 and the defendant inflicted great bodily injury within the meaning of Penal Code Section 12022.7 and, as to Count IV, the Information alleged four overt acts. On that same date, the defendant entered pleas of not guilty and denied the special allegations and overt acts. On July 27, 1982, jury trial was set for Septemeber 7, 1982 and duly trailed, continued and reset to November 2, 1982. On that date, a jury trial commenced and on December 1, 1982, as to Count I, the jury returned a verdict finding the defendant guilty of attempt violation of Section 187 of the Penal Code

1  (Attempt. Murder of the First Degree), as charged in the third amended

2  Information. Further, as to Count I, the jury found the special allegations

3  within the meaning of Penal Code Sections 12022.5 and 12022.7 true. As to

4  Counts II and III, the jury returned verdicts finding the defendant guilty

5  of violation of Section 653f(b) of the Penal Code (Solicitation for Murder),

6  as charged in the third amended Information. As to Count IV, the jury

7  returned a verdict finding the defendant guilty of violation of Section

8  182 of the Penal Code (Conspiracy to Commit First Degree Murder), as

9  charged in the third amended Information. Further, as to Count IV, the

10  jury found the overt acts true. The matter was thereupon referred to

11  the Probation Officer for a pre-sentence investigation and report,

12  returnable January 10, 1983, at 8:30 a.m., in Department 5.

13     The defendant is presently in custody and is represented by Mr.

14  Samuel Kahn, Attorney-at-Law.

15  PERSONAL DATA: (As provided by the defendant)

16     Address: Riverside County Jail, Riverside, California.

17     The defendant is a 36 year old divorced Caucasian male born October 13,

18  1946, in Sapula, Oklahoma. He was the oldest of three children born to the

19  union of Wayne K. Mauzey and Ruth Mauzey. The defendant indicated that he

20  married Elke Steffanowski, age 31, on October 22, 1967, but that they were

21  divorced on November 13, 1981. Two children, now ages 14 and 10 years old,

22  were born as a result of their union. He indicated that his oldest son

23  resides with his parents in Riverside, California and that his youngest son

24  resides with his ex-wife, who is now married to the victim in this matter,

25  John Paullin.

26     With regard to his formal education, the defendant stated that he

27  graduated from Ponca Military Academy in Oklahoma in 1964. He attended

28  Cypress College from 1968 to 1971 and then Cal State Fullerton to 1972.

In 1974 he attended the University of Tulsa. He stated that his major was Business Administration but that he did not obtain any degrees. He was last self-employed as a general contractor and business owner. He related that he owned Ronco Framing Incorporated, Lumber Commodities Incorporated and W.H. Wash Trucking Incorporated, but lost those businesses due to his incarceration in the instant matter. He stated that his corporations had a net business profit of between $250,000.00 to $300,000.00 per year and that he had a personal income of $90,000.00 to $100,000.00 per year. He listed previous employment experience as an accountant. He indicated that he has been a member of the Carpenter's Union since 1968. He served in the United States Army from 1965 to 1968 and was honorably discharged. The defendant indicated that he currently has no income nor any assets. He stated that due to his arrest in the instant matter he has lost assets of approximately $400,000.00. He listed no major liabilities.

The defendant describes his health as good and listed no handicaps or ailments. With regard to the use of alcohol, the defendant stated that he only drank occasionally, except during the period of the instant offenses. With regard to the use of controlled substances, the defendant stated that he used cocaine, only during the period of the instant offenses.

He claims affiliation with the First Baptist Church of Sunnymead and that he has attended services sporadically. His goal is to "get out, start my businesses again and regain custody of my sons. He plans to "return my environment back to the same before it got bad".

ARREST RECORD: (CII A02734183; FBI: 969597W1; SSN: 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)

A communication received from the California Bureau of Identification reveals no arrests or convictions other than the instant offenses.

Local records reveal that in RMC-005405, on 8-12-80, the defendant was convicted of violation of Section 23102(a) of the Vehicle Code,

-3-

1    granted three (3) years Court probation and fined $365.00.

2        Further, in RMC-107889, on 10-1-81, the defendant was convicted of

3    violation of Section 23103 of the Vehicle Code, granted two (2) years

4    Court probation and fined $350.00.

5    SUMMARY OF OFFENSE:

6        The following information is summarized from reports of the Riverside

7    Police Department. (This information is not necessarily the same information

8    elicited at the trial in this matter).

9        COUNT I:

10        On June 30, 1981, at approximately 11:50 p.m., officers responded to

11    the 4200 Block of Lido, Riverside, California, following a radio call of

12    a shooting incident. Victim, John Howard Paullin, was located and had

13    a gunshot wound to his side. He was in severe pain, made no statement

14    and was transported to Parkview Hospital where it was later determined

15    the bullet was lodged in the victim's abdomen or liver. The victim's

16    neighbors advised the victim came to their residences stating someone

17    was after him and that he had been shot by the defendant. Officers were

18    then contacted by Elke Mauzey, the defendant's estranged wife who had

19    been living with the victim. She advised that as they were awake in

20    the bedroom, the victim went to answer the front door and she then heard

21    the victim and the defendant, who she identified by his voice, fighting.

22    Witnesses observed the defendant leave the area at a high rate of speed

23    in his pickup truck which was later recovered at his parent's residence

24    where he had borrowed another vehicle.

25        On July 1, 1981, Elke Mauzey was again interviewed and stated that

26    on April 23, 1981, she had left the defendant's residence after advising

27    him that divorce proceedings were in progress and subsequently began

28    living with the victim. She advised that on approximately June 19, 1981,

-4-

1  while attempting to pursuade her to leave her boyfriend the defendant ad-

2  vised her he knew his identity, had driven around his residence and that

3  he was going to "hire some Mexicans to get him". She advised the defendant

4  had been violent towards her in the past, has a bad temper when drinking

5  and can be violent. Detectives subsequently siezed as evidence a .22

6  caliber rifle and ammunition from the defendant's Sunnymead residence.

7  On July 2, 1981, the victim, who had undergone surgery to repair his

8  liver, pancreas, colon and stomach was interviewed at the hospital and ad-

9  vised the door was suddenly "kicked open" and he observed the defendant,

10  who he recognized from a photograph, pointing a rifle at him and that the

11  defendant fired the rifle. He related they struggled, he did not recall

12  the weapon discharge again and was not immediately aware of being shot.

13  In a search of the victim's residence detectives noted a shoe print on

14  the front door, located a spent .22 caliber shell casing and removed a

15  lead slug from a 2X4 outside the south bathroom.

16  On July 9, 1981, the defendant was booked for attempted murder and

17  released on $10,000.00 cash bail.

18  During follow-up investigation on July 16, 1981, detectives learned

19  the victim had undergone additional surgery wherein a colostomey was per-

20  formed and that further surgery was anticipated.

21  COUNTS II, III and IV:

22  On approximately November 20, 1981, detectives received information

23  that an informant, Arthur Carranza, had information concerning a possible

24  solicitation for murder wherein the defendant had approached Carranza to

25  kill a subject named John Paullin. Detectives were aware the defendant

26  had previously been arrested for the attempt murder of Mr. Paullin, that

27  Mr. Paullin had testified against the defendant and that the defendant

28  was held to answer in Superior Court.

-5-

Subsequently, on November 30, 1981, and December 7, 1981, detectives contacted Carranza who indicated that sometime after August, 1981, the defendant had taken a liking to him, invited him to live in his home and did on several occasions solicit him to kill Mr. Paullin as he was the only person who could identify him regarding the attempted murder. The defendant offered to buy Carranza a house, give him a job in his construction company and pay him $4,000.00 a month, not only for killing Mr. Paullin but also for assisting in illicit sales of cocaine. A slip of paper the defendant had given Carranza with John Paullin's name, make of car and home and business addresses was seized as evidence. Carranza advised the detectives the defendant drove him by Paullin's residence and business, showed him the probable route of travel between Paullin's home and business and suggested "sniping" Paullin while enroute to his office. Carranza advised detectives he did not want to commit the murder himself but may find someone who would and that he did on one occasion contact another subject. It was later determined through the defendant's telephone records that in October, 1981, Carranza telephoned a Felix Salsedo for the purposes of soliciting the murder for the defendant. For the purpose of the investigation it was determined the informant would make contact with the defendant and should the defendant still be inclined to solicit Mr. Paullin's murder, Detective Brian McAuley would be introduced as "Wolf", a paid killer.

On December 8, 1981, the informant met the defendant at his residence and during taped conversation the defendant made several comments regarding wanting Mr. Paullin killed. Appropriate payment for the killing was discussed and reference was made to "one grand", "a kilo", or "some coke".

On December 9, 1981, Detective McAuley telephoned the defendant as "Wolf" concerning the solicitation for murder. In the recorded conversation

-6-

1  the defendant provided the detective with information concerning Mr. Paullin
2  and indicated he still wanted Paullin killed.

3     On December 10, 1981, the informant again contacted the defendant re-
4  garding subject "Wolf" killing Paullin on Friday, December 11, 1981. The
5  defendant indicated in reference to the killing of Mr. Paullin that it was
6  too soon and that he wanted to postpone the killing until he was able to
7  pay half down and the other half upon completion of the job.

8     On December 11, 1981, an arrest warrant was obtained and the defendant
9  was arrested without incident at his residence at 25502 Jaclyn Street,
10  Sunnymead, California.

11  DEFENDANT'S STATEMENT:

12     In an interview conducted at the Riverside County Jail, the defendant
13  essentially maintained his innocence in the instant matter feeling that the
14  most he should have been convicted of was "simple assault or assault with
15  a deadly weapon".

16     In discussing the attempt murder, the defendant stated the whole thing
17  was "over the children and his ex-wife was the moving force". He explained
18  that during their separation for two and a half months prior to the shooting
19  incident she was "constantly telling me the victim was a better man and
20  would be a better father for our children". He indicated that he only went
21  to the victim's residence that night to "tell my ex-wife and the victim
22  to leave me and the kids alone" and that he had taken the rifle along to
23  "scare the victim and make my point". He stated that when the victim
24  opened the door he grabbed the rifle, they struggled and that he does not
25  even know when the rifle went off. He related it would not have happened
26  had he been himself and that he wasn't rational due to his personal
27  problems, that he had been on a three day binge and had used cocaine.
28  He indicated that he was disappointed as the jury "didn't buy the diminished

1    capacity". He denied that he sought out the victim or that he had made

2    prior threats towards him stating it was his wife who told him all about

3    Paullin and it was she who "got it into her mind that I would do something

4    violent". He did admit that he had driven by the victim's house once prior

5    to the incident "just to see his house".

6         In discussing the other charges, the defendant claimed it was the

7    informant who suggested getting rid of the witness and offered to kill

8    Paullin as they had become friends and the informant felt gratitude for

9    what he was doing for him. He related that he never took the informant

10   seriously, as he knew it wouldn't help his case but that it got to the

11   point that "I just played along with Art". He feels the informant made

12   up the story about "this terrible criminal in Sunnymead" and that the

13   informant testified against him as he had his own problems with the

14   police and for revenge, as he had kicked the informant out of his house.

15   He denied doing anything other than possibly "pointing out the victim's

16   business once when we were partying".

17        When questioned regarding his feeling towards the offenses, the defen-

18   dant stated "if I had wanted Paullin dead I would have done it myself and

19   use something other than a .22 caliber rifle". He feels the attempt

20   murder conviction is "garbage" and that had the informant told the truth

21   he would not have been convicted. He admitted the taped conversations

22   were damaging but stated he didn't mean what was said and when he realized

23   "Art had something there I tried to put it off and say no in a round about

24   way". He related that he is not a violent or dangerous person and that

25   only on one occasion did he "slap my wife on the arm, but the District

26   Attorney made it out like I beat her regularly". When questioned about

27   the victim, the defendant stated "what I've heard since about Paullin,

28   I still don't like him". He explained that his youngest son is now living

1    with his ex-wife and Paullin, and they tell him "better forget his dad, you're better off with us". He indicated that he is still pursuing child custody in court as he does not want his children separated.

2

3

4    In discussing sentencing, the defendant realizes he will be sentenced to State Prison. He feels "it was a mistake going over there with the rifle, but it was the tapes that convinced the jury I was guilty of everything". He feels the court should have tried the offenses separately and that he has good grounds for appeal and must now leave it in the hands of the Appeallate Court.

5

6

7

8

9

10   ADDITIONAL INFORMATION:

11   Both the District Attorney and the defendant's defense counsel were contacted and their views considered.

12

13   Detective Rowe, the investigating officer in this matter, advised that he feels the defendant had full intent to murder the victim and then intended to have the victim killed for the added motive of eliminating the witness to the attempted murder. He felt that in addition to the "family reasons" the defendant was motivated to murder Paullin to protect his assets in his construction company due to his pending divorce. He described the defendant as intelligent, but calculating and callous.

14

15

16

17

18

19

20   Wayne K. Mauzey, the defendant's father, was contacted and stated he does not feel the defendant was guilty of everything and "is not capable of doing all that". He feels the defendant's ex-wife drove him out of his mind and that the defendant became involved in a "triangle thing with the victim". He has not known the defendant to be a violent person.

21

22

23

24

25   Lewis McElfresh, the defendant's minister at the First Baptist Church in Sunnymead, contacted the writer and advised that he has visited the defendant every week in jail to try to keep him encouraged. He feels the defendant realizes he made mistakes and that he has a good attitude in

26

27

28

1   jail, trying to make the best out of a bad situation.

2   .Deputy Persinger, at the Riverside County Jail, contacted the writer

3   and advised the defendant has been a trusty: for one (1) year and has been

4   trustworthy, honest and non-violent in the custody setting. He related

5   the defendant has assisted in keeping order in the jail and his behavior

6   while in custody has been indicative of a non-violent person.

7   The writer attempted to make personal contact with Elke Paullin,

8   but was unable to do so. She provided a statement, in conjunction with

9   John Paullin, which is attached to the report for the court's consideration.

10  VICTIM INFORMATION:

11  John Paullin, the victim, provided the Probation Officer with a written

12  statement which he requested be attached to the report for the court's con-

13  sideration. In discussion, the victim indicated that his medical expenses

14  were in excess of $40,000.00 and that his insurance company paid all but

15  the deductible, $1,000.00. He describes his financial losses as a result

16  of the shooting to be in the excess of $150,000.00. In discussing his

17  medical condition, the defendant stated that he has a fourth surgery planned

18  to repair a hernia problem as a result of the shooting incident. He stated

19  that he will remain under a doctor's care, be on a controlled diet and have

20  lingering complications from the shooting for the rest of his life. He

21  described the defendant as being dangerous, threatening and vindictive

22  and that he will fear retaliation from the defendant for the rest of his

23  life. He stated that the defendant had previously threatened his wife

24  who had attempted to divorce him and that on this occasion he made a

25  threat and then followed through. He feels the defendant should be sentenced

26  to the maximum term allowable by law.

27  PROBATION OFFICER'S STATEMENT:

28  Appearing before the court for sentencing is a 36 year old male who

-10-

1    has been convicted by a jury of attempt murder of the first degree, two
2    counts of solicitation for murder, and conspiracy to commit first degree
3    murder, all felonies. Further, the jury found the Special allegations
4    true, as to Count I, that the defendant personally used a firearm and that
5    the defendant inflicted great bodily injury within the meaning of Penal
6    Code Sections 12022.5 and 12022.7. Further, as to Count IV, the jury
7    found the overt acts true, The court having heard testimony in this
8    matter is aware of the circumstances of the offenses.

9        The defendant, who has been a self-employed businessman and owner of
10    multiple corporations, was cooperative when interviewed and appears to
11    possess above average intelligence. Although he stands convicted in this
12    matter, he essentially maintains his innocence other than possibly committing
13    a "simple assault or assault with a deadly weapon". Despite the evidence
14    and apparent motives for committing the offenses, he accepts little
15    responsibility and projects blame for his convictions onto the witnesses,
16    the court and the jury. His denials leave little apparent capacity for
17    remorse. In the defendant's behalf, in view of his background of pro-
18    ductivity and lack of prior criminal history, other than alcohol related
19    convictions, one could find it difficult to understand the defendant as
20    one capable of such serious offenses. On the other hand, there are indica-
21    tions that prior to the offenses the defendat had had significant marital
22    problems with incidences of aggressive behavior, possibly induced by
23    substance abuse. He is seen as an individual who, when in control of
24    his environment, functions adequately but who was unable to accept the
25    reality of his disrupted personal life and its consequences and turned
26    to assaultive and violent behavior to protect his interests and needs.
27    Circumstances in this matter indicate the offenses are not just the
28    result of transient emotional and aggressive outbursts but suggests

11

1 the defendant to be a calculating and callous individual who deliberately,
2 somewhat compulsively and purposefully developed malice intent for the
3 victim in disregard of any value for human life. Particular concern for
4 the victim was not detected nor did he appear to have been impressed with
5 these overall proceedings. The writer sees the defendant as being
6 emotionally confused and possibly continuing to harbor a great deal of
7 anger, frustration and resentment. The writer feels that the defendant,
8 when under stress and lacking proper judgement and control, could still
9 be considered a danger to others.

10 Circumstances in aggravation might include that the crimes involved
11 great violence, great bodily harm, threat of great bodily harm, or other
12 acts disclosing a high degree of cruelty, viciousness or callousness,
13 whether or not charged or chargeable as an enhancement under Section
14 12022.7; that the defendant was armed with or used a weapon at the time
15 of the commission of the crime, whether or not charged or chargeable as
16 an enhancement under Section 12022 or 12022.5; that the defendant induced
17 others to participate in the commission of the crime or occupied a position
18 of leadership or dominance of other participants in its commission; that
19 the defendant attempted to illegally interfere with the judicial process;
20 the planning sophistication or professionalism with which the crime was
21 carried out, or other facts, indicate premeditation; and that the defendant
22 has engaged in a pattern of violent conduct which indicates a serious
23 danger to society. Circumstances in mitigation might include that the
24 defendant has no prior record or an insignificant record of criminal
25 conduct considering the recency and frequency of prior crimes.

26 In summary, the defendant is ineligible for probation conderation
27 pursuant to Penal Code Sections 1203.06 and 1203.075 and a State Prison
28 commitment is being recommended. Even if the defendant were felt to be

-12-

1   eligible for probation, considering the nature, seriousness and circumstances
2   of the offenses, wherein it is no credit to the defendant that the victim
3   was not killed, and the defendant's apparent insensitivity to the value of
4   human life, he is seen as unsuitable and undeserving of probation con-
5   sideration. It is felt that a commitment to State Prison is necessary
6   to protect the public and to serve as an appropriate penalty for such
7   serious offenses. Further, it is felt the defendant is in need of
8   correctional, psychological or psychiatric treatment which can most
9   effectively be provided if he is confined in the Department of Corrections.
10  In view of the degree of harm to the victim, that the defendant poses
11  an unreasonable threat and the nature of these multiple offenses, which
12  involve felony offenses committed by the defendant while released custody
13  pending criminal charges on an earlier felony, the writer feels consecutive
14  sentencing could be considered.

15  CREDIT, TIME SERVED:

16      Total days credit 595; local time, 397 days; PC 4019 time, 198 days;
17  State Institution time, 0 days.

18          Arrest Date:              Release Date:

19          July 9, 1981              July 9, 1981

20          December 11, 1981         Not applicable

-13-

1  RECOMMENDATION:

2      In the matter of Ronald Keith Mauzey, CR-18817 MF (CR-19283), it is

3  respectfully recommended that probation be denied and that the defendant

4  be committed to State Prison for the term prescribed by law as to Count

5  IV. Further, that as to Counts I, II and III, the defendant be committed

6  to State Prison.

7

8  DATED this 28th day of December, 1982.
    *Ha/em*
9

10                                       Respectfully submitted,

11                                         LAWRENCE F. SMITH
                                       Probation Officer
12

13

14                                         *Gary Carnes*

15                                    BY: GARY CARNES
                                  Senior Probation Officer

16

17  I hereby certify that I have read and considered the Probation Officer's
    Report.
18

19                                 Judge of the Superior Court

20

21

22

23

24

25

26

27

28

E X H I B I T

3

Abstract of Judgment
February 8, 1983

In the Superior Court of the State of California

in and for the County of _____RIVERSIDE_____

F I L E D
RIVERSIDE COUNTY

# Abstract of Judgment

Commitment to State Prison

FEB - 8 1983

WILLIAM E. CONERLY, Cler
By _A.P. Wright_ Depu
Pretoin:

Dept. No. ____5____ Case No. __CR-18817 MF__
The People of the State of California (CR-19283)

Hon. __J. WILLIAM MORTLAND__
Judge of the Superior Court

District Attorney by:
Randall Tagami, Deput.
Prosecuting Attorney

vs.

RONALD KEITH MAUZEY,

Defendant.

Samuel Kahn
Counsel for Defendant

This certifies that on the __8th__ day of __February__, 19 __83__, judgment of conviction of the above-named defendant was entered as follows:

(1) In Case No. __CR-18817__ Count No. _____ he was convicted by ____Jury____; on his plea of _____
(court or jury)

____Not Guilty____
(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of __Conspiracy to Commit First Degree Murder__

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of __182 P.C./187 (first degree)P.C.(Overt Acts 1,2,3 and 4)__
(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
| none | ---- | ---- | ---- |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Defendant has been held in jail custody for ____843____ days as a result of the same criminal act or acts for which he has been convicted. (* 843  total, local 579 days, PC4019 time 264 days, State Inst
Defendant __**__ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap- —(
(was or was not)

on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.

Defendant __**__ armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
(was or was not)

tions 969c and 12022 of the Penal Code.

Defendant ____**____ a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of
(used or did not use)

the Penal Code.          ** no finding

(Repeat foregoing with respect to each count of which defendant was convicted.)

ABSTRACT OF JUDGMENT

(2) Defendant _____ adjudg ___ ___ .itual criminal within the meaning of S _____ ___ of Section 644 of the Penal
(was or was not)                                                                          (a or b)

Code; and the defendant _____ a habitual criminal in accordance with Subdivision (c) of that Section.   No finding
(Is or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of ___Riverside_____ and by him delivered to the Director of Corrections of the State of California at _____

Chino, California

It is ordered that xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx):

Sentenced to State Prison and stayed as to the following Counts:
Count I 187(1°) Attempted Murder Middle term - 2 years, plus 2 years re:
12022.5 PC use of Firearm, plus 3 years re: 12022.7 PC infliction G.B.I.,
Count II 653(f)sub b - middle term of 4 years, Count III 653(f) middle
term of 4 years, all ordered stayed and stay to become permanent upon
completiton of time served in Count IV.
and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences
from other jurisdictions):

NONE

(4) To the Sheriff of the County of ___Riverside_____ and to the Director of Corrections at the _____

California Institution For Men at Chino, Califorr

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at ___the California Institution For Men Chino,_____
California, at your earliest convenience.

Witness my hand and seal of said court

this __8 th__ day of __February__ , __1983__

__William E. Conerly,_____ Clerk,

by __D. Wight__  D. Wight _____ Deputy

State of California,

County of __Riverside_____ } ss.

I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court this __8 day of __February__,
19 __83__.

__William E. Conerly, by: D. Wight__ D. Wight Dep

County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of ....
Riverside

The Honorable __J. WILLIAM MORTLAND__ _____,

Judge of the Superior Court of the State of California, in and for the County of _____

RIVERSIDE

NOTE: If probation was granted in any senten    of which abstract of judgment is certified, attach
a minute order reciting the fact and imposing    ence or ordering a suspended sentence into effect.

E X H I B I T

4

Psychological Evaluation
September 25, 2003

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
SEPTEMBER 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 25, 2003

This is a psychological evaluation for the Board of Prison Terms for inmate Ronald Mauzey, CDC# C-61868. This report is based upon a clinical interview of the inmate, conducted on 09/25/03, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

Inmate Mauzey's last Board of Prison Terms' psychological evaluation was done by M. Carswell, Ph.D., and was dated 12/10/99. Please refer to that report for the inmate's identifying information, developmental history, educational history, psychosexual development and sexual orientation, military history, and plans if granted release, as there have been no changes.

## PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

   There have been no changes in this section since his last report.

II.  **DEVELOPMENTAL HISTORY:**

   There have been no changes in this section since his last report.

III. **EDUCATIONAL HISTORY:**

   There have been no changes in this section since his last report.

IV.  **FAMILY HISTORY:**

   With regard to his family history, one of his brothers has passed away. He died from a heart attack. For additional information, refer to the psychological evaluation of 12/10/99.

V.   **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

   There have been no changes in this section since his last report.

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## VI.  MARITAL HISTORY:

Inmate Mauzey's sons are now 31 and 34 years old.  He has two grandchildren, ages 8 and 12.  He reports a second marriage while he was in prison, from 1986 to 1989 or 1990.  He reports that his marriage ended due to infidelity on his wife's part.  For additional information, refer to the psychological evaluation of 12/10/99.

## VII.  MILITARY HISTORY:

There have been no changes in this section since his last report.

## VIII.  EMPLOYMENT/INCOME HISTORY:

Inmate Mauzey furnished additional information regarding his employment and income history.  He indicated that at the present time he does not choose to have a prison job.  He says he spends his time helping others with legal paperwork, playing his guitar, teaching music, and studying German.

## IX.  SUBSTANCE ABUSE HISTORY:

In addition to the information reported in his 12/10/99 evaluation, inmate Mauzey reported that he was using cocaine during the same two to three month period when he abused alcohol.  He strongly feels he is not an alcoholic or addict, and does not wish substance abuse treatment of any kind.

## X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Mauzey indicates that he has a heart condition, for which he takes Niacin.  He also reported that he takes Timolol for glaucoma in his right eye.

## XI.  PLANS IF GRANTED RELEASE:

There have been no changes in this section since his last report.

## CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Mauzey's current mental status is within normal limits.

### CURRENT DIAGNOSTIC IMPRESSIONS:

There have been no changes in this section since his last report.

MAUZEY          C-61868          CTF-NORTH          09/26/03          gmj

MAUZEY, RONALD
CDC NUMBER: C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## XIII.  REVIEW OF LIFE CRIME:

When asked to review his committing offense, inmate Mauzey denied that he conspired to kill the victim. He acknowledged that he did shoot the victim, but said it was an accident. He took responsibility for exercising extremely poor judgment in going to the victim's residence with a rifle. He stated that he believed he had diminished capacity at that time, but could give no reason for this belief other than the fact that he took his rifle to the scene of the crime because he believed the victim had a gun. He expressed remorse for the pain he had caused his victim and his children and grandchildren. At the present time, his remorse is more of an intellectual than emotional experience.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.    Inmate Mauzey has no prior criminal history. He has only one disciplinary report for violence while in CDC. This occurred in 1995, and involved a shoving match with another inmate. It is notable that inmate Mauzey did not take responsibility for his actions at that time, presenting them as justifiable self-defense. He now acknowledges that he was involved in a fight, but points out that it was many years ago. Another concerning rules violation occurred in 1997, when inmate Mauzey was found to have a note in his pocket which contained instructions for the manufacture of methamphetamine. He did not take responsibility for this infraction. Other rule violations in his file are for occasional uncooperativeness and contentiousness. He has functioned well within CDC. He appears to be at lower than average risk for violence compared to a Level II inmate population.

B.    If released to the community, his violence potential is somewhat higher than that of the average citizen in the community due to his history of violence and history of involvement with alcohol and drugs.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.    This inmate has been able to function well within the institution.

B.    He does not have a mental disorder which would necessitate treatment, either during his incarceration period or following parole.

C.    Although he denies having an alcohol or drug problem, and is resistant to attending Alcoholics Anonymous, it would be reasonable to monitor his drug and alcohol consumption through urine testing on a random basis if he were granted parole. It would also be advisable that he have parole conditions prohibiting the use of alcohol and drugs, and access to weapons.

MAUZEY          C-61868          CTF-NORTH          09/26/03          gmj

MAUZEY, RONALD
CDC NUMBER: C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

*[signature]* , Ph. D. for

**DEE SHAFER, Ph.D.**
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

*[signature]* , Ph. D.

**B. ZIKA, Ph.D.**
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

DS/gmj

D: 09/25/03
T: 09/26/03

E X H I B I T

5

Psychological Evaluation
November 15, 1995

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

Richard J. Donovan Correctional Facility

January 1995 Calendar
November 15, 1995

This is the fourth report to the Board on this inmate. This writer has had a forty-five minute interview with this inmate and has reviewed his C-File and Medical Record.

Mr. Mauzey works as a clerk in the Program Office in Yard One. He is the Facility Captain's clerk. He does typing, filing, and compilation of figures used for reports. He has been doing this since June of 1992. He receives good work reports and requests for Placement Override for this inmate have been approved and signed by the Warden. In these requests, he is praised for his excellent work and his ability to function without much supervision. Quoting from one of these override requests, "Inmate Mauzey is the PA Clerk-he has demonstrated exceptional skills in fulfilling his duties. His vast clinical experience in other institutions has been used to fine tune the clerical procedures implemented in Facility One. His efficiency has contributed to the smooth operation in the Program Office inspite of numerous supervisory changes." In his free time he enjoys playing the guitar which he does for several hours at night and he also studies calculus. He has two sons who both live out of town. He also has a grandson and granddaughter. He has not participated in NA or AA and states that he has not had a drug or alcohol problem in the past or at present. He appears to be a high functioning individual who is easily able to perform the duties of his job.

He is presently serving a twenty-five year to life sentence for conspiracy to commit first degree murder. He states that the victim was shot and seriously wounded but he is unsure whether he shot him by pulling the trigger or if the rifle discharged during a struggle. The victim, after he was shot, went to a neighbor's home and told them that the defendant had shot him. The defendant was arrested and booked for attempted murder. The victim underwent operations for his abdominal wound and subsequently healed. When I asked the inmate how he felt about what happened, he states, "the guy shouldn't have been shot at all." He felt it was wrong for him to have gone to the victim's house and to have gone there with a gun. This man does not have a long criminal record.

MAUZEY, RONALD      C61868      (1)      RJDCF-SD      (rmp)

He does not have the attributes necessary to make the diagnosis of Antisocial Personality Disorder. He has functioned on a high level most of his life. Prior to coming to prison, he was married and was divorced in 1981. He graduated from a military academy in 1964 and attended college from 1968 to 1972. He was later self-employed as a general contractor and business owner. He was successful in his business and states that if released, he would go back to the same business he had been in and would be successful. He was in the Army from 1965 to 1968 and received an honorable discharge. Mental Status Examination of this man is entirely normal. He does not have a thought or mood disorder. He does state at the time of the instant offense, he had been drinking and using cocaine and he feels this had probably contributed to committing this offense. However, he denies a drug or alcohol use history and states he used those drugs for a very short period prior to the instant offense. He has had two CDC 115's, one in 1990 and one in 1993. One was for disclosing confidential information and the other was for fighting in which basically no one was seriously injured. He does not show a great deal of remorse and states he has had fourteen years to deal with it. However, he has written a letter to the victim and has apologized to him for what he did. He does state, "I am sorry the guy got shot."

PSYCHIATRIC DIAGNOSIS:

Axis I:        No Diagnosis.

Axis II:       No Diagnosis.

PSYCHIATRIC CONCLUSIONS:

The diagnosed pschopathology has been related to criminal behavior indirectly. During observation in the institution, he has psychiatrically improved greatly. In a less controlled setting, such as return to the community, this inmate is considered likely to continue improvement.

SUGGESTED ACTIONS:

This inmate has had favorable psychiatric reports with similar conclusions favorable for release.

**MAUZEY, RONALD        C61868      (2)        RJDCF-SD        (rmp)**

PAROLE AND RELEASE:

If this inmate is to be paroled or released, consideration should be given to the following:

Violence potential outside a controlled setting in the past is considered to have been average and at present is decreased.

Conditions of parole should include routine monitoring of drug or alcohol intake.  This inmate is not on any drug therapy at the present time.  This individual is highly functioning and is able to make a living in the community which he has demonstrated in the past.  At the present time, he is not a threat or danger to society.  It is very doubtful that he would be involved in violence of any kind if he were released to the community.

*Sheldon J. Falkenstein MD*

SHELDON J. FALKENSTEIN, M.D.
Staff Psychiatrist

E X H I B I T

6

Psychological Evaluation
November 7, 1997

RICHARD J. DONOVAN CORRECTIONAL FACILITY

HEALTH CARE SERVICES

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

UPDATE

November 1997 Calendar

*IDENTIFICATION:*

*Mr. Mauzey is generally doing well but has received a CDC-115 for Drug Paraphernalia which was a note found in his pocket at visiting. This note gave instructions on how to make methamphetamine. Mr. Mauzey maintains he is not guilty and is taking it to court. This incident happened this year, 1997. He also received a CDC-115 for not showing skin at night in his cell. He states that the officer wakes him up at one o'clock in the morning so that he will show his skin. Presently, he has been working in PIA textile, which he has just started.*

*Mr. Mauzey was married in June of this year and states that he likes his wife. He met her thorough an ad in the paper circulated in Europe. He likes her openness and honesty.*

*From a psychiatric point of view he is basically unchanged. He remains stable with no thought disorder or affective disorder. He is a man of above average intelligence and is well organized.*

*DIAGNOSTIC IMPRESSION:*
*Axis I:  No diagnosis.*
*Axis II:  Possible Personality Disorder, NOS.*

*He has not participated in AA/NA and states that he does not have a drug/alcohol problem, although it is to be noted that he was felt to be under the use of drugs at the time of his instant offense. He has not participated in other activities, for example: such as CROP.*

*In his free time, he enjoys playing the guitar and visiting with his wife. She visits him four days a week.*

*In summary, Mr. Mauzey is a intelligent, middle aged, Caucasian male,*
*D: 11/7/97*
*T: 11/7/97*
*MAUZEY                    C-61868              RJDCF/SD              SF/lic*

12-16-97

Copy to Inmate file OCH

BOARD OF PRISON TERMS
PAGE 2

who is doing time for attempted murder and who has adjusted well to the
prison environment.   In general he programs well but the recent CDC-115
received violates prison rules and is a lapse in his ability to program
well.   Psychologically, he is a stable man.   When he is released, I am
confident that he will do well in the free community.

S. FALKENSTEIN, MD.
STAFF PSYCHIATRIST

D: 11/7/97
T: 11/7/97
MAUZEY                    C-61868              RJDCF/SD              SF/lic

E X H I B I T

7

Psychological Evaluation
December 10, 1999

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
FEBRUARY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 10, 1999

This is the sixth psychological evaluation for the Board of
Prison Terms on inmate Ronald Mauzey. This report is the
product of a personal interview, conducted on 12/10/99, as
well as a review of his Central file and unit health record.
This single contact interview was for the express purpose of
preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Mauzey is a 53-year-old, divorced, Caucasian
      male. He has no religious preference. No unusual
      physical characteristics were noted and he denied the
      use of any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Mauzey is the oldest of three boys. He stated
      there were no prenatal or perinatal concerns or birth
      defects. He had no abnormalities of developmental
      milestones. All speech, language and motor development
      occurred unremarkably. He denied any history of
      cruelty to animals or any history of arson. He stated
      he had no significant childhood medical history and
      denied any childhood history of physical or sexual
      abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Mauzey has completed four years of college and
      was still attending the University of Tulsa when his
      work became too busy and he stopped attending. His
      last TABE score was in 1990 and was 12.9.

IV.   FAMILY HISTORY:

      Inmate Mauzey's mother is 73 and in good health. His
      father died in 1997. He states his brothers are doing
      well. He communicates with his family monthly by
      writing. He states that his relationship with his
      family is normal.

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Mauzey states that he is a heterosexual male.
He denied any history of high-risk sexual behavior
either prior to or since incarceration.

VI.   MARITAL HISTORY:

Inmate Mauzey was married for 13 years.  There are two
children from that marriage, ages 30 and 28.  He
states that he has a very good relationship with his
children and his grandchildren.

VII.  MILITARY HISTORY:

Inmate Mauzey was in the U.S. Army for three years.
He was discharged in 1968 at the rank of E4 and was a
general staff clerk.

VIII. EMPLOYMENT AND INCOME HISTORY:

Prior to his incarceration, inmate Mauzey was a general
contractor and owned a contracting company, a trucking
company and a lumber wholesale company.  Since
incarceration, he has worked as a clerk, and is now
working on and enjoying the yard crew.  He has not
finished any vocational work, as he is already a
journeyman carpenter.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Mauzey denies any history of substance abuse
whatsoever until a three month window in which the
commitment offense occurred.  He also states that he
has not attended Alcoholics Anonymous nor any self-help
groups due to the fact that eight of the steps are
religiously based and that is an issue with him.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Mauzey has no prior diagnoses nor serious
illnesses.  He has had no medical or psychiatric
hospitalizations and has had no serious accidents or
head injuries.  He has no history of suicidal ideation
or suicide attempts.  He has had no seizures or any
other neurological condition.  He has had no history of

MAUZEY      C-61868      CTF-NORTH      12/21/99      gmj

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE


        disabilities or significant impairments.  He is on no
        medication at this time.

XI.   PLANS IF GRANTED RELEASE:

        Inmate Mauzey states that should he be paroled, he
        would live in Riverside County and would start his
        construction business again.  He has kept up with the
        trade and he believes that he would do well on parole.

                        CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

    A.  Inmate Mauzey is a 53-year-old, Caucasian male.  He
        was appropriately dressed and groomed.  He was
        cooperative, calm and alert during the interview.  His
        speech was clear and readily understandable.  His
        affect was normal.  His flow of thought was normal with
        no hallucinations nor delusions noted.  He was fully
        oriented and his intellectual functioning was estimated
        to be in the average range.  His attention and
        concentration were adequate for purposes of this
        examination.  There was no evidence of a mood or
        thought disorder.  His insight and judgment appeared to
        be intact.  He showed good insight into his commitment
        offense.

    B.  CURRENT DIAGNOSTIC IMPRESSIONS:

        AXIS I:    No Contributory Clinical Disorder.
        AXIS II:   Antisocial Personality Disorder, much
                   improved.
        AXIS III:  No Contributory Physical Disorder.
        AXIS IV:   Incarceration.
        AXIS V:    GAF = 85.

        Should this inmate at this time be given a parole or
        release date, it is expected he will be able to
        maintain his present gains in the community.

XIII. REVIEW OF LIFE CRIME:

        Inmate Mauzey described the circumstances surrounding
        his commitment offense.  He states that he did not
        conspire to kill the victim.  He states that he had a

MAUZEY     C-61868      CTF-NORTH      12/21/99      gmj

MAUZEY, RONALD
CDC NUMBER:   C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

rifle and the victim was shot when he (the victim)
pulled on the rifle, or he stated that when the victim
pulled him in the rifle discharged.  However, he does
accept that it was his fault due to the fact that he
should not have been there with a gun.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.   This inmate has no criminal history and has been
     able to program well.  Therefore, he would be
     assessed at a lower than average risk for violence
     when compared to this Level II inmate population.

B.   If released to the community, his violence
     potential is estimated to be no higher than the
     average citizen in the community.

C.   The most significant risk factor as a precursor to
     violence for this inmate would obviously be should
     he decide to return to the use of alcohol.

XV.   CLINICIAN OBSERVATIONS, COMMENTS AND RECOMMENDATIONS:

A.   This inmate is responsible for his behavior.  He
     has the ability to abide by institutional standards
     and has generally done so during his incarceration
     period.

B.   This inmate has no mental health disorder which
     would necessitate treatment either during his
     incarceration period or after parole.

C.   Since this inmate admits having an alcohol and drug
     problem, he would benefit from attending Alcoholics
     Anonymous.

M. Carswell Php

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

MAUZEY      C-61868      CTF-NORTH      12/21/99      gmj

MAUZEY, RONALD
CDC NUMBER:  C-61868
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MC/gmj

D:  12/10/99
T:  12/21/99

**E X H I B I T**

8

Initial Parole Consideration Hearing Transcript
February 20, 1996

53

1  CALIFORNIA BOARD OF PRISON TERMS

2  D E C I S I O N

3  **PRESIDING COMMISSIONER GUADERRAMA:**   Okay, the

4  time is 11:50 and all those that were present before

5  the hearing are back with the exception Mr. Giaquinto,

6  and he had to live, however, he did participate in the

7  decision.   And I'll tell you what that decision is.

8  The panel reviewed all the information received from

9  the public and relied on the following circumstances

10  in concluding that you're not suitable for parole and

11  that your release would pose an unreasonable risk of

12  danger to society and a threat to public safety if you

13  were to be released from prison.   This offense was

14  carried out in a manner which exhibits a callous

15  disregard for the suffering of another.   The offense

16  was carried out in a dispassionate and calculated

17  manner.   These conclusions are drawn from the

18  Statement of facts where you went to the home of the

19  Victim to confront him concerning his involvement with

20  your wife and you ended up shooting him.   Prior to

21  that, you had conspired on at least two occasions to

22  have this man killed.   Previous record.   You have an

23  escalating pattern of criminal conduct, a consistent

24  pattern of tumultuous relationships, an unstable

25  social history.   You failed previous grants of

26  probation.   You failed to profit from society's

27  **RONALD MAUZEY    C-61868    DECISION PAGE 1    (2/20/96)**

54

1  previous attempts to correct your criminality.  Such

2  attempts include county jail.  There's some question

3  about the probation (inaudible).  An unstable social

4  history and prior criminality which includes

5  convictions for DUI for which you were placed on

6  probation and prior to the end of that probationary

7  period, you were convicted of reckless driving.  You

8  had a problem with alcohol and also using cocaine

9  prior to the Life offense.  Institutional behavior.

10  You've programmed in a limited manner while

11  incarcerated.  You have failed to prove that you have

12  a marketable skill that can be put to use upon

13  release.  You have failed to prove that you have also

14  improved yourself educationally.  And you have not

15  sufficiently participated in beneficial self-help and

16  therapy programs.  You've failed to demonstrate

17  evidence of positive change.  Misconduct while

18  incarcerated includes two CDC-115's.  The last one was

19  on February 3rd of '95 for fighting.  Psychiatric

20  factors.  The psychological report dated 1/31/92

21  authored by Dr. A. M. Charlens, C-h-a-r-l-e-n-s, is

22  unfavorable.  In that report, Dr. Charlens says "there

23  is present within this Inmate unresolved anger.  He

24  denies experiences of abuse or molestation as a child.

25  He further denies having had homosexual experiences.

26  He has not, as yet, (inaudible) his gaze inward with

27  **RONALD MAUZEY    C-61868    DECISION PAGE 2    (2/20/96)**

55

1    depth and intensity in an effort to understand the

2    source of the homicidal rage." And that takes us to

3    the psychological report that was prepared for this

4    hearing, dated 11/15/95, authored by Dr. Falkenstein.

5    And Dr. Falkenstein has failed to cover the problems

6    that were raised in Dr. Charlens report. And it was a

7    pretty superficial report. And that's no fault of

8    yours. The panel makes the following findings. That

9    you need therapy in order to face, discuss, understand

10   and cope with stress in (inaudible) killing. Until

11   progress is made, he continues to be unpredictable and

12   a threat to others. Therapy in a controlled setting

13   is needed, but motivation and amenability are

14   questionable. Your gains are recent and you must

15   demonstrate an ability to maintain gains over an

16   extended period of time. In view of your recent

17   negative behavior and lack of program participation,

18   there is no indication that you'd behave differently

19   if paroled. Nevertheless, you should be commended for

20   being a good worker, in fact, a critical worker, as

21   pointed out by your attorney. However, this positive

22   aspect of your behavior does not outweigh the factors

23   of unsuitability. We did deny you parole for two

24   years, Mr. Mauzey. The hearing finds it's not

25   reasonable to expect that parole would be granted at a

26   hearing during the following two years. The specific

27   **RONALD MAUZEY   C-61868   DECISION PAGE 3   (2/20/96)**

56

1    reasons for this finding are as follows.  One, you
2    committed the offense.  Specifically, you conspired to
3    have your wife's boyfriend killed, later went to the
4    Victim's home and shot him, seriously wounding him.
5    The second reason, a longer period of time is required
6    to evaluate your suitability in view of your history
7    of criminality and misconduct, including convictions
8    for DUI and reckless driving, using alcohol to excess
9    and cocaine.  The third reason is that you recently
10   committed a serious disciplinary violation on 2/3/95
11   and that was for fighting.  The fourth reason is that
12   you've not gone through the necessary programming
13   which is essential to your adjustment and you need
14   additional time to gain such programming.  Whether you
15   believe it or not, you need to really participate in
16   substance abuse programming.  It's important that you
17   get the kind of therapy to deal with your lack of
18   insight.  You need a lot of (inaudible), more than
19   you've demonstrated (inaudible) here today.  The panel
20   recommends that you become disciplinary free, that you
21   upgrade vocationally and educationally, if you can't
22   produce documents that prove that you have the skills
23   that you say you have and also the education level
24   that you claim you have.  And we also recommend that
25   you participate in self-help and therapy programming.
26   That's the official decision.  You know, you're a good
27   **RONALD MAUZEY    C-61868    DECISION PAGE 4    (2/20/96)**

57

```
 1    worker.  You've been a good worker.  And (inaudible)
 2    two 115's during that period of time is (inaudible).
 3    What concerns us is the recency of the last one for
 4    fighting.  That's a serious 115.  And you need to do
 5    some programming, AA or NA or whatever kind of
 6    substance abuse program is available.  And you
 7    (inaudible) need to do.  And seriously.  Because
 8    people just don't go out there and get convicted of
 9    drunk driving and reckless driving, or reduced to
10    reckless, (inaudible) DUI.  And another you were
11    drinking and you ran your wife off the road.  It shows
12    that you have a problem.  And there's evidence of it.
13    So you need to work on that.  The last thing we had
14    mentioned for you to do is to get some support on the
15    outside and get letters from people who are going to
16    offer you a job or they have a place for you to live
17    or they're going to help you out financially.  Make
18    sure it's documented.  Get them to write letters.  It
19    doesn't take a lot for them to write.  Okay?  You have
20    some work to do.  And hopefully, it's a different
21    story for the next time you come.  One of the things
22    that you're going to have to deal with, you weren't
23    very credible here today.  And it's going to be a
24    problem.  Whether or not you've been consistent all
25    these years means nothing to us if we don't believe
26    you.  It's going to hurt you.  And all I'm going to
27    RONALD MAUZEY    C-61868    DECISION PAGE 5    (2/20/96)
```

58

1    say is if you didn't tell us the truth today, think

2    about it and make sure you tell the truth (inaudible).

3    Go ahead.

4         **INMATE MAUZEY:**    I was just going to say I have

5    (inaudible)

6         **PRESIDING COMMISSIONER GUADERRAMA:**    Okay.

7    That ends the hearing at five minutes to 12:00.    We

8    want to wish you well and we'll see you in two years.

9                            --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED TWO YEARS**

26    **EFFECTIVE DATE OF THIS DECISION** _____ MAY 1 4 1996

27    **RONALD MAUZEY    C-61868    DECISION PAGE 6    (2/20/96)**

E X H I B I T

9

Subsequent Parole Consideration Hearing Transcript
February 25, 1998

```
 1              CALIFORNIA BOARD OF PRISON TERMS

 2                    D E C I S I O N

 3         PRESIDING COMMISSIONER GIAQUINTO:  All right,

 4    we're back on Record at 12:55, and we denied you

 5    parole.  The Panel reviewed all the information

 6    received from the public and relied on the following

 7    circumstances, in concluding that the prisoner is not

 8    suitable for parole, and would pose an unreasonable

 9    risk of danger to society, and a threat to public

10    safety, if released from prison.  The offense was

11    carried out in a cruel manner and a callous manner,

12    with a disregard for the suffering of another, and a

13    dispassionate and calculated manner.  These

14    conclusions are drawn from the Statement of Facts,

15    wherein, the prisoner was angered by the victim,

16    because the victim had been associating with the

17    prisoner's wife.  And as a result of that, the

18    prisoner armed himself with a rifle, and went to the

19    victim's address, and shot the victim.  And

20    ultimately, he also conspired or solicited others to

21    kill the victim.  The prisoner had been previously

22    arrested for driving under the influence and reckless

23    driving.  And he had used cocaine and alcohol.  The

24    prisoner has not sufficiently participated in

25    beneficial self-help and therapy programming.  The

26    most recent psychiatric report indicates that under

27    RONALD MAUZEY    C-61868    DECISION PAGE 1    2/25/98
```

46

1    Axis II, the prisoner has a possible personality

2    disorder, not otherwise specified.  The Panel makes

3    the following findings:  That therapy and a controlled

4    setting is needed, but motivation and amenability are

5    questionable.  This denial is for two years.  The

6    Panel finds that it's not reasonable to expect that

7    parole would be granted during the following two

8    years, for the following reasons:  Number one is the

9    life offense, which was carried out in a callous

10   manner.  Specifically, the prisoner attempted to kill

11   another human being and he, also, attempted to solicit

12   others to kill that person.  As a result, a longer

13   period of observation and evaluation is required

14   before the Board should set a parole date.  The

15   prisoner has committed several serious disciplinary

16   violations, including refusing to show skin on

17   2/13/97, and on 7/24/97, introducing contraband, in

18   this case, instructions on how to manufacture

19   methamphetamine, into a facility.  The prisoner has

20   not completed necessary programming, which is

21   essential to his adjustment and needs additional time

22   to gain such programming.  Specifically, he has not

23   participated in substance abuse therapy or other

24   therapy that might help him to gather further insight,

25   and delve into the causative factors related to the

26   life offense, and his use of illegal substances, and

27   **RONALD MAUZEY    C-61868    DECISION PAGE 2    2/25/98**

47

1    his misconduct since he's been incarcerated.  The

2    Panel recommends that the prisoner become

3    disciplinary-free, and participate in available self-

4    help and therapy programming.  And I hope the issues

5    are very clear to you on why you were denied today.

6    Okay?  Good luck to you.  That ends this hearing at

7    12:58.  Yeah, just for the Record, we're also going to

8    ask that the BPT conduct an investigation, regarding

9    the transcripts of the tapes of solicitation for the

10   murder from the Riverside District Attorney's Office.

11   Okay, good luck to you.

12                           --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION_____APR 1 4 1998_____

27   RONALD MAUZEY    C-61868    DECISION PAGE 3    2/25/98

E X H I B I T

10

Subsequent Parole Consideration Hearing Transcript
October 31, 2000

1       CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3       PRESIDING COMMISSIONER ANGELE:   This is the

4    matter of Ronald Mauzey.  Mr. Mauzey, the Panel

5    reviewed all information received from the public

6    and relied on the following circumstances in

7    concluding that the prisoner is not suitable for

8    parole and would pose an unreasonable risk of

9    danger to society or a threat to public safety if

10   released from prison.  The offense was carried out

11   in a violent manner.  The offense was carried out

12   in a calculated manner.  The offense was carried

13   out in a manner which demonstrates a disregard for

14   human life. These conclusions are drawn from the

15   Statement of Fact wherein, in July of 1981, the

16   inmate shot the victim in an attempt to kill him

17   and, between August and December of 1981, he

18   solicited the murder of the same individual.  The

19   prisoner had an unstable social history.  We're

20   looking at the three failed marriages.  Also, has

21   been on probation twice, these are for vehicle

22   related crimes, I did indicate they are vehicle

23   related not penal code related.  The prisoner has

24   programmed in a limited manner while incarcerated,

25   has not sufficiently participated in beneficial

26   self-help or therapy programming, and failed to

27   RONALD MAUZEY   C-61868  DECISION PAGE 1   10/31/00

62

1    2000, for his involvement in the Arts and

2    Corrections Music Program, and for his work

3    reports, which have been satisfactory.  However,

4    these positive aspects of his behavior do not

5    outweigh the factors of unsuitability.  The denial

6    is going to be for a period of two years.  In a

7    separate decision, the Hearing Panel finds that it

8    is not reasonable to expect that parole would be

9    granted at a hearing during the following two

10   years.  The specific reasons for the finding are as

11   follows:  The offense was carried out in a

12   calculated manner.  The offense was carried out in

13   a violent manner.  The offense was carried out in a

14   manner which demonstrates a disregard for human

15   life.  These conclusions, once again, are drawn

16   from the Statement of Fact wherein the inmate, in

17   July of 1981, shot the victim and attempted to kill

18   him.  And between the months of August and December

19   of 1981, did solicit the murder of the victim.  The

20   prisoner has a history of unstable relations with

21   others, these are three failed marriages.  The

22   prisoner recently committed a serious disciplinary

23   violation.  Once again, these will include, since

24   his last hearing, which was February of 1998, he

25   had three 128s, all three for grooming which are

26   not the serious violations, but he did have two

27   RONALD MAUZEY   C-61868  DECISION PAGE 3  10/31/00

63

1    115s since February 1998, one dealing with grooming

2    and the other, on March the 7th, refusing to

3    comply. Once again, indicating a disregard,

4    disrespect for authority. The Panel makes the

5    following recommendations, that the prisoner become

6    and remain disciplinary-free, that if available to

7    participate in self-help and therapy programming.

8    And once again, this will be for a period of two

9    years. Anything you'd like to add, Mr. Harmon?

10        **DEPUTY COMMISSIONER HARMON:** Nothing, thank

11   you.

12        **PRESIDING COMMISSIONER ANGELE:** Good luck to

13   you Mr. Mauzey. I do indicate that we did also

14   take into consideration some confidential material.

15   At this point, once again, it's for a period of two

16   years. We do wish you luck. Like I said, that

17   concludes the hearing. The time is approximately

18   11:15.

19                        --o0o--

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION____NOV 2 2 2000_____

27   RONALD MAUZEY    C-61868   DECISION PAGE 4   10/31/00

E X H I B I T

11

Subsequent Parole Consideration Hearing Transcript
September 24, 2002

47

1            **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3        **PRESIDING COMMISSIONER MUNOZ:**  All right.

4    It's 2:15 p.m. and the parole consideration

5    hearing for inmate Mauzey has resumed with all

6    parties having returned to the hearing room.  And

7    Mr. Mauzey, this Panel has decided on a one-year

8    denial in your case.  We reviewed all information

9    received from the public and relied on the

10   following circumstances in concluding that the

11   prisoner is not suitable for parole and that his

12   release would pose an unreasonable risk of danger

13   to society if he were to be released at this time.

14   And we did not, we decided during our

15   deliberations not to even consult that letter that

16   we referred to during the hearing in the Central

17   File.  We acknowledge it's there, that's about it.

18        **ATTORNEY COTTON:**  Okay.

19        **PRESIDING COMMISSIONER MUNOZ:**  We're not

20   taking that one under consideration.

21        **ATTORNEY COTTON:**  Thank you.

22        **PRESIDING COMMISSIONER MUNOZ:**  The offense

23   involved was carried out in a callous manner that

24   required some planning.  It demonstrated a

25   disregard for human suffering.  The motive for

26   this crime was, in our view, trivial in relation

27   **RONALD MAUZEY  C-61868    DECISION PAGE 1    9/24/02**

48

 1    to the offense.  These conclusions are drawn from

 2    the Statement of Facts wherein the prisoner

 3    entered into a plan to have victim Paullin killed,

 4    initially contacting a Mr. Carranza, and then

 5    Mr. Carranza facilitating contacting an undercover

 6    officer, in an attempt to kill his wife's lover,

 7    an individual who the inmate had shot a few months

 8    prior.  In regards to the inmate's previous

 9    record, he does have a history of unstable

10    relationships with others referring to the

11    marriage to his first wife or -- Well, actually

12    I'm not sure this is his first wife, but to Elke,

13    which according to some of the reports we've read

14    including the probation officer's report, involved

15    some domestic violence.  He has failed to profit

16    from society's previous attempts to correct his

17    criminality.  That's in reference to the probation

18    as a result of two misdemeanor arrests; that's in

19    reference to the driving under the influence and

20    the reckless driving.  Institutional behavior, the

21    inmate has programmed in a limited manner while

22    incarcerated.  He has failed to obtain a new

23    vocation while incarcerated and has not

24    sufficiently participated in beneficial self-help

25    and/or therapy programming.  The psychological

26    evaluation is for the most part a good evaluation.

27    **RONALD MAUZEY  C-61868    DECISION PAGE 2    9/24/02**

49

1   The inmate's parole plans, although appearing to

2   be viable, I will note that we have no current

3   documentation in support of those plans, although

4   we don't doubt that that support does exist, we

5   just need to see some documentation.  I hope

6   you'll have that for your next parole

7   consideration hearing.  We note that the District

8   Attorney from the County of Riverside is opposed

9   to parole suitability.  We make the following

10  findings.  That the prisoner needs to participate

11  in any and all self-help and therapy programming

12  that may become available in order to face,

13  discuss, understand and cope with stress in a non-

14  destructive manner.  Until progress is made, the

15  prisoner continues to be unpredictable and a

16  threat to others.  The inmate should be commended

17  for his participation in some self-help

18  programming, that's a reference to the Destino

19  course, D-E-S-T-I-N-O, the course in Spanish.

20  However this positive aspect of his behavior does

21  not outweigh the factors of unsuitability.  Again,

22  this is a one-year denial, and that was in spite

23  of the 115 that you were cited for since your last

24  hearing.  But we do expect you to come back in a

25  year without any disciplinaries, 115s or 128(a)s

26  in your packet.  We want you, as I indicated, to

27  **RONALD MAUZEY  C-61868    DECISION PAGE 3    9/24/02**

50

1    participate in anything, any self-help and/or

2    therapy programming that may become available.  We

3    realize that sometimes those kind of things are

4    not available.  And we would also want you to

5    consider self-study, it's up to you.  You may

6    consider reading self-help or motivational books

7    in your cell and maintain a list of those books

8    and bring that list to your next parole

9    consideration hearing.  Mr. Lehman, any comments

10   you wish to make?

11       **DEPUTY COMMISSIONER LEHMAN:**  I have nothing

12   further.  Good luck, sir.

13       **PRESIDING COMMISSIONER MUNOZ:**  Yeah, all

14   right.

15       **ATTORNEY COTTON:**  Could I make one request.

16   Since his last psychological exam was 1999, so we

17   don't have a problem in a year, I'm wondering if

18   the Board could request another psychological

19   evaluation.

20       **PRESIDING COMMISSIONER MUNOZ:**  If that's

21   your request, Ma'am, we'll certainly order one.

22       **ATTORNEY COTTON:**  Yes.  I'd appreciate that.

23       **PRESIDING COMMISSIONER MUNOZ:**  Okay.

24       **ATTORNEY COTTON:**  Thank you.

25       **PRESIDING COMMISSIONER MUNOZ:**  All right.

26   Thank you.  Thank you for being here today.  It's

27   **RONALD MAUZEY  C-61868   DECISION PAGE 4   9/24/02**

51

1    20 minutes after two p.m. and that concludes the

2    hearing.

3                          --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED ONE YEAR**

26    **EFFECTIVE DATE OF THIS DECISION** _____ OCT 1 8 2002 _____

27    **RONALD MAUZEY   C-61868   DECISION PAGE 5   9/24/02**

E X H I B I T

12

Subsequent Parole Consideration Hearing Transcript
January 9, 2004

1   **CALIFORNIA BOARD OF PRISON TERMS**

2   **D E C I S I O N**

3   **DEPUTY COMMISSIONER COLDREN:**  We're now on

4   record, Sir.

5   **PRESIDING COMMISSIONER RISEN:**  Okay,

6   everyone who was previously involved in the

7   hearing has returned.  The time is 11:05 a.m.  The

8   Panel reviewed all information received from the

9   public and relied on the following circumstances

10  in concluding that the prisoner is not suitable

11  for parole and would pose an unreasonable risk of

12  danger to society or a threat to public safety if

13  released from prison.  The offense was carried out

14  in an especially violent and brutal manner.  The

15  offense was carried out in a manner which

16  demonstrates an exceptionally callous disregard

17  for human suffering and life.  And the motive for

18  the crime is inexplicable and very trivial in

19  relation to the offense.  These conclusions are

20  drawn from the Statement of Facts wherein the

21  prisoner in July of 1981, went to the victim's

22  house, where he kicked the door down.  When the

23  victim arrived at the door he was shot twice with

24  a rifle by the prisoner, causing severe injury and

25  resulting in numerous operations after the

26  shooting by the victim.  While the prisoner was

27  **RONALD MAUZEY   C-61868   DECISION PAGE 1   1/9/04**

1   out on bail for the crime, he solicited and then
2   conspired with others to murder the victim in the
3   previous assault.  The prisoner has programmed in
4   a limited manner while incarcerated.  He has not
5   sufficiently participated in beneficial self-help
6   as previously recommended by this Board, by his
7   counselors and his psychiatrists.  The prisoner
8   has one 115 during this period, it occurred on
9   October the 6th, 2002, that was just after the
10  last Board hearing, it was for refusing to move.
11  And interestingly just prior to the last Board
12  hearing in June of 2002, he received a 115 for
13  refusal to provide a required specimen.  The
14  psychological report dated 9/26/2003, authored by
15  Dee, first name, D-E-E, last name Shafer,
16  S-H-A-F-E-R, Ph.D., Staff Psychologist at CTF, is
17  not totally supportive of release.  She states on
18  page second to last, if released to the community,
19  his violence potential is somewhat higher than the
20  average citizen in the community, due to his
21  history of violence and history of involvement
22  with alcohol and drugs.  She goes on to say,
23  although he denies having an alcohol or drug
24  problem and is resistant to attending Alcoholics
25  Anonymous, it would be reasonable to monitor his
26  drug and alcohol consumption through urine testing
27  **RONALD MAUZEY   C-61868   DECISION PAGE 2   1/9/04**

1   on a random basis if he were granted parole.

2   Under parole plans, the prisoner lacks realistic

3   parole plans.  He has no written confirmation of a

4   residence or a job offer.  The hearing Panel notes

5   that in response to the 3042 Notices, the District

6   Attorney's Office of Riverside County participated

7   in the hearing by videoconference, and was opposed

8   to a parole of the prisoner.  We also received a

9   letter from the victim in this case who was

10  opposed to parole.  The Panel makes the following

11  findings:  the prisoner needs to participate in

12  self-help, in order to face, discuss, understand

13  and cope with stress in a non-destructive manner.

14  Until progress is made, the prisoner continues to

15  be unpredictable and a threat to others.   The

16  prisoner should be commended for taking a video

17  course in Spanish, and he also took three music

18  courses in the self-study.  However, these

19  positive aspects of his behavior do not outweigh

20  the factors of unsuitability.  In a separate

21  decision, the hearing Panel finds that it is not

22  reasonable to expect that parole would be granted

23  at a hearing during the following two years.  The

24  specific reasons for these findings are as

25  follows:  the prisoner committed the offense in an

26  especially violent manner.  The offense was

27  **RONALD MAUZEY   C-61868   DECISION PAGE 3   1/9/04**

```
 1    carried out in a manner which demonstrates an
 2    exceptionally callous disregard for human
 3    suffering and life.  Specifically, the prisoner,
 4    in July of 1981, went to the door of the victim's
 5    home, he kicked it down, then became involved in
 6    an altercation and subsequently shot the victim
 7    twice with a rifle, causing the victim severe
 8    injury.  While the prisoner was out on bail, he
 9    solicited and then conspired with others to murder
10    the victim that he had previously shot.  Also the
11    prisoner committed a disciplinary violation during
12    this period.  On June 6th, correction, on October
13    the 6th, 2002, he received a 115 for refusing to
14    move.  A recent psychiatric and psychological
15    report dated 9/26 of 2003, authored by Dee Shafer,
16    S-H-A-F-E-R, indicates a need for a longer period
17    of observation and evaluation.  Also, the prisoner
18    has not completed the necessary programming which
19    is essential to his adjustment.  He needs
20    additional time to gain such programming.  He's
21    failed to sufficiently participate in self-help.
22    Therefore, a longer period of observation and
23    evaluation of the prisoner is required before the
24    Board should find that the prisoner is suitable
25    for parole.  The Panel requests that he remain
26    disciplinary-free, and participate in self-help,
27    RONALD MAUZEY   C-61868   DECISION PAGE 4   1/9/04
```

69

1    if available.  That's the conclusion of the

2    reading of the decision.  Any comments?

3         **COMMISSIONER DALY:**  No, I think you should

4    do like I suggested as far as your self-help.  Go

5    ahead and do up a resume of all of the books that

6    you've read and kind of a summary of what you

7    learned from each one of the books, if you're not

8    going to participate in the formal self-help.  And

9    try to have that to present so it, you know, we'll

10   have something to hand the Board as to what you've

11   done.  I just wish you good luck.

12        **INMATE MAUZEY:**  Could you be more specific

13   as to the self-help, it's not available.  You tell

14   me to take self-help, it's not available, it's

15   kind of a Catch-22.

16        **PRESIDING COMMISSIONER RISEN:**  I think she

17   just answered your question a moment ago.

18        **INMATE MAUZEY:**  Well that's not structured

19   self-help.

20        **PRESIDING COMMISSIONER RISEN:**  It's not

21   what?

22        **INMATE MAUZEY:**  Structured self-help.

23        **PRESIDING COMMISSIONER RISEN:**  We say that

24   there's instructor-type self-help.

25        **ATTORNEY TARDIFF:**  No structured.  He's

26   asking for the -- I do believe there are some

27   **RONALD MAUZEY   C-61868   DECISION PAGE 5   1/9/04**

1   self-help programs available, I just don't know if

2   he knows about them.

3        **PRESIDING COMMISSIONER RISEN:**  I know other

4   people come in and they have taken them.

5        **ATTORNEY TARDIFF:**  Right.

6        **COMMISSIONER DALY:**  AA is also considered a

7   self-help.

8        **INMATE MAUZEY:**  So it's the Board's position

9   that I need to become a Christian before I can be

10  found suitable for parole.

11       **PRESIDING COMMISSIONER RISEN:**  No, that's

12  not the Board's position and you know that.

13       **INMATE MAUZEY:**  That's AA or NA.

14       **PRESIDING COMMISSIONER RISEN:**  That

15  terminates the hearing.  The time is 11:10.

16       **INMATE MAUZEY:**  Can I ask how long the

17  denial was?

18       **PRESIDING COMMISSIONER RISEN:**  Two years.

19  Do you have a copy of --

20       **ATTORNEY TARDIFF:**  No, I don't have it yet.

21                          --o0o—

22

23

24

25  **PAROLE DENIED TWO YEARS**

26  **FINAL DATE OF DECISION**_____  APR - 8 2004

27  **RONALD MAUZEY   C-61868   DECISION PAGE 6   1/9/04**

E X H I B I T

13

Letter of Support
November 28, 2003

November 28, 2003

Hearing Panel
Board of Prison Terms
State of California

re:  Letter of Support, R. K. Mauzey, C-61868

Gentlemen,

     This letter is to inform you that I will provide parole
assistance for my son, R. K. Mauzey, C-61868.

     I will provide shelter for my son in one of the two residences
I own in Riverside, California, or I will provide the money for
an apartment.

     I will provide the funds for transportation or will provide
a vehicle.

     I will also provide any and all financial assistance necessary
for my son to make a successful transition from inmate to citizen.

     This letter shall remain in force until written notification
of recension is proffered.

     It is cruel of the Board of Prison Terms to raise the
expectation of my son's release by requiring me to write this
same letter every one, two, or three years.

     Your attention to this matter will be appreciated.  If you
have any question, please advise.

Sincerely,

*Ruth I. Mauzey*

R. I. Mauzey

## DECLARATION OF SERVICES

I, R. K. Mauzey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-326U, CTF-North Facility, Soledad, CA 93960-0705; I served the attached document entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

On the persons/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdraw form for appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as followed:

**Superior Court of California**
**County of Riverside**
**4050 Main Street**
**Riverside, CA 92501-3703**


**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**


There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 11th Day of February, 2007, at the Correctional Training Facility in Soledad, California.

R. K. Mauzey
R. K. Mauzey

# A T T A C H M E N T

## TWO

Order Denying Petition for Writ of Habeas Corpus
Superior Court of Riverside County

1

2

3

4

5

SUPERIOR COURT OF CALIFORNIA

COUNTY OF RIVERSIDE

**F I L E D**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAR 13 2007

6

7

8

9

10

IN THE MATTER OF THE APPLICATION OF:

  R.K. MAUZEY

FOR A WRIT OF HABEAS CORPUS.

} CASE NO.  RIC466177

}

} ORDER RE: PETITION FOR WRIT OF

} HABEAS CORPUS PURSUANT

11

12

13

14

15

16

17

Pursuant to California Rule of Court 4.551, the petition is denied due to the failure of the petition

to state a prima facie case supporting petitioner's release. The record before the Board of Prison

Terms contained some evidence in support of the Board's findings

18

19

20

21

Date: _03·13·07_

Michele D. Levine,
Judge of the Superior Court

22

23

24

25

26

27

28

IMAGED

1

## DECLARATION OF SERVICE

I, R. K. Mauzey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-326U, Soledad, CA 93960-0705; I served the attached document entitled:

### PETITION FOR WRIT OF HABEAS CORPUS

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**State of California**
**Court of Appeals**
**Fourth Appellate District**
**3389 12th Street**
**Riverside, CA 92501**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 13th day of May, 2007, at the Correctional Training Facility in Soledad, California.

R.K. Mauzey
R. K. Mauzey

Court of Appeal, Fourth Appellate District, Div. 2 - No. E043165
**S153810**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RONALD KEITH MAUZEY on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

AUG **1 5** 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

R. K. Mauzey, C-61868
P. O. Box 705, WA-326U
Soledad, CA 93960-0705

# S153810

RECEIVED

JUN 2 2 2007

CLERK SUPREME COURT

**IN THE SUPREME COURT OF CALIFORNIA**

SUPREME COURT
FILED
JUN 2 2 2007
Frederick K. Ohlrich Clerk

Deputy

| | |
|---|---|
| In the matter of ) | **Case No.** |
| ) | |
| R. K. MAUZEY ) | **REQUEST FOR REVIEW** |
| ) | |
| On Habeas Corpus. ) | (Fourth App. Ct. No. E043165) |
| ) | (Riverside Sup. Ct. No. RIC 466177) |

TO THE HONORABLE CHIEF JUSTICE OF THE CALIFORNIA SUPREME
COURT AND THE ASSOCIATE JUSTICES OF THE COURT:

R. K. Mauzey, petitioner herein, respectfully requests
review following the decision of the Court of Appeal, Fourth
Appellate District, filed on June 14, 2007 and received on June
19, 2007, denying his petition for writ of habeas corpus. A
copy of the denial from the court of appeal is attached hereto
as Exhibit A.

1

I

## QUESTIONS FOR REVIEW

This case presents the following questions for review:

1. **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner's offense was particularly egregious?**

2. **Is it a due process violation for the Board to deny parole without supporting evidence that the offense contained elements or aggravating facts beyond the minimum necessary to sustain a conviction for conspiracy to commit first degree murder?**

3. **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner currently poses an unreasonable risk of danger or poses a threat to public safety?**

4. **Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?**

II

## NECESSITY FOR REVIEW

This case presents questions of law of first impression that are of statewide importance.

This court's decision in *In re Rosenkrantz* (2002) 29 Cal.4th 616, holds that a Board of Parole Hearings decision violates due process and must be reversed if there is not "some evidence" in the record to support it. This court's decision in *In re Dannenburg* (2005) 34 Cal.4th 1061, holds that although parole may in some cases be denied on the basis of the crime, the Board must cite some evidence to support a finding that there were aggravating facts beyond the minimum necessary to sustain a conviction of first degree murder. The Board must also cite some evidence that indicates a parolee's release unreasonably endangers public safety.

2

The Board of Parole Hearings [hereafter Board] has totally
ignored the mandates of this Court and the laws and regulations
that govern it.  The Courts in this state have allowed this
abrogation of the law to go unchallenged.  Petitioner would ask
"What good are the California Supreme Court decisions if the
courts in this state ignore or refuse to abide or enforce the
precedents?"

### III

### JURISDICTION OF THE COURT

Petitioner has exhausted all lower court remedies.  Thus,
petitioner having been placed in jeopardy and danger of
irreparable harm, this court has jurisdiction.  (*Employees
Association v. City of Glendale,* 15 Cal.3d 328, 342 (1975).)

There is no issue of "comity" since both state and federal
due process standards are offended.  This is particularly true
since the California standard of due process is more stringently
protective of the individual.  (*People v. Ramirez,* 25 Cal.3d 260
(1979).)

### IV

### HISTORY OF THE CASE

Petitioner was convicted of conspiracy to commit first
degree murder on December 1, 1982 and was sentenced to a term of
25 years-to-life on February 8, 1983.  On May 4, 2006,
petitioner's fifth parole suitability hearing was conducted and
he was found unsuitable and denied parole for a period of two
years.  On February 11, 2007, petitioner filed a petition for
Writ of Habeas Corpus in the Superior Court for the County of

3

Riverside.  On March 13, 2007, the petition was denied.  On May 13, 2007, petitioner filed a petition for Writ of Habeas Corpus in the Court of Appeal, Fourth Appellate District.  On June 19, 2007 petitioner received the denial from the Fourth Appellate District.

## V

### ARGUMENT

**1.   Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner's offense was particularly egregious?**

The Court's decision in *Rosenkrantz* holds that a Board's parole decision violates due process and must be reversed if there is not "some evidence" in the record to support it.  Also, although parole may in some cases be denied on the basis of the crime, there must be evidence to support a finding that the crime was particularly egregious.  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 683.)

In petitioner's case, as in all Boards decisions, the commitment offense is the evidence relied on by the Board to support a finding that the crime was particularly egregious. That is to say in the eyes of the Board all indeterminate sentenced prisoner's committed particularly egregious crimes. Petitioner would submit that all indeterminate offenses could be considered egregious, yet not all of them could be classified as "particularly" so.  But that is precisely what the Board has done.  Petitioner would contend that if all indeterminate offenses are particularly egregious, then none are particularly egregious.

4

This Court has held "[S]ole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date 'shall normally be set' under 'uniform term' principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, 'for example[,] where no circumstances of the offense reasonable could be considered more aggravated or violent that the minimum necessary to sustain a conviction for that offense.' (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.) Quoting *Ramirez, supra,* 94 Cal.App.4th 549, 570, we suggested that, in order to prevent that parole authority's case-by-case suitability determination from swallowing the rule that parole should 'normally' be granted, an offense must be '*particularly egregious*' to justify the denial of parole. (*Rosenkrantz, supra,* at 683.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095, italics added.)

The Board may deny parole if a defendant committed his crime "in an *especially* heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1), italics added.) The measure of atrociousness is not general notions of common decency or society norms, for by that yardstick all murders are atrocious. (See *In re Scott,* (2004) 119 Cal.4th 871, 891 ["'[A]ll second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others'"].) Rather, the inquiry is whether among murders the

5

one committed by petitioner was particularly heinous, atrocious or cruel. (*In re Ramirez, supra,* 94 Cal.App.4th at 570, disapproved on another point by *In re Dannenberg, supra,* 34 Cal.4th at 1082-1083, 1100.) By that measure, petitioner's crime was more commonplace than egregious.

**2. Is it a due process violation for the Board to deny parole without supporting evidence that the offense contained elements or aggravating facts beyond the minimum necessary to sustain a conviction for conspiracy to commit first degree murder?**

This Court has stated "When the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense.* (*In re Rosenkrantz, supra,* 29 Cal.4th 1061, 1095, italics in original.)

It is therefore axiomatic that the absence of such a citing would rise to the level of a due process violation.    In petitioner's case, and in almost every other parole consideration hearing, the Board merely recites the circumstances of the commitment offence to satisfy the aggravating facts requirement.    That the Board is allowed to propagate such a miscarriage of justice is beyond rational explanation.    Petitioner would contend that at some point the Board, or the Courts, will have to clarify this constitutional vague requirement by establishing exactly what constitutes aggravating facts.    Until then surely the Board must be required to pay more than lip service to this Court's holding in *Dannenberg.*

6

3.  **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner currently poses an unreasonable risk of danger or poses a threat to public safety?**

This court has held that "[T]he Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See § 3041, subd. (b); CCR § 2402.) A prisoner may be found unsuitable for parole so long as "some evidence," which may be as little as a "modicum," supports the Board's decision. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676-677; *In re Smith*, (2003) 114 Cal.App.4th 343, 361; *In re McClendon* (2003) 113 Cal.App.4th 315, 321.)

However, as the *Lee* court held, "The test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonable endangers public safety.* (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner 'will pose an unreasonable risk of danger to society if released from prison']; see *In re Scott* (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicates that the offender will present an unreasonable public safety risk if released from prison']); ... Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*In re Lee*, (2006) 49 Cal.Rptr.3d 931, 936-937, italics in original.) Thus a finding that a particular unsuitability factor applies to a prisoner does not automatically establish

7

that he poses an unreasonable risk to public safety if released
on parole.

Therefore, absent a rational indication that the
unsuitability factors proves or demonstrates that a prisoner is
a threat to public safety the unsuitability factors fail to meet
the "modicum" requirement of the "some evidence" standard.

The Board illegally concludes that if an unsuitability
factor can be applied to a prisoner then this factor alone
establishes proof of an unreasonable risk to public safety if
he/she is released on parole.  This is not what the Legislature
intended when it enacted Penal Code section 3041 (a) and (b).

The record in this case establishes that petitioner does not
pose an unreasonable risk to public safety.  Any contrary
conclusion lacks any evidentiary support.

## 4.   Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?

In the circumstances of this case, the Board's continued
reliance upon the nature of petitioner's crime to deny him
parole in 2006 violates due process.

In finding petitioner unsuitable at his fifth parole
suitability hearing, the panel relied exclusively on an
unchanging factor: the commitment offense.  In *Biggs*, the Ninth
Circuit stated that the Board was "*initially* justified" in
finding Mr. Biggs unsuitable based on the circumstances of the
offense and his conduct prior to imprisonment.  The Ninth
Circuit added that "[a] continued reliance in the future on an
unchanging factor, the circumstances of the offense and conduct

8

prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." (*Biggs v. Turhune,* 334 F.3d 910, 917 (9th Cir. 2003).)

The Ninth Circuit Court of Appeals has articulated when the reliance on unchanging factors, i.e. the reliance on the commitment offense to deny parole, triggers a violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.  The Ninth Circuit held, "We note that in all the cases in which we have held that a parole Board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum numbers of years to which they have been sentenced at the time of the challenged parole denial by the Board.  *Biggs, Sass,* and here, the petitioners had not served the minimum numbers of years to which they had been sentenced at the time of the challenged parole denial by the Board.  *Biggs,* 334 F.3d at 912;  *Sass,* 461 F.3d 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." (*Irons v. Carey,* 479 F.3d 658 (9th Cir. 2007).)

This decision by the Ninth Circuit in *Irons* failed to consider that the State, in an effort to entice prisoners to behave well and participate in work, education or vocational

9

programs, has offered a reduction in the minimum term if the prisoner meets certain conditions. The Legislature established guidelines under which an inmate can receive a reduction in his term. Penal Code § 2931 allows for a four month term reduction for every eight months of good behavior and participation in an appropriate program. The Board has established that a life prisoner may earn four months of term reduction credits for each year of good behavior and program participation. These credits are to be applied after a parole release date has been established. (Cal. Code Regs., tit. 15, § 2401, subd. (a) and (b).)

Therefore, based on the above, an inmate with a first degree murder conviction who did not actually kill anyone, whether by the felony murder rule or a conspiracy, is entitled to a maximum term of 25 years once found suitable for parole. (Cal. Code Regs., tit. 15, § 2403, subd. (b).) If the prisoner has served the minimum term of 25 years when the release date is established, then the total time served on the sentence will be 25 years plus 8.25 years of earned credit for a total term served of 33.25 years. The State currently requires every life prisoner to serve a period on parole. The actual parole period differs based upon the law in effect at the time the crime was committed. In petitioner's case the parole period is five years. If the reduction credits are applied only against the base term then an inmate assessed a base term of 25 years, who has served 25 years, would have his term set at 16 years 9 months. What happens to the 8.25 years earned credit? The

10

State discards the credits.  The State's promise of a reduction in the minimum term for life prisoner who qualify becomes nothing more than a sham.  The Ninth Circuit's ruling in *Irons* allows the State to further this injustice.  The Board denies all life prisoners a parole date until they have reached or surpassed their minimum term and then requires the prisoner to forfeit all earned credits the Legislature has authorized by law for life prisoners to receive.  This is a gross miscarriage of justice and violates a prisoner's due process rights.

Because there is no reliable evidence supporting the conclusion that petitioner is unsuitable for parole, the Board's determination of unsuitability violated petitioner's due process rights.  (*Hill,* 472 U.S. at 455.)

Therefore, according to this Court, the Board must follow and apply the factors specified by statute and regulation in determining that the circumstances of the commitment offense were "particularly egregious" and cite aggravating facts that were beyond the minimum elements of the offense and support these determinations with "some evidence" in the record.  The Board must also cite "some evidence" that reliably and rationally indicates a prisoner's release would unreasonably endanger public safety.

A cursory review of the record in this case demonstrates that the Board's decision was unreasonable under the applicable "some evidence" rule.  The record simply does not contain *any* evidence that petitioner's conspiracy to commit first degree murder was *particularly* egregious.  Nor does the record contain

11

*any* evidence that petitioner is currently a threat to society. Given that both findings are required by California law, there is *zero* evidence

in the record to support the Board's decision.

### CONCLUSION

All murders represent the bases form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record establishes that petitioner does not pose an unreasonable risk of danger or poses a threat to public safety. Any contrary conclusion lacks any evidentiary support.

For the foregoing reasons, it is respectfully requested that this petition for review be granted in the interest of justice to address the important questions of law of a statewide importance.

DATE:   June 20, 2007                    Respectfully submitted,


                                         R. K. Mauzey
                                         R. K. Mauzey
                                         Petitioner, In Pro Per

12

E X H I B I T

A

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**



COURT OF APPEAL FOURTH DISTRICT

In re RONALD KEITH MAUZEY
on Habeas Corpus.

E043165

(Super.Ct.Nos. RIC466177 &
CR18817)

The County of Riverside

THE COURT

The petition for writ of habeas corpus is DENIED.

**HOLLENHORST**

Acting P.J.

cc:    See attached list

## DECLARATION OF SERVICE

I, R. K. Mauzey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-326U, Soledad, CA 93960-0705; I served the attached document entitled:

### REQUEST FOR REVIEW

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**California Supreme Court**
**350 McAllister Street**
**San Francisco, CA 94102**


**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**


There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 20th day of June, 2007, at the Correctional Training Facility in Soledad, California.

R. K. Mauzey
R. K. Mauzey

## DECLARATION OF SERVICE BY MAIL

I, Ronald K. Mauzey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, FD-16L, Soledad, CA 93960-0705; I served the attached document entitled:

## PETITION FOR WRIT OF HABEAS CORPUS

on the persons/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal form for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with the logging and mailing of inmate legal mail addressed as follows:

United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

State of California
Office of the Attorney General
Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 28th day of January, 2008, at the Correctional Training Facility in Soledad, California.

Ronald K. Mauzey
Ronald K. Mauzey